## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

**Chris Sevier, DE FACTO ATTORNEYS GENERAL, John Gunter, SPECIAL FORCES OF LIBERTY, Richard Penkoski, WARRIORS FOR CHRIST**

**Plaintiffs,**

**V.**

**Merrick Garland, IN HIS OFFICIAL CAPACITY OF THE UNITED STATES, Ron DeSantis, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF FLORIDA**

**Defendants.**

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF



FILED BY _____ D.C.

**JUL 2 0 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## ORIGINAL COMPLAINT

*What the ACLU started in Reno American Civil Liberties Union, 521 U.S. 844 (1997), we intend to finish and perfect. - De Facto Attorneys General*

*Understanding the Stop Social Media Censorship Act*
*https://www.youtube.com/watch?v=CCcOALXNteM*

*http://www.specialforcesofliberty.com/*

1. This is an action for declaratory and injunctive relief that challenges the sole surviving

provisions of the "Communications Decency Act of 1996", 47 U.S.C. § 230 et. seq.,[1] (hereinafter

referred to as "Section 230") for namely violating the Petition and Access Clause of the First

Amendment of the United States Constitution, as well as the Free Speech, Free Exercise and

Establishment Clauses.  The Plaintiffs attack this issue from a different angle than the Trump

---

[1] In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 with Section 230(c), intending to promote the growth and development of Internet platforms, as well as to protect against the transmission of obscene materials over the Internet to children. Section 230 is vague and not the least restrictive means to fulfill any interests asserted by the government.

Plaintiffs.[2] Congress, not Twitter, Facebook, or Youtube, made Section 230. If a litigant wants to have a court strike down one of Congress's laws, the proper party to sue in most cases is the chief enforcer of Congress's laws, the United States Attorney General. That is what the ACLU did in getting all of the other sections of the Communications Decency Act struck down in *Reno American Civil Liberties Union,* 521 U.S. 844 (1997). That is what the Plaintiffs have done here.

2. In view of a recent decision in *Netchoice, LLC et al., v. Moody et. al.*

4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) and in other cases, there are only two

intellectually honest outcomes that this Court can render. Option one: this Court could find that

"Congress...ma[d]e [a] law...abridging...the right [of the Plaintiffs] to petition the Government

for a redress of grievances" in violation of the First Amendment of the United States

Constitution, when it made Section 230. Option two, this Court could declare that Florida can,

should, or must enact a narrowly tailored law, like the amended version HB 33 (referred to

hereinafter as the Stop Social Media Censorship Act) by Sen. Gruters and Rep. Sabatini that was

painstakingly crafted to fall squarely within the state-law exemption, so that the Plaintiffs and

other Floridians, for the first time, can legitimately seek redress for their grievances against

social media websites [3] that acted in bad faith in inflicting personal injury on profile users

---

[2] See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021), *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021), and *Trump et al v. YouTube*, LLC, 1:21-cv-22445-KMM (S.D.F.L. 2021)
[3] For purposes of this complaint "social media websites" refer to Facebook, Twitter, Youtube." The amended version of HB 33 defines social media websites as follows:
"Social media website":

   1. Means an Internet website or application that enables users to communicate with each other by posting information, comments, messages, or images and that meets all of the following requirements:

   i. Is open to the public.

   ii. Has more than 75 million subscribers with personal user profiles.

   iii. From its inception, has not been specifically affiliated with any one religion or political party.

   iv. Provides a means for the website's users to report obscene materials and has in place procedures for evaluating those reports and removing obscene material; and

   v. Allows for subscribers to sign up for a personal user profile page or account where

through fraud, breach, and other deceptive trade practices. Social media websites injured the Plaintiffs by falsely marketing themselves as a place where the Plaintiffs were free to exchange their political and religious views. After inducing the Plaintiffs to create and invest heavily in their user profiles on social media webistes that marketed themselves as glorified digital bulletin boards that were neutral on religious and political expression, the social media websites arbitrarily shifted their standards and were no longer neutral towards religious and political speech, engaging in self-help reprisal actions. The social media websites changed the deal terms in bad faith after having reached critical mass and having successfully created a monopoly on the digital public square to the shock and awe of users like the Plaintiffs. The bad faith censorship in the wake of arbitrary shifting standards that were designed to elevate the religion of Secular Humanism over non-religion and other religions has economically and emotionally injured the Plaintiffs.[4] Social media websites have been permitted to get away with these consumer protection violations because of a Congressional action in making Section 230.

3. In determining the trajectory of the First Amendment of the United States Constitution, the public's interest would likely best be served if the Court goes with the second option presented. Accordingly, the Plaintiffs plead in the alternatively under FRCP 8(e)(2) and demand that if the Court finds that Section 230 does not violate the First Amendment because Congress included an escape hatch under subsection (e) subparagraph (3) (referred to as the state-law exemption), that the Court should:

---

beliefs and preferences can be expressed by the user.

2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

[4] In this case, the Plaintiffs seek a legal path so that social media websites that were never affiliated with a religious institution or political party from their inception will be forced to keep their promises to consumers to remain neutral on political and religious speech. Social media websites that have less than 75,000,000 subscribers or that made it clear upfront to consumers that they were affiliated with a specific religious organization or political party are not of concern to the Plaintiffs in this action.

(a) declare that the State of Florida should have enacted the amended version of HB 33 and not the comparatively disastrous SB7072 [5] that suffers from the Constitutional concerns described by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113);

(b) declare that if Florida or any other state were to enact the Stop Social Media Censorship Act that the statute would not be preempted under Section 230 and because it narrowly falls squarely within the state-law exemption under subsection (e) subparagraph (3) of Section 230;

(c) affirmatively order and direct Governor DeSantis to call a special session pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of Article VI of the United States Constitution to enact the Stop Social Media Censorship Act to cure constitutional defects of SB7072 in view of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs can finally have the actual ability to properly petition the courts of competent jurisdiction for redress against deceptive social media websites that defrauded and dehumanized them.

(d) declare that the Plaintiffs could bring a lawsuit under § 501.2041 against social media websites that have victimized them and that § 501.2041 would not be automatically preempted by Section 230, even though § 501.2041 is poorly written in comparison to the Stop Social Media Cenosrship Act.

## NATURE OF THE CASE

4. This case creates a binary that asks for a logically consistent outcome by the Judicial branch, who is tasked with the obligation to interpret Section 230, the Stop Social Media

---

[5] SB7072 is the bill enacted on May 24, 2021 by Governor DeSantis, which created §106.072, § 287.137, and § 501.204.

Censorship Act, and SB7072 in view of the doctrine of preemption created by the Supremacy

Clause and the First Amendment of the United States Constitution. The Plaintiffs need

responsiveness from the Court and the Governor because they are concerned about the statute of

limitations for the kinds of censorship they have experienced that have been detailed by some

media outlets in articles such as:

(a) *"Facebook Continues Censorship Of Warriors For Chris Page Pastor Says"* -
*Christian Post*

https://www.christianpost.com/news/facebook-continues-censorship-of-warriors-for-chris
t-page-pastor-says.html

(b) *Facebook Removes Christian Page 'Warriors for Christ'* - *Christian Headlines*
https://www.christianheadlines.com/blog/facebook-removes-christian-page-warriors-for-c
hrist.html

(c) *"Facebook shuts down Warriors for Christ page"* - *Geller Report*
https://gellerreport.com/2018/01/facebook-warriors-christ.html/

(d) *"Gay Activists Shut Down Christian Facebook Page"* - *Church Militant*
https://www.churchmilitant.com/news/article/gay-activists-succeed-in-getting-christian-fa
cebook-page-shut-down

(e) *"Facebook Yanks Warriors For Christ After Ignoring Death Threats To Pastor, Says
Angel In Armor Pic Violates Standards"* - *Conservative Firing Line*
https://conservativefiringline.com/facebook-yanks-warriors-christ-ignoring-death-threats-
pastor-says-angel-armor-pic-violates-standards/

(f) *"Facebook Censorship of Christians MUST STOP! Lawsuit underway!"* - *Counter
Culture Mom*
https://counterculturemom.com/facebook-censorship-of-christians-must-stop-lawsuit-und
erway/

(h) *"Youtube Censorship: 'Warriors for Christ' Channel Demonetized"* - *National File*
https://nationalfile.com/youtube-censorship-warriors-for-christ-channel-demonetized/

(i) *"LGBT Activists Target Pastor with Death Threats and Feces over a Facebook Emoji"*
- *CBN News*
https://www1.cbn.com/cbnnews/us/2017/july/pastor-sent-death-threats-feces-in-mail-for-
opposing-this-emoji-on-facebook

(j) *"Pastor who banned rainbow flag emoji from his Facebook page is forced to flee after
receiving death threats"* - *Christian Today*
https://www.christiantoday.com/article/pastor.who.banned.rainbow.flag.emoji.from.his.fa
cebook.page.is.forced.to.flee.after.receiving.death.threats/111157.htm

5. The ultimate question raised by this action is what is the best solution to the ongoing bi-partisan problem of social media censorship? Is it (a) "an executive order by the President?" or (b) "to have the judicial branch decree that social media websites are quasi-state actors for purposes of the First Amendment?" or (c) "the striking down Section 230 by judcial action under the petition and access clause or the total repeal of Section 230 by Congressional action?" or (d) "to do nothing, allowing the status quo of bad faith abuse to continue?",  or (e)  "to allow censored litigants to successfully bring a cause of action pursuant to a narrowly tailored state statute, like the Social Media Censorship Act, that will allow injured consumers to hold social media websites accountable for having engaged in self-evident unprotected harmful forms of speech to include: (1) breach of contract, (2) false advertising, (3) deceptive trade practices, (4) bad faith, (5) unfair dealing, (6) unjust enrichment, and (7) fraudulent inducement?" The Plaintiffs believe that it would be in the best interest of everyone if the Court resolved that the optimal solution to this problem is the fifth option - option (e). This is because already built into section 230 is the "state-law exemption" under subsection (e) subparagraph (3).[6]  The following coalition of bi-partisan state legislatures agreed that the fifth option is the best and served as the prime sponsnor of the Stop Social Media Censorship Act[7] at the 2021 legislative session and have promised to introduce the bill at the 2022 legislative session. Here is the breakdown state by state of the bill language, bill numbers, and the name of the prime sponsors:

---

[6] When Congress passed section 230 they included exception provisions for when a section 230 immunity defense could not be successfully invoked by an internet intermediary under subsection (3). The state of Florida has the authority to enact the Stop Social Media Censorship Act under the Tenth Amendment of the United States Constitution so that Florida citizens are protected.

[7] All of these bills were assembled by either De Facto Attorneys General or Professor Hamburger of Columbia law school.
https://www.law.columbia.edu/sites/default/files/2020-02/hamburger-_resume_5.30.19.pdf
The measures are championed by the Heartland institute of policy. https://www.heartland.org.

**1. Alabama** - Drafted as follows for the 2022 legislative session:
https://www.dropbox.com/s/mh0kpmi8s9bkisp/2022%20ALABAMA%20STOP%20SOCIAL%2
0MEDIA%20CENSORSHIP%20AMENDED%20FINAL.pdf?dl=0

**2. Alaska.** Drafted by **Senator Showers (R)** for introduction at the 2022 legislative session:
https://www.dropbox.com/s/ci7c8x9r10jb55z/2022%20Alaska%20Stop%20Social%20Media%2
0Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**3. Arizona. SB1428  sponsored by Sen. Townsend (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:
https://legiscan.com/AZ/text/SB1428/2021

-Amended for 2022 legislative session to be introduced by **Sen. Townsend**:
https://www.dropbox.com/s/7i0iakb3z4to1eg/2022%20Arizona%20Stop%20Social%20Media%
20Censorship%20final.pdf?dl=0

**4. Arkansas.**  Drafted by **Chairman Sen. Clark (R)** to be introduced at the 2023 legislative
session:
https://www.dropbox.com/s/o98fkpfblyzgkmy/2023%20Arkansas%20Stop%20Social%20Media
%20Censorship%20Act%20AMENDED%20%281%29.pdf?dl=0

**5. California.** In review by **Sen. Grove (R)** to be introduced at the 2022 legislative session as
follows:
https://www.dropbox.com/s/b7n96qegfhkgsw3/2022%20California%20Stop%20Social%20Medi
a%20Censorship%20Act.pdf?dl=0

**6. Colorado.** To be introduced by **Rep. Williams (R)** at the 2022 legislative session as follows:
https://www.dropbox.com/s/tcc7uxddoqwgs6f/2022%20Colorado%20Stop%20Social%20Media
%20Censorship%20Act%20Final.pdf?dl=0

**7. Connecticut.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/db4xv70hcu5j4jp/2022%20Connecticut%20Stop%20Social%20Med
ia%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**8. Delaware.** To be introduced by **Sen. Richardson (R)** at the 2022 legislative session:
https://www.dropbox.com/s/0x3ayrs6964xy9n/2022%20Delaware%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**9. Florida. HB 33  sponsored by Rep. Sabatini (R)** - provided by De Facto Attorneys General -
at the 2021 legislative session :
https://legiscan.com/FL/bill/H0033/2021

To be introduced at the 2022 legislative session as follows:
https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%
20Censorship%20Act%20AMENDED.pdf?dl=0

**10.  Georgia.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/391sacz7gg3oekj/2022%20New%20Georgia%20Stop%20Social%2
0Media%20Censorship%20Act%20FINAL%20%281%29.pdf?dl=0

**11. Hawaii. SB357 sponsored by Sen. Gabbard (D)** - provided by De Facto Attorneys General
- at the 2021 legislative session:

https://legiscan.com/HI/text/SB357/2021

To be introduced at the 2022 legislative session by Sen. Gabbard as follows:

https://www.dropbox.com/s/4drp0d1wrkp4gah/2022%20Hawaii%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**12. Idaho. H0323 sponsored by Rep. Nichols (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ID/text/H0323/2021

To be introduced at the 2022 legislative session by Rep. Nichols as follows:

https://www.dropbox.com/s/5m97v1mpdrs36cg/2022%20Idaho%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**13. Illinois.** Drafted as follows for the 2022 legislative session:

https://www.dropbox.com/s/tun4sxpl4r4h2ka/2022%20Illinois%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**14. Indiana:** To be introduced at the 2022 legislative session by **Rep. Jacobs (R)** as follows: https://www.dropbox.com/s/laea6ssvk03j5lj/2022%20Indiana%20Stop%20Social%20Media%20Censorship%20Act%20.pdf?dl=0

**15. Iowa. HF171 sponsored by Rep. Salmon (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/IA/text/HF171/2021

To be introduced at the 2022 legislative session by Rep. Salmon as follows:

https://www.dropbox.com/s/66e8he2cd0zxsj4/2022%20Iowa%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**16. Kansas. HB2322 sponsored by Rep. Gaber (R)** - provided by De Facto Attorneys General. To be introduced by Rep. Garber at the 2022 legislative session as follows:

https://www.dropbox.com/s/6dxnzcfpzlr67qd/2022%20Kansas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**17. Kentucky. SB111 sponsored by Sen. Mills (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/KY/text/SB111/2021

To be introduced at the 2022 legislative session by Sen. Mills as follows:

https://www.dropbox.com/s/tlr4kcqakr1elyc/2022%20Kentucky%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**18. Louisiana. SB196 sponsored by Sen. Morris (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/LA/text/SB196/2021

To be introduced at the 2022 legislative session by Sen. Morris as follows:

https://www.dropbox.com/s/o0qiu7nout6np6h/Louisiana-2021-SB196-Engrossed%20%283%29.pdf?dl=0

**19. Maine. LD1609 sponsored by Rep. Sampson (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ME/text/LD1609/2021

To be introduced at the 2022 legislative session by Rep. Sampson as follows:
https://www.dropbox.com/s/xji2kpbtktkkrsf/2022%20Maine%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**20. Maryland. HB1314 sponsored by Del. Adams (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MD/text/HB1314/2021

To be introduced at the 2022 legislative session by Del. Adams as follows:
https://www.dropbox.com/s/nshl9js3df3vyn5/2022%20Maryland%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**21. Massachusetts.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/yy2ubrqeo5eft6k/2022%20Massachusetts%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**22. Michigan.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/n3lqn0uw23re37z/2022%20Michigan%20Stop%20Social%20Media%20Censorship%20Act%20Final%20amendment.pdf?dl=0

**23. Minnesota.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/7zrv9qy8jzv48gi/2022%20Minnesota%20Stop%20Social%20Media%20Censorship%20Act%20Amended%20final.pdf?dl=0

**24. Mississippi: SB2617 sponsored by Sen. Hill (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MS/text/SB2617/2021

To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/wyjq7ean5b37ogw/Mississippi%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**25. Missouri. HB482 sponsored by Rep. Coleman (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MO/bill/HB482/2021

To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/2hj5e2vlyro8m39/2022%20Missouri%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**26. Montana.** To be introduced as follows at the 2023 legislative session:
https://www.dropbox.com/s/qtwz360f2dik04u/2023%20MONTANA%20STOP%20SOCIAL%20MEDIA%20CENSORSHIP%20ACT%20AMENDED%20FINAL.pdf?dl=0

**27. Nebraska. LB621 sponsored by Sen. Curt Friesen (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NE/text/LB621/2021

To be introduced as follows at the 2023 legislative session:
https://www.dropbox.com/s/4s6wsko5dw9suj4/2022%20Nebraska%20%20Stop%20Social%20Media%20Censorship%20Act%20FINAL.pdf?dl=0

**28. Nevada:** To be introduced as follows at the 2023 legislative session:

**29. New Hampshire. HB133 sponsored by Rep. Plett (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NH/text/HB133/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/bi1whnhjf4cfxui/2022%20New%20Hampshire%20Stop%20Social
%20Media%20Censorship%20Act.pdf?dl=0

**30. New Jersey. A578 sponsored by Asm. Auth (R)** - provided by De Facto Attorneys General
- at the 2021 legislative session:

https://legiscan.com/NJ/text/A578/2020

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/pkt2wqtqx8mwpjb/New%20Jersey%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**31. New Mexico.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/3rjkno4547telvr/2022%20New%20Mexico%20Stop%20Social%20
Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**32. New York.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/fretoaagwy7108z/2022%20New%20York%20Stop%20Social%20M
edia%20Censorship%20Act%20FINAL%20AMENDED%20.pdf?dl=0

**33. North Carolina. S497 sponsored by Sen. Alexander (R)** - provided by De Facto
Attorneys General - at the 2021 legislative session:

https://legiscan.com/NC/text/S497/2021

**34. North Dakota. HB1144 sponsored by Rep. Kading (R)** - provided by Professor
Hamburger- at the 2021 legislative session:

https://legiscan.com/ND/text/1144/2021

To be introduced as follows at the 2022 legislative session by Rep. Jones:

https://www.dropbox.com/s/iwf5b1eyvj82wsi/2022%20North%20Dakota%20Stop%20Social%2
0Media%20Censorship%20Act.pdf?dl=0

**35. Ohio.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yziri2z6g80eer4/2022%20New%20Ohio%20Stop%20Social%20Me
dia%20Censorship%20Act%20Final.pdf?dl=0

**36. Oklahoma. SB383 sponsored by Sen. Standridge (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/OK/text/SB383/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/l50i8fe4z7qwuxb/2022%20Oklahoma%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**37. Oregon.** To be introduced as follows at the 2022 legislative session by Rep. Leif:

https://www.dropbox.com/s/4k0sm4j5o0iub68/2022%20Oregon%20Stop%20Social%20Media%
20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**38. Pennsylvania. SB604 sponsored by Sen. Mastriano (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/PA/text/SB604/2021

 **39.  Rhode Island. H5564 sponsored by Vella-Wilkinson (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://www.dropbox.com/s/hnk11ybifb0bqk8/2022%20Rhode%20Island%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**40. South Carolina. H3450 sponsored by Rep. Burns (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/SC/text/H3450/2021

To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/73d6fwll hwr204t/2022%20South%20Carolina%20Stop%20Social%20Media%20Censorship%20Act%20Consolidated%20%282%29.pdf?dl=0

**41. South Dakota. HB1223 sponsored by Rep. Jensen (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/SD/bill/HB1223/2021

To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/7bnc8jvt50hhzbu/2022%20South%20Dakota%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**42. Tennessee.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/y1r1biujf5awlep/2022%20Tennessee%20Stop%20Social%20Media%20Censorship%20bill%200859%20amended%20FINAL%20.pdf?dl=0

**43. Texas. SB12 sponsored by Sen. Hughes**  - provided by De Facto Attorneys General - at the 2021 legislative session:
https://www.dropbox.com/s/upeh2w5u5pn6zfc/2022%20Texas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**44. Utah. SB228 sponsored by Sen. McKell (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/UT/text/SB0228/2021

To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/6zv60b2iqd5xpun/2022%20Utah%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**45. Vermont.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/kyx6ok5u8o1fhwu/2021%20Vermont%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20.pdf?dl=0

**46. Virginia.** To be introduced as follows at the 2022 legislative session by Delegate Byron:
https://www.dropbox.com/s/fmbibg9oe9r6st3/2022%20Virginia%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**47. Washington.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/x3tig83nsjdhr0p/2022%20Washington%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL.pdf?dl=0

**48. West Virginia.** To be introduced as follows at the 2022 legislative session by Sen Azinger:
https://www.dropbox.com/s/6tfkmxloznw5igj/West%20Virginia%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**49. Wisconsin.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/pt8v99suwbirje1/2022%20Wisconsin%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**50. Wyoming. SF0100 sponsored by Sen. Steinmetz (R)** - provided by Professor Hamburger-
at the 2021 legislative session:
https://legiscan.com/WY/text/SF0100/id/2339364/Wyoming-2021-SF0100-Engrossed.pdf
To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/mdr58wy4wsuvh91/2022%20Wyoming%20Stop%20Social%20Me
dia%20Censorship%20Act.pdf?dl=0

6. The Plaintiff, along with hundreds of legislatures, have spent an enormous amount of

time, money, and resources working on this issue because it is vital to the strength of our

democracy and the welfare of our citizens. The Court could hold that the "cure-all" to the

problems presented by this case is the state legislature must be responsive in enacting the Stop

Social Media Censorship Act, if they want their constituents to be protected from the deceptive

trade practices perpetrated by social media websites.

## DEMAND FOR SUA SPONTE RESPONSIVENESS OF THE GOVERNOR AND SETTLEMENT OFFER TO THE GOVERNOR IN THE SPIRIT OF FRCP 68

7. In keeping with the spirit of FRCP 68, if Governor DeSantis, also a former Judge

Advocate General, like several members of De Facto Attorneys General and Special Forces Of

Liberty, will sua sponte call a special session pursuant to Article III, Section 3 of the Florida

Constitution to attempt to enact the Stop Social Media Censorship Act as set forth in Appendix B

and in the body of this complaint, then the Plaintiffs will voluntarily non-suit their case against

the Governor pursuant to FRCP 41(a) without prejudice.[8] In view of the decision in *Netchoice,*

---

[8] The Plaintiffs do not care who is the prime sponsor in the Florida House and Senate,
but note that Sen. Gruters and Rep. Sabatini carried the bill in the past.

*LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113), Governor DeSantis has a duty pursuant to his oath of office under clause 3 of Article VI of the United States Constitution to call a special session regarding the Stop Social Media Censorship Act in view of the constitutional issues embodied in SB7027 as identified by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). The demand asserted by the Plaintiffs on the Governor mirrors what he is already Constitutionally obligated to do and reflects the goals he was attempting to accomplish in enacting SB7072.

## RELEVANT PROCEDURAL AND LEGISLATIVE HISTORY OF THE CASE

8. In 1996 Congress enacted the Communications Decency Act (CDA) to promote "decent" speech, not the deceptive trade practices that social media websites have been engaging in with a sense of absolute impunity because of Congress's action. Congress enacted the CDA to make it easier for consumers to avoid being exposed to ubiquitous obscene pornographic material on Internet-enabled devices that is injurious to minors and the public's health. (Most of the states have resolved that pornography online is creating a public health crisis that is harming children and families). Section 230 was included in part of the CDA to encourage the free flow exchange of ideas and to help the Internet grow, by either somewhat limiting or by totally limiting the liability of certain Internet providers - like social media websites. The Constitutionality of the CDA was challenged by the ALCU for good cause, and the Supreme Court struck down all relevant parts of the CDA in *Reno American Civil Liberties Union,* 521 U.S. 844 (1997), except for Section 230, which was not challenged.[9] So what started out as an

---

[9] The Plaintiffs, who are ardent anti-pornography activists, agree with the ACLU's positions and the *Reno* court's decision. The Plaintiffs do believe that Congress should take up JJustice Rehnquist's suggestion of Internet zoning and zoning pornographic websites in the same way and for the same reason that adult establishments are zoned by ordinances. After Congress enacted the Human Trafficking And Child Exploitation Prevention Act or SOCA, the Plaintiffs intend to aggressively take up the matter with Congress for good cause.

attempt to marginalize indecent content morphed into an immunization sword of indecent deceptive trade practices and perversion.

9. In 1998, Congress attempted to cure the failures of the CDA and deal with the problem of unavoidable pornography online by enacting the Child Online Privacy Protection Act (COPPA).[10] The ACLU successfully had COPPA struck down in *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004). COPPA suffered from fewer Constitutional problems than the CDA, and in striking down COPPA, the Supreme Court provided a road map for the legislative branch so that it could successfully deal with the problem of online pornography websites distributed by Internet-enabled devices without running afoul of the First Amendment, stating "Congress may undoubtedly act to encourage the use of filters.....It could also take steps to promote their development by industry, and their use by parents," which was the Supreme Court's way of signaling to the legislative branch that it could pass filter legislation, such as the Human Trafficking And Child Exploitation Prevention Act or Save Our Children Act (SOCA) authored by the Plaintiffs, and that such a legislative instrument would survive judicial review under heightened scrutiny, since as the ACLU put it, "filters are the least restrictive means" for purposes of the First Amendment of the United States Constitution.

10. After engaging in operations in Iraq and Afghanistan, some of the members of De Facto Attorneys General and Special Forces Of Liberty joined groups of former Special Forces and FBI to do extractions in the area of sex trafficking overseas. While doing the training for such field operations, the evidence became overwhelmingly clear that human trafficking and rampant prostitution was not just a problem overseas, but was a serious growing problem in our own backyard here in America thanks to the concerted efforts of manufacturers and retailers of

---

[10] The Plaintiffs' friend, Senator Markey, a Democrat, from Massachusetts was the prime sponsor of COPPA. He still serves in the United States Senate and could prime sponsor the Federal version of the Human Trafficking And Child Exploitation Prevention Act.

Internet-enabled devices to distribute prostitution websites and pornographic websites in flagrant disregard of obscenity codes and products liability statutes.[11] While the manufacturers and retailers of Internet-enabled devices are not creating pornography content or offering sex trafficking themselves directly, their distribution of pornographic websites and prostitution hubs make them the head of the causal chain of harm. To kill a snake, you have to cut off its head.

11. In response to this realization, the founder of De Facto Attorneys General, acting on behalf of 35 different entities, filed lawsuits against the Tech Enterprise for racketeering in violation of products liability law and obscenity codes, asserting that the current condition that Internet-enabled devices were sold in were dangerous and defective because they exposed consumers to prostitution websites and pornography websites, after the products were falsely marketed as "family-friendly." *Sevier v. Google*, 15-5345 (6th Cir. 2014). The plaintiff asked the court in *Sevier v. Google*, 15-5345 (6th Cir. 2014)[12] and *Sevier v. Apple Inc.,* 3:2013-cv-00607 (M.D.T.N. 2013) to issue an injunction that required the manufacturers and retailers of Internet-enabled devices to sell their products in a manner that opted-out consumers by default from having immediate access to websites that displayed obscenity, child pornography, and revenge pornography and websites that were known to facilitate human trafficking and

---

[11] The evidence shows that the pornography pandemic hurting the public's health and the explosion in sex trafficking across the globe is the direct result of concerted effort by the Tech Enterprise to disregard obscenity laws and products liability codes, knowingly selling their products in a dangerous and defective manner that has unleashed a litany of secondary harmful effects.

[12] Appellant brief.
https://www.dropbox.com/s/43hvt217s2p2a63/Appellant%20Brief%20in%20Sevier%20v.%20G
oogle.pdf?dl=0

Appellee Google response
https://www.dropbox.com/s/y7y0quqs1r6c85l/Appellee%20Response%20Brief%20in%2
0Sevier%20v.%20Google.pdf?dl=0

Appellant reply
https://www.dropbox.com/s/3jnzmi62adsovpq/Reply%20Brief%20official.pdf?dl=0

prostitution. [13] In the litigation, one of the defendants, Verizon, raised a Section 230 immunity defense, but the defense did not work because the plaintiffs' cause of action concerned the safeness of physical Internet-enabled products, not the Internet itself. This was the first time that some of De Facto Attorneys General and Special Forces Of Liberty team members encountered an attempt by the Tech Enterprise to use Section 230 to justify immoral business practices.[14]

12. The ultimate goal of the De Facto Attorneys General litigation against the Tech Enterprise in *Sevier v. Google*, 15-5345 (6th Cir. 2014) and *Sevier v. Apple Inc.,* 3:2013-cv-00607 (M.D.T.N. 2013) was to cure the problems with COPPA. In the wake of the litigation, the Plaintiffs custom authored a bill called Human Trafficking And Child Exploitation Prevention Act or, alternatively, the Save Our Children Act (SOCA) for all 50 states. See www.humantraffickingpreventionact.com.[15] This legislative instrument was fashioned directly off the findings of the Supreme Court in *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) and *Ginsberg v. New York*, 390 U.S. 629 (1968), two cases that none of the Tech enterprise's lawyers could get around in their destructive crusade to keep big tech from being regulated at all cost. [16]

---

[13] The case was covered extensively by the press extensively, and the International Business Times reported that the litigation carved a path in a manner that prompted Britsh Prime Minister Cameron to bring about some of policy demands in the United Kingdom.https://www.ibtimes.com/war-porn-uk-does-david-camerons-plan-battle-child-pornogr aphy-go-too-far-video-1355279

[14] Instead of pursuing the litigation to its final conclusion, the Plaintiffs took to the legislative branch to solve the problem so as to not ask too much from the judicial branch. [15] Here is a link to the proposed bill language for the SOCA bill for all 50 states: https://www.dropbox.com/sh/o59we5kqkbu1qpr/AABrDTwd19yrWkUu1GhNqo8Ma?dl=0

[16] The United States Supreme Court found in *Ginsberg v. New York*, 390 U.S. 629 (1968) that a physical display state statute that required physical brick and mortar stores to put physical obscene material behind a physical blinder rack was Constitutional under first amendment heightened scrutiny, which means that a digital blinder rack statute, such as the Save Our Children Act, that requires digital retailers to put digital obscene material behind a digital blinder rack is also constitutional on the same legal basis.

13. In working with 37 state legislative bodies on the Human Trafficking And Child Exploitation Prevention Act/SOCA, many of the legislatures in both parties asked the Plaintiffs to draft an additional piece of legislation so that their party would not be construed as "the party of censorship" and so that the code under a new area of law called "indecent deceptive trade practices" would be balanced out. In response, the Plaintiffs custom-designed the language for the Stop Social Media Censorship for all 50 states for the benefit of their legislative drafting commissions - also referred to commonly as Legislative Research Commission (LRC) or the Office of Legal Services (OLS). The Stop Social Media Censorship At is based on well-settled existing contract and tort principles. By introducing the Stop Social Media Censorship Act and the Human Trafficking And Child Exploitation Prevention Act contemporaneously, several state created a seamless narrative that their statehouse is not for censorship (see the Stop Social Media Censorship Act) unless the content is injurious to children or facilitates human trafficking (See the Human Trafficking And Child Exploitation Prevention Act-SOCA), and even then, their statehouse was not for total censorship.

14. The goals of the Human Trafficking And Child Exploitation Prevention Act/SOCA and the Stop Social Media Censorship Act was not to reinvent the wheel but to merely get existing law to catch up to modern-day technology to protect the general public from objective harm. Internet-enabled devices makers and social media websites have been operating in direct violation of the law under a double standard without consequence in a manner that is devastating our democracy and undermining National unity.

15. In 2017, before being elected to Congress, Florida state Rep. Spano introduced the Human Trafficking And Child Exploitation Prevention Act at the Plaintiffs' request.[17]

---

[17] See the current modified version for the 2022 legislative session https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

16. In 2019, Sen. Gruters introduced the Stop Social Media Censorship Act at the
Plaintiffs' request, constituting the first state legislator to introduce the measure in the Country.

17. In 2020, Sen. Gruters and Rep. Sabatini[18] reintroduced the Stop Social Media
Censorship Act at the Plaintiffs' request. [19]

18. In 2021, Rep. Sabatini introduced the Stop Social Media Censorship Act (HB33),
and subsequently, for unknown reasons, Rep. Sabatini got into some kind of squabble with
Speaker Sprowls, as passions do tend to run high in the legislative branch and there are a lot of
opportunities for conflict in the legislative branch. This dust-up caused the members of the
Florida House to oppose Rep. Sabatini's bills simply because of "who he was" and not because
of "the meritorious substance of his bills." In the wake of the Sabatini/Sprowls spat, Governor
DeSantis got his staff to use the Stop Social Media Censorship Act as a preliminary foundation
to draft the monstrosity that became SB7072.

19. At the risk of sounding snarky, SB7072 - although well-intended - was distorted by
ambitions and legal ignorance. Upon information and belief, personal glory might have been
prioritized over substance and the rule of law. [20] The judicial branch can help the legislative
branch get things right.

20. On May 24, 2021, SB7072 was enacted and set to go into effect in early July.

21. In early June, Netchoice (a hyper dishonest lobbying firm that does Big Tech's dirty
work)[21] filed a lawsuit to stop the state from enforcing SB7072. See *Netchoice, LLC et al., v.*

---

[18] Rep. Sabatini is running for Congress, and the Plaintiffs support his efforts to do so.
[19] See the press conference with Laura Loomer:
https://www.facebook.com/watch/live/?v=907548599640066&ref=watch_permalink)

[20] The Plaintiffs do not give two shakes of a lamb's tail about credit, but they do want to
see themselves and other consumers protected. The Plaintiffs would remind the Governor of the
Reagan priniciple in asking him to sua sponte call a special session"there is no limit to the
amount of good you can do if you don't care who gets the credit."

[21] The Plaintiffs deal with Netchoice's agents all the time at different state houses around the
country. Their lobbiests are some of the greasiest and the most intellectually dishonest people

*Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021). Countless lawmakers around the

country implored the Plaintiffs to intervene in that case, and the Plaintiffs refused to be

responsive knowing from personal experience - with all due respect - that if you give Judge

Hinkle of the Northern District of Florida enough rope, he will metaphorically hang himself.[22]

22. On June 30, 2021, Judge Hinkle in *Netchoice* granted the plaintiffs' motion for

preliminary injunction to enjoin Florida state officials from enforcing parts of SB7072. Id. at

(DE 113). This decision, taken with others, gave the Plaintiffs the apprehension that there is no

way for the Plaintiffs to seek redress from the harmful acts of social media websites because of

the unconstitutional actions of Congress in making Section 230.

23. On July 7, 2021, President Trump and others filed a lawsuit against Twitter,

Facebook, and Youtube but did not include a cause of action under state statute written to fall

within the state-law exemption of Section 230. See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L.

2021); *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021); *Trump et al v. YouTube, LLC*,

1:21-cv-22445-KMM (S.D.F.L. 2021). On July 16, 2021, the Plaintiffs, in this case, filed an

---

imaginable. They routinely distort the law unethically and ultimately are driven by greed. Their
entire position can be boiled down to "big tech should be permitted to do whatever it wants
because it is big tech." Widgets and the Internet are special. Fundamental rights are, like the
freedom to practice one's religion.

[22]https://www.lifesitenews.com/news/former-jag-officer-highlights-absurdity-of-gay-marr
iage-by-suing-to-marry-h
The courts should have dismissed the same-sex marriage cases for lack of subject matter
jurisdiction. The Establishment Clause of the First Amendment of the United States Constitution
prohibits the states and federal government from legally recognizing or promoting any form of
non-secular parody marriage. Also, the states can limit marriage to one man and one woman
because all other forms of marriage policies promote licentiousness and undermine the state's
compelling interest to uphold community standards of decency. In the wake of the judiciaries
unconstitutional endorsement of the LGBTQ secular humanist religion, the Plaintiffs have
authored the Establishment Act for all 50 states. See Florida's version:
https://www.dropbox.com/s/iwam8l7t7madp4r/2021%20Florida%20Establishment%20Act.pdf?
dl=0

*amicus* brief in partial support of the Trump plaintiffs' cause of action and in *Trump v. Twitter*,

1:21-cv-22441 (S.D.F.L. 2021) in partial opposition before filing this lawsuit.[23]

## SECTION 230

24. The Plaintiffs challenge every section and every subsection of Section 230,

collectively and individually, for having been misconstrued or written to prevent citizens from

acquiring relief from the government for the bad faith act of social media websites in violation of

the petition and access clause of the First Amendment of the United States Constitution.

25. For the Court and Defendants' convenience, here is Section 230 in its entirely:

### (a)  Findings

The Congress finds the following:

(1)The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3)The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

### (b)  Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

---

[23] The *amicus* brief filed by the Plaintiffs in the *Trump v. Twitter* case raises similar questions of law asserted in this complaint. There are several Federal courts that have concurrent jurisdiction over the claims here - including this one - and the Plaintiffs are giving the Florida District Court the first crack at resolving this controversy in a manner that honors common sense, the rule of law, the United States Constitution, while protecting the interest of social media websites and the general public. Other groups that the Plaintiffs work with may be immediately filing a similar lawsuit to encourage judicial accountability.

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). [1]

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5) No effect on sex trafficking law

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

(A) any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

(C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term " information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

26. The purpose of Section 230 was to allow for the free exchange of competing ideas

and to allow the Internet to "grow," by putting some limit on liability for certain providers in

certain circumstances. But social media websites, that haveinduced billions of subscribers to

sign up for user profiles, have "grown," and that extreme "growth" occurred because social

media websites falsely marketed themselves as being neutral on religious and political speech to

induce everyone to sign up despite their religious and political affiliations. Just because

Congress wanted to see the Internet businesses grow does not mean that it gets to ignore the

Petition and Access Clause of the First Amendment and subject the Plaintiffs to harmful fraud without remedy. Former Attorney General Bill Barr described this scenario as "the greatest bait and switch in history" stating that social media websites created the modern-day public square "by saying that they were open to all views" until they reached critical mass only to prove otherwise after the fact. (See interview with Michael Knowles of the Daily Wire on Verdict with Ted Cruz: https://youtu.be/_HVqRE-6bkc)

27. Section 230(b)(1) asserts that "it is the policy of the United States to promote the continued development of the Internet and other interactive computer services and other interactive media" but that policy must fail if completely blocks aggrieved parties, like the Plaintiffs and the Trump plaintiffs, from having the opportunity to petition the government for redress against social media websites that have engaged in harmful consumer protection violations in view of the First Amendment.[24]

28. Section 230(c)(2)(A) does not apply for blanket immunity for social media websites that censor in bad faith.[25] Yet, so far, this has been misconstrued by the courts to allow for a

_____

[24] As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw, *The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,* pg. 564, 565 (2018): Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.' Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services. Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.' Rather, Congress sought to provide limited protections for limited actions.

[25] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the caselaw, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7

range of injurious action to go without redress in a manner that causes Section 230 to violate the

Petition and Access Clause of the First Amendment, as well as the Free Speech, Free Exercise,

and Establishment Clauses of the First Amendment. The Plaintiffs are under the apprehension

that they have no lawful recourse, unless this Court clarifies the importance of the state-law in

exemption and the need for state legislatures to pass good laws, like the Stop Social Media

Censorship Act that will cut through an immunity defense.

## FACTS ABOUT THE CURRENT LANDSCAPE OF CENSORSHIP GENERALLY

29. The evidence shows that the decision in *Stratton Oakmont, Inc. v. Prodigy Services*

*Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995) in part led to the creation of

Section 230.[26]

---

(D.N.J. May 4, 2020). In *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021), the court stated in its order granting a preliminary injunction that "the legislation compels providers to host speech that violates their standards—speech they otherwise would not host—and forbids providers from speaking as they otherwise would." But that court failed to realize that the social media website providers shift those standards in bad faith in an arbitrary and dishonest manner in total breach of how they marked themselves to the public to induce reliance. That court also failed to realize that the providers invited, enticed, and induced members of the public to speak out openly and freely on different religious and political doctrines without any threat of emotional or economic reprisal, ony to then turn around and deploy a "gotcha game" with the expectation of total immunity.

[26] In *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995), an anonymous user posted allegedly defamatory content on an electronic bulletin board—an earlier version of what today might be called social media. The court said that if the provider of such a bulletin board did not undertake to review posted content—much as a librarian does not undertake to review all the books in a library—the provider would not be deemed the publisher of a defamatory post, absent sufficient actual knowledge of the defamatory nature of the content at issue. On the facts of that case, though, the provider undertook to screen the posted content—to maintain a "family-oriented" site. The court held this subjected the provider to liability as a publisher of the content. At least partly in response to that decision, which was deemed a threat to the development of the internet, Congress enacted 47 U.S.C. § 230. The Stop Social Media Censorship Act does not subject computer services to tort liability for passively hosting content posted by others but seeks to empower users by limiting how content may be censored. See 47 U.S.C. § 230(b)(2) (describing congressional purpose to ensure that users retain "a great degree of control over the information that they receive")

30. The Plaintiffs in this case, unlike the Trump Plaintiffs in their cases, contend that

there are valid uses of Section 230 that should remain in place, if and only if this Court clarifies

that the state-law exemption can be used by states to provide consumers with the means for

recourse, as was perhaps intended by Congress.[27] However, what has been happening to the

Plaintiffs, the Trump plaintiffs, and millions of profile users, who are both registered Democrat

and Republican, is that social media websites have been arbitrarily censoring users speech in bad

faith when it just so happens to offend the delicate sensibilities of the employees who happen to

work at the social media website at the time of the censorship. When censored individuals file a

lawsuit against the social media website for such injurious wrongdoing, the social media

defendants invariably float the same questionable argument that they were "merely engaging in

'editorializing' and should, therefore, not be held liable in view of the Section 230 absolute

immunity shield." So far in these kinds of cases, the courts have reluctantly allowed the social

media defendants to barely escape liability, like a man jumping through flames. See 1

---

[27] Preliminarily, Section 230 should be explained so that a fifth-grader can understand it. Basically, Section 230 was a federal statute created by Congress that was part of the Communications Decency Act (CDA). The Communications "Decency" Act was designed to promote "decent" speech, not the "deceptive trade practices" that social media websites have engage in to the direct injury of the Plaintiffs. Section 230 allows for certain internet intermediaries to invoke an immunity defense for the harmful acts of third parties, if and only if, the internet intermediary was not acting as a publisher/speaker/common carrier to a certain arbitrary and hard to determine degree. So, since that explanation is still confusing and since trying to determine whether a platform provider was a speaker, publisher, or common carrier tends to be a linguistic nightmare, the best way for anyone to understand a valid Section 230 immunity defense is through the following example: if a Floridian maliciously posts a defamatory comment on Twitter against a person from New York, the New Yorker who was defamed could legitimately sue the Floridian for defamation. However, if the New Yorker named Twitter as a co-defendant in the lawsuit, then Youtube could successfully file a motion to dismiss under FRCP 12 et. seq. invoking Section 230 immunity defense as the legal basis, and legitimately have the lawsuit dismissed with prejudice against it.

That example involves a good use of Section 230 - showing that Section 230 is good law - because Youtube was merely acting as an innocent platform in that scenario. Therefore, this Court could find that Section 230 does not violate the First Amendment Petition but only if it finds that the Stop Social Media Censorship Act, if enacted, would fall in the state-law exemption and not be preempted by the doctrine of preemption like SB7072 was.

Corinthians 3:15. [28] Despite having hundreds of thousands of users who have been defrauded and

brutalized, social media websites to date have not been held liable a single time that the Plaintiffs

are aware of as the result of unconstitutional Congressional action.

## FACTS ABOUT THE STATE LAW EXEMPTION AND FACTUAL DIFFERENCES BETWEEN THE STOP SOCIAL MEDIA CENSORSHIP ACT AND SB7077

31. The evidence shows that lawyers know just enough to be dangerous on any topic

unless they have litigated the issue. (See the staff lawyers who work for Defendant Governor

Desantis, who wrote SB7072). The Plaintiffs have litigated Section 230 issues and social media

censorship before a host of Federal Courts, and more importantly, they have litigated the matter

before countless legislative committees in the face of robust opposition:

(1) See the video of the hearing on the Social Media Censorship Act before the public
laws committee in Missouri, which included arguments from De Facto Attorneys General,
Google, and the Heartland Institute:
    https://www.youtube.com/watch?v=e4QUKoTHKZs
(2) See the video of the hearing before the Commerce Committee in the Louisana
Senate with testimony by Senator Morris, De Facto Attorneys General, Netchoice, and
(https://www.youtube.com/watch?v=c-NqZhBqkBs&t=8s)
(3) See the video of the hearing before the Judiciary Committee in the State of Maine
with testimony by Rep. Sampson and De Facto Attorneys General.
    (https://www.youtube.com/watch?v=jjZ_Ljnx-dE)

32. While the Plaintiffs appreciate Florida's initiative to solve this problem, the Plaintiffs

are concerned that the Florida state government and Federal Court could get this complex issue

wrong at the expense of the entire country. The Plaintiffs seek a perfect result from a

constitutional perspective and have filed this action before this Article III Court for good cause

in view of their personal injuries.

---

[28] In rendering such decisions, the courts have been hinting that if the state legislature was
to enact a statute that was (1) narrowly tailored, (2) consistent with the spirit of Section 230, and
(3) intentionally designed to fall in the state-law exemption, then such a cause of action would
successfully pierce through a Section 230 immunity defense. The Court could declare that the
Stop Social Media Censorship Act - a state statute - is the answer that everyone is looking for
whether they realize it or not.

33. The "state-law exemption" is the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3).

34. In the wake of the decision in *Netchoice, LLC et al., v. Moody et. al.*

4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) regarding SB7072, it is unclear whether the courts are suggesting that no state statute could fall in the state-law exemption that would allow the Plaintiffs to acquire relief against the deceptive bad faith trade practice routinely perpetrated by social media websites.[29] On the one hand, the Plaintiffs in this case have sensibly concluded that Section 230 does create total and perpetual immunity as a result of Congressional action for social media websites who engage in fraudulent and bad faith consumer protection violations, and therefore, the statute violates the First Amendment's Petition and Access Clause. On the other hand, the Plaintiffs believe that perhaps Governor DeSantis and the Florida general assembly errored in enacting SB7072 over the amended version of the Stop Social Media Censorship Act and that if the Stop Social Media Censorship Act was enacted, then and only then could the Plaintiffs and other similarly situated victims legitimately seek redress from the government regarding the deceptive trade practices perpetrated social media websites.

35. The language of the Stop Social Media Censorship Act was carefully and intentionally written by the Plaintiffs for all 50 states so that it would fall squarely in the

---

[29] Because it is possible that the Stop Social Media Censorship could be construed to be unconstitutional or preempted by Section 230, as was seeming the case with SB7072, then the Plaintiffs First Amendment claim to strike down Section 230 must prevail under *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (discussing when conditions on federal funding "result in an unconstitutional burden on First Amendment rights"). Accordingly, the courts should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it. The states have an ongoing compelling interest to protect their citizens in step with their police powers under the Tenth Amendment of the United States Constitution from fraud, deceptive trade practices, breach, bad faith, etc - none of which is protected speech for purposes of the First Amendment. It is up to this Court to decide the fate of the state-law exemption and Section 230.

state-law exemption under Section 230(e)(3). For the Court's and Defendants' convenience, here

is the Stop Social Media Censorship Act in its entirety.

WHEREAS, the Communications Decency Act was created to protect decent speech, not deceptive trade practices, and

WHEREAS, repealing section 230 of the Communications Decency Act at the federal level is unnecessary because it already includes a state-law exemption and the Stop Social Media Censorship Act was crafted to fall squarely in the state-law exemption of section 230 to cure abuses of section 230 to protect the consumers of this state, and

WHEREAS, contract law is a state-law issue, and when a citizen of this state signs up to use certain social media websites, they are entering into a contract, and

WHEREAS, this state has a compelling interest in holding certain social media websites to higher standards for having substantially created a digital public square through fraud, false advertising, and deceptive trade practices, and

WHEREAS, major social media websites have engaged in the greatest bait and switch of all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to then prove otherwise at great expense to consumers and election integrity, and

WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent inducement, and deceptive trade practices are not protected forms of speech for purpose of the first amendment of the United States Constitution or the Constitution of this state, and

WHEREAS, the major social media websites have already reached critical mass, and they did it through fraud, false advertising, and deceptive trade practices at great expense to the health, safety, and welfare of consumers of this state, while making it difficult for others to compete with them, and

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner. NOW THEREFORE,

Be It Enacted by the Legislature of the State of Florida:

**Section 1.** This act may be cited as the "Stop Social Media Censorship Act."

**Section 2.** This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following:

(1) Deceptive trade practices;

(2) False advertising;

(3) Breach of contract;

(4) Bad faith;

(5) Unfair dealing;

(6) Fraudulent inducement; and

(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

**Section 3.** Social media website speech; cause of action; penalties.—

(1) As used in this section, the term:

(a) "Algorithm" means a set of instructions designed to perform a specific task.

(b) "Hate speech" means a phrase concerning content that an individual finds offensive based on his or her personal moral code.

(c) "Obscene" means that an average person, applying contemporary community standards, would find that, taken as a whole, the dominant theme of the material appeals to prurient interests.

(d) "Political speech" means speech relating to the state, government, body politic, or public administration as it relates to governmental policymaking. The term includes speech by the government or a candidate for office and any discussion of social issues. The term does not include speech concerning the administration, law, or civil aspects of government.

(e) "Religious speech" means a set of unproven answers, truth claims, faith-based assumptions, and naked assertions that attempt to explain such greater questions created, what constitutes right and wrong what happens after death.

(f) "Social media website":

1. Means an Internet website or application that enables users to communicate with each other by posting information, comments, messages, or images and that meets all of the following requirements:

i. Is open to the public.

ii. Has more than 75 million subscribers with personal user profiles.

iii. From its inception, has not been specifically affiliated with any one religion or political party.

iv. Provides a means for the website's users to report obscene materials and has in place procedures for evaluating those reports and removing obscene material; and

v. Allows for subscribers to sign up for a personal user profile page or account where beliefs and preferences can be expressed by the user.

2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

(g) "User profile" means a collection of settings and information associated with a user or subscriber who signs up for an account made available by a social media website. Such accounts often include the explicit digital representation of the identity of the user or subscriber with respect to the operating environment of a social media website. Such accounts often associate characteristics with a user or subscriber, which may help in ascertaining the interactive behavior of the user along with their personal preferences and beliefs.

(2)(a) The owner or operator of a social media website who contracts with a social media website user in this state is subject to a private right of action by such user if the social media website purposely:

1. Deletes or censors the user's religious speech or political speech; or

2. Uses an algorithm to disfavor or censure the user's religious speech or political speech.

(b) A social media website user may be awarded all of the following damages under this section:

1. Up to $75,000 in statutory damages.

2. Actual damages.

3. If aggravating factors are present, punitive damages.

4. Other forms of equitable relief.

(c) The prevailing party in a cause of action under this section may be awarded costs and reasonable attorney fees.

(d) A social media website that restores from deletion or removes the censoring of a social media website user's speech in a reasonable amount of time may use that fact to mitigate any damages.

(3) A social media website may not use the social media website user's alleged hate speech as a basis for justification or defense of the social media website's actions at trial.

(4) The Attorney General may also bring a civil cause of action under this section on behalf of a social media website user who resides in this state and whose religious speech or political speech has been censored by a social media website.

(5) This section does not apply to any of the following:

(a) A social media website that deletes or censors a social media website user's speech or that uses an algorithm to disfavor or censure speech that:

1. Calls for immediate acts of violence;

2. Is obscene, lewd, lascivious, filthy or pornographic in nature;

3. Is the result of operational error;

4. Is the result of a court order;

5. Comes from an inauthentic source or involves false personation;

6. Entices criminal conduct;

7. Involves minors bullying minors;

8. Constitutes trademark or copyright infringement;

9. Is excessively violent; and

10. Constitutes harassing spam of the commercial, not religious or political, nature.

(b) A social media website user's censoring of another social media website user's speech.

(6) Only users who are 18 years of age or older have standing to seek enforcement of this section.

**Section 4.** The Secretary of State may:

(1) Issue a fine in one of the following amounts if the Secretary of State finds that the social media website has engaged in deplatforming or shadowbanning a political candidate seeking office in Florida in violation of this act:

(a) If the candidate is seeking Statewide office, up to $100,000 per day of the violation;

(b) For all other candidates, up to $10,000 per day of the violation; and

(2) Disclose a social media company's algorithmic bias for or against a political candidate seeking Statewide office under subsection (1) of this section as a campaign contribution.

**Section 5.** If any section in this act or any part of any section is declared invalid or unconstitutional, the declaration shall not affect the validity or constitutionality of the remaining portions.

**Section 6.** This act shall take effect July 1, 2021.

36. There are several factual differences between SB7072 and the Stop Social Media

Censorship Act that are appropriate to identify for this Honorable Court. [30]

37. First, SB7072 is vague and the Stop Social Media Censorship Act is not. [31]

38. The Stop Social Media Censorship Act is not vague whatsoever in view of its ten

legislative findings and purpose section and the straightforward structure of the language. The

legislative findings of the Stop Social Media Censorship Act spell out the legislative intent in a

common sense manner.

39. Furthermore, the purpose and legal framework of the Stop Social Media Censorship

Act is crystal clear, whereas the purpose of SB7072 is not. The purpose section of the Stop

Social Media Censorship Act states:

---

[30] Never since the inception of American jurisprudence has a plaintiff brought a lawsuit under a state statute and argued that the Section 230 immunity defense could not be successfully invoked because the lawsuit was filed under a statute that fell within the state-law exemption, piercing through the Section 230 immunity defense. Yet, when comparing the Stop Social Media Censorship Act to SB7072, the *Amici* somewhat agree with Judge Hinkle's sentiment that the "statutes [created by SB7072] are not narrowly tailored" and might constitute an "instance of burning the house to roast a pig." See *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) (page 27 of DE 113). See also, e.g., *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882 (1997*); Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 131 (1989). It would be more accurate to say that striking down Section 230 of the CDA completely would be an "instance of burning the house to roast a pig" when the Stop Social Media Censorship Act is obviously the cure-all from the perspective of any reasonable observer to this ongoing dilemma because it falls squarely in the state-law exemption.

[31] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253 (2012). "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). To pass muster, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent "arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." Id.; accord *Wollschlaeger v. Governor,* 848 F.3d 1293, 1320 (11th Cir. 2017). Although greater clarity is necessary when a statute regulates expression, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989); see also *Grayned,* 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams,* 553 U.S. 285, 305 (2008).

This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following: (1) Deceptive trade practices; (2) False advertising; (3) Breach of contract; (4) Bad faith; (5) Unfair dealing; (6) Fraudulent inducement; and(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

The purpose of the Stop Social Media Censorship Act is to parallel the goals and spirit of Section 230 so that the proposed statute "threads the needle," unquestionably falling within the state-law exemption of Section 230(e)(3) to piece through a Section 230 immunity defense. The Stop Social Media Censorship Act mirrors the objectives of Section 230 and Congress but also allows the state of Florida to protect consumers, like the Plaintiffs and the Trump plaintiffs, [32] in step with the state's police powers, afforded under the Tenth Amendment of the United States Constitution to the state of Florida, without offending the doctrine of preemption or the First Amendment.

40. Second, unlike with SB7072, the language of the Stop Social Media Censorship Act and Section 230 are parallel and verbatim in some respects on purpose. For example, 47 U.S.C. § 230(c)(2)(A) states that an interactive computer service, like the Defendants, cannot be "held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Similarly, the Stop Social Media Censorship Act states that social media websites that are subject to the act cannot be held liable if they censor content that:

1. Calls for immediate acts of *violence*; 2. Is *obscene, lewd, lascivious, filthy* or pornographic in nature; 3. Is the result of operational error; 4. Is the result of a court order; 5. Comes from an inauthentic source or involves false personation; 6. Entices criminal conduct; 7. Involves minors bullying minors; 8. Constitutes trademark or

---

[32] See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021); *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021); and *Trump et al v. YouTube*, LLC, 1:21-cv-22445-KMM (S.D.F.L. 2021).

copyright infringement; 9. Is *excessively violent*; and 10. Constitutes *harassing* spam of the commercial, not religious or political, nature.[33]

These parallel exemptions and exceptions are all based on common sense. The government has a narrowly tailored compelling interest to uphold community standards of decency.

41. Third, by framing the issues as breach of contract, bad faith, false advertising, unfair dealing, unjust enrichment, deceptive trade practices, and consumer protection violations, the Stop Social Media Censorship Act fulfills a litany of compelling government interests in ways that SB7072 fails to do so.[34]

42. Fourth, by framing the issue as arising under breach of contract, bad faith, fraudulent inducement, false advertising, unjust enrichment principles, a social media website sued under the Stop Social Media Censorship Act could not assert "good faith" protections under Section 230(c)(2)(A).[35] Judge Hinkle failed to pick up on this critical factor in *Netchoice, LLC et al., v.*

---

[33] Because the Stop Social Media Censorship Act neatly parallels the spirit and intent of Section 230, it "threads the needle" in a way that SB7072 does not. From every angle, it is clear that the Stop Social Media Censorship Act has been crafted for all 50 states in a manner that respects federal law, while allowing consumers to be protected from deceptive trade practices. The Stop Social Media Censorship Act respects the doctrine of preemption and the First Amendment rights of social media websites, while protecting consumers from deceptive trade practices.

[34] The Stop Social Media Censorship Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner Broad. Sys., Inc. v. FCC ("Turner")*, 512 U.S. 622, 662–63 (1994). Ensuring that the public "has access to a multiplicity of information sources," the Supreme Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Furthermore, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994). Additionally, Florida also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States*, 290 U.S. 534 (1934); *Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986).

[35] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the case law, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See*

*Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) in granting a preliminary injunction that sent

SB7072 down the path of nullification.

43. Fifth, where SB7072 construes social media websites as common carriers,[36] the Stop

Social Media Censorship Act focuses more on consumer protection violations, existing torts, and

existing breach of contract principles.[37]

44. Sixth, because the Stop Social Media Censorship Act is framed on breach of

contract, tort, and consumer protection principles, jurisdiction for enactment and enforcement is

not Constitutionally problematic in view of the Ten Amendment of the United States

Constitution, unlike with SB7072.[38]

---

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7 (D.N.J. May 4, 2020).

[36] In Section 1 of SB7072, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers." SB7072 § 1(5), 1(6). In fact, as Justice Thomas recently explained, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring)

[37] The Stop Social Media Censorship treats social media websites like any entity doing business in the state, and prevents the business from harming consumers for engaging in fraud, breach, deceptive practices, false advertising, etc. While the Florida Legislature permissibly determined that the "old rules" applicable to common carriers should be applied to the "new circumstances" of social media in SB7072, the Stop Social Media Censorship Act merely gets existing consumer protection laws and contract law principles to apply to the "new circumstances" of social media, while invoking the state-law exemption. See *Parks v. Alta Cal. Tel. Co.,* 13 Cal. 422, 422 (1859). Put simply, the Stop Social Media Censorship Act does not ask the judicial branch to reinvent the wheel; it merely asks that existing law be permitted to catch up to modern-day technology to safeguard consumers and election integrity.

[38] The state of Florida has the legal authority to enact the Stop Social Media Censorship and injured parties, like the Plaintiffs, have the right to enforce it under the long-arm statute. See Fla. Stat. § 48.193. When the Plaintiffs signed up to use Facebook and Twitter, they entered into a contract in Florida. One of the oldest jurisprudence is that "contract law" is a "state-law issue." States have paramount jurisdiction to enact statutes that place certain restrictions on contracts to protect consumers from harm. Otherwise, all consumer protection laws and all products liability laws could be declared to violate the First Amendment. Twitter and Facebook reached into the state of Florida and induced the Plaintiffs to sign up to use their services by a contract, which gives the state of Florida jurisdiction to regulate those contracts and put parameters around them. While a contract does exist between social media websites and the Plaintiffs, the contract is only

45. Seventh, perhaps the biggest distinction between the Stop Social Media Censorship

Act and SB7072 is that the Stop Social Media Censorship only applies to social media websites

that have more than 75 million profile users that were never affiliated with any particular

religious or political party from their inception.[39] A social media website that was affiliated with

a religious or political party can, therefore, continue to censor users at will, since they do not

suffer from the same false marketing problem.[40] If from their inception Facebook, Twitter,

Youtube, or Tictok had openly marked themselves as being aligned with the Democrat Party or

with the licentious religion of secular humanism, then they would have a defense for the removal

of political and religious speech that does not happen to conform to their favored religious and

political worldviews. But those social media websites that have brutalized the Plaintiffs and

relevant for the purpose of the state having jurisdiction to regulate those contracts because the
contract at issue is undoubtedly a contract of adhesion. Twitter and Facebook have billions of
subscribers, they never had a realistic expectation that the Plaintiffs would employ lawyers to
review their contract. Therefore, the contract is a contract of adhesion. Accordingly, the
specific terms of the adhesion contract do not matter. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110,
119, 126–27 (2d Cir. 2012). However, what does matter is the fact that Twitter, Facebook, and
Youtube have conspired to falsely market themselves as being "free, fair, open to the public, and
open to all religious and political ideas" to induce reliance only to then break their promise and
censor certain users in bad faith. This is a problem of broken promises flowing out of egoism.

[39] The reason why the Stop Social Media Censorship Act only applies to social media
websites that have more than 75 million users is not to treat different potential speakers
differently. The reason for this threshold is because the purpose of Section 230 was to allow
websites on the internet to grow without the fear of certain liability. The evidence shows from
the reasonable observer perspective that a social media website that has over 75 million profile
users has "sufficiently grown." Therefore, a statute, such as the Stop Social Media Censorship
Act, that allows victims of the deceptive, fraudulent, and dishonest honest trade practices of
social media websites to acquire relief against a social media provider with more than 75 million
subscribers is consistent with the spirit and "growth goals" of Section 230, which further causes
it to fall squarely in the state-law exemption. The 75 million threshold is not imposed to treat
smaller and larger social media websites differently. The threshold is included out of respect for
the doctrine of preemption so that the Stop Social Media Censorship Act will squarely fall in the
state-law exemption.

[40] A Black Lives Matter social media website, a Christian social media website, a Muslim
social media website, an LGBTQ social media website could censor any profile user who
opposed their fundamental doctrine and not be subjected to liability under the Stop Social Media
Censorship Act, if they made their affiliation and preference of a certain worldview known
upfront.

others, like the Trump plaintiffs, due to a hidden religious and political agenda that they sprang

on the whole of society to its extreme detriment.[41] This "gotcha game" tactic makes social media

websites the poster child of bad faith, and the idea that they can continue to have total immunity

because Congress made a bad law action combined with a bad judicial interpretation of that bad

law is self-evidently unconscionable and repugnant to the vast majority of Americans. The

arbitrary shifting of undefined standards conducted in the normal course of business by social

media websites constitutes classic bad faith and breach of contract that has led to the injury of

millions of profile users - to include the Plaintiffs. This controversy presents an opportunity for

this Honorable Court and Governor DeSantis to alleviate real suffering that is crushing

Floridians and the citizens of the other 49 states, by framing these issues correctly for once.

46. In terms of breach of warranty, the Plaintiffs have been harmed by social media

websites censoring others in bad faith. For example, Pastor Franklin Graham of the Billy

---

[41] The Stop Social Media Censorship Act is calculated to stop businesses from harming consumers through broken promises, false advertisement, and fraud. The so-called "standards" floated by Facebook, Twitter, and Youtube have always been unclear, vague, and shifting. The changing of those standards constitutes bad faith. While it is true that social media websites might be able "to establish standards of decency without risking liability for doing so," what they cannot do is to change those standards arbitrarily after they induced billions of people to subscribe and invest in user profiles, having relied on the fact that the social media websites marketed themselves as free, fair, open to the public, and open to neutral political and religious speech. See *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021). The court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) failed to pick up on the critical factor that Facebook, Twitter, and Youtube arbitrarily changed their standards in bad faith all the time, after fraudulently inducing billions of people to subscribe and invest in their service at great personal expense to themselves, their families, and their communities. That court ignored the shifting standards completely, shrugging it off in callous disregard for reality, because it is out of touch with just how serious of a problem this has become for consumers and the Nation.

In sum, this controversy is just about making the mega social media websites keep their promises to consumers. The goal of the Stop Social Media Censorship Act is not to punish disfavored, out-of-state businesses and to stop or deter them from exercising their First Amendment rights in ways the Plaintiffs dislikes. The goal is to force certain social media websites to honor their promises and to live up to the way that they marketed themselves from their inception in order to induce reliance. Social media websites like Twitter marked themselves as being neutral on religion and politics, and they should be legally forced to remain so despite the unwarranted inflated view that the employees who work there.

Graham Foundation had over a million followers on his facebook profile page. The Plaintiffs were followers of his page and benefitted greatly from his life-giving posts that were rife with Bible verses. One day, Facebook's employees decided to delete Pastor Graham's Facebook page without warning, simply because the employees felt entitled to metaphorically crusify Pastor Graham and punish his followers for seeking the truth of the Gospel. Deleting Pastor Graham's profile had transferable injury on the Plaintiffs who were not only inconvenienced but stifled by the threat of deletion themselves.

## JURISDICTION AND VENUE

47. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. §§ 1331 and 1361.

48. The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

49. The Court has the authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

50. Venue is proper in this district under 28 U.S.C. § 1391(e)

## THE PARTIES

51. John Gunter Jr. is the executive director of Special Forces Of Liberty. Christopher Sevier Esq. is the executive director of De Facto Attorneys General. Pastor Rich Penkoski is the executive director of Warriors For Christ. Deb Maxwell is a Florida chapter leader of Special Forces Of Liberty and Warriors For Christ. De Facto Attorneys General, Special Forces Of Liberty, and Warriors For Christ are partners, who have served as administrators on social media websites through Facebook, Twitter, Youtube, and Tictok. Plaintiff Gunter lives in Miami, and

Deb Maxwell lives in Tampa. Plaintiff Sevier lives in Florida for part of the year. The Plaintiffs

have a headquarters in Miami Florida. The Plaintiffs entered into agreements with Facebook,

Twitter, and Youtube at different times in Florida, Tennessee, Louisiana, West Virginia, and in

the District Of Columbia, and were subsequently censored by the social media websites after the

social media websites had acted in concert to falsely marketed themselves as being free, fair,

open to the public, and neutral on matters of politics and religion. The Plaintiffs felt the injury in

Florida. [42]

---

[42] The social media websites shifted their standards in bad faith and censored the
Plaintiffs because their Constitutionally protected religious and political speech offended the
delicate sensibilities of the employees who happened to work for the social media websites at the
time. At the time of each censorship, the Plaintiffs had previously invested a ton of time and
money in their user profile accounts. Every time the Plaintiffs have threatened Facebook,
Twitter, and Youtube with legal action, the social media websites promise to immunize their
deceptive and destructive trade practices by invoking Section 230 of the Communications
Decency Act. This assumption based on the public record that social media websites might have
total immunity under Section 230 has given rise to the Plaintiffs cause of action here in which
the Constitutional or the parameters of Section 230 are in question.

The Plaintiffs collectively consists primarily of Christ-followers, who served in the
United States Military in foreign theaters of war, namely on the rule of law mission, which is
purposed to better ensure a government's compliance with their highest Constitutional authority.
The Plaintiffs have continued that mission state-side in America even though they no longer
officially operating under Title 10 jurisdiction on behalf of the Armed Forces. The Plaintiffs
routinely file comprehensive lawsuits across the United States on different controversial and
complex issues that typically concern the "culture wars" and First Amendment issues that are too
"politically hot" for the government-funded Attorneys General to pursue. In bringing such
lawsuits, the Plaintiffs - without apology - often end up converting Article III Courts into their
own private legislative research commission. Out of the overflow of the litigation pursued by the
Plaintiffs, the Plaintiffs subsequently draft legislation for all 50 states and for the federal
government, which is then routinely introduced by a bi-partisan network of sponsors that
stretches across the Country before the Article I branch. The legislation authored by the Plaintiffs
that gets presented to the members of legislative branch is legally vetted ad nausem and is
calculated to survive judicial review, if subsequently challenged once enacted.

One of the fights that the *Amici* have undertaken in multitudes of Federal District Courts
concerns Big Tech censorship, since this fight has created a freedom crisis that is eroding the
quality of life for millions of Americans. Subsequently, the Plaintiffs authored a proposed bill
called the "Stop Social Media Censorship Act" that is customized for all 50 states and is
narrowly tailored to parallel the spirit of Section 230 of the CDA so that it falls squarely in the
state-law exemption under subsection (e) subparagraph (3) of the Section 230 - thereby getting
around the problem of preemption. Here is a website for the bill:

52. The Plaintiffs authored the Stop Social Media Censorship Act for all 50 states, not for personal glory or donations but because it is the right thing to do and because as Christian missionaries, the Plaintiffs have set out to advance human flourishing as far as they are able.

53. Defendant Attorney General Garland is the chief legal officer of the United States and heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of federal civil laws, including the statute at issue in this case.[43]

54. Governor DeSantis is the Governor of Florida. He resides in Florida and is sued in his official capacity. His staff members were the architects of SB7072 which has been set on the path of nullification in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). Defendant Governor DeSantis has the authority under Article III, Section 3 of the Florida Constitution to convene a special session so that the Stop Social Media Censorship Act can be enacted in a manner that will allow the Plaintiffs here and the Trump Plaintiffs in *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021) to get relief from the government for their injuries inflicted by social media websites that engage in breach of contract, bad faith, unfair

---

https://www.specialforcesofliberty.com/. Here is a short video that the Plaintiffs provide to state legislatures who prime sponsor, co-sponsor, or support the bill so that they can easily understand the bill and the issues involved: (https://youtu.be/CCcOALXNteM).

Over 25 states moved on two primary bills written to stop the on-going problem of social media censorship that were drafted by either De Facto Attorneys General or Professor Hamburger of Columbia Lawschool. Countless Republicans and Democrats prime sponsored, co-sponsored, or supported these legislative measures. For a breakdown by state and by prime sponsor for the 2021 legislative session and the 2022 legislative session of the proposed language of the bills see Appendix A.

[43] Attorney General Garland is unfit for the job because his paramount agenda is to excessively entangle the government with the religion of Secular Humanism in direct violation of the Establishment Clause. Attorney General Garland lacks the character and fitness to serve on the courts or as Attorney General because he does not understand the differences between "right and wrong," "real and fake," and "secular and non-secular." This individual has checked his brain at the door of secular humanism to the point that he does not even operate in objective reality or see that most of the Democrat party platform is cultish and unconstitutional under the Establishment Clause.

dealing, fraudulent inducement, deceptive trade practices, false advertising, and other forms of

consumer protection violations. The Plaintiffs are asking Governor DeSantis to sua sponte

convene a special session or, alternatively, that this Court order and direct the Governor to do so,

which will actually give the Plaintiffs a valid pathway to acquiring redress through the courts

against social media websites that have injured them and millions of others due to fraud.

## NOT ALLOWING CONSUMERS TO REDRESS INJURIES AGAINST SOCIAL MEDIA WEBSITES THAT MARKETED THEMSELVES FROM THEIR INCEPTION AS BEING NEUTRAL ON POLITICAL AND RELIGIOUS SPEECH IS HARMING THE PUBLIC

55. Issuing an injunction that strikes down Section 230 or finding that Florida could pass

Stop Social Media Censorship Act and cure the constitutional defects of the Section 230 in view

of the state-law exemption, serves the public's best interest. The public record is replete with

examples evincing social media companies' sustained campaign of inconsistently and unfairly

censoring, shadow banning, deplatforming, and deprioritizing Floridians, including journalistic

enterprises and candidates for public office.[44] Senator Hughes of Texas, the prime sponsor of

---

[44] For example, state of Florida has admitted the following in the public record regarding how bad social media censorship is for the general public: *The Babylon Bee*, a conservative Christian news satire website headquartered in Jupiter, Florida that publishes satirical articles on religion, politics, and current events has repeatedly been the target of social media platforms' inconsistent and unfair behavior. In 2018, *The Babylon Bee's* Facebook page was threatened with removal and demonetization after one of its satirical articles titled "'CNN Purchases Industrial-Sized Washing Machine to Spin News Before Publication' was 'fact-checked.'" Facebook later apologized and explained that it had made a "mistake." In 2020, *the Babylon Bee* posted a story titled "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch," referencing the comedy *Monty Python and the Holy Grail*. Facebook demonetized *The Babylon Bee*'s Facebook page and stuck to its determination that the article "incited violence" due to its reference to burning witches, reversing its decision only after numerous media outlets lambasted Facebook for its censorship. Also in 2020, Twitter briefly suspended *The Babylon Bee*'s page for being "spam," reversing the suspension shortly thereafter and explaining that *The Babylon Bee* had "mistakenly" been caught in a spam filter.

The *New York Post* has received a similar treatment for some of its stories. Twitter locked the *New York Post*'s account and demanded that it delete six tweets that linked to the *Post*'s exposé on Hunter Biden in the fall of 2020. Facebook reduced the distribution of the story on its site. Twitter CEO Jack Dorsey later called the move a "total mistake," describing it as the result of a "process error." In April 2021, Facebook disallowed its users from sharing the *New York*

SB12, paid Facebook large amounts to promote his campaign posts on his user profile. Facebook

pocketed the money and did not allow the campaign advertisements to be viewed by the public.

Then Facebook began shadow banning Senator Hughe's posts and shutting down his profile page

---

*Post*'s story about a Black Lives Matter co-founder's expensive real estate purchases, citing the story as against its "community standards."

Individuals and journalistic enterprises alike have had to grapple with social media platforms' inconsistent and unfair practices regarding COVID-19. In February 2021, Facebook announced that it would expand its content moderation on COVID-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." It blocked the *New York Post*'s article written that month suggesting that the virus could have leaked from a Chinese virology lab.. But now, given "ongoing investigations into the origin of COVID-19 and in consultation with public health experts," Facebook has decided that it will no longer "remove the claim that COVID-19 is man-made or manufactured."

The social media platforms' behavior has also affected politicians. YouTube removed a video of Governor Ron DeSantis holding a panel with pandemic health experts for allegedly violating community standards regarding COVID-19 medical information. YouTube stated that the video included information on mask-wearing that "contradicts the consensus of local and global health authorities." In April 2020, Twitter terminated the account of Howie Hawkins, a Green Party candidate for President, for allegedly violating its rule on "impersonation." And in early 2021, Facebook, Twitter, Instagram, and YouTube banned President Trump in the wake of the January 6 Capitol riot out of concerns that he would encourage violence on their platforms, while taking no action against Representative Maxine Waters for her statements to protestors during Derek Chauvin's trial for the murder of George Floyd.

Social media platform users are not always notified that they have been deplatformed or given an explanation for how they violated the platforms' content guidelines. When a social media platform shadow bans a user, that user is still able to access the platform, post content, and comment on others' posts, but their actions are invisible to all other normal users. The user is not notified of the shadow ban. In one instance, a user was shadow banned from Reddit but continued to spend four to five hours a day posting content for weeks before realizing that the content was invisible to all other normal users.

These examples of social media platforms' inconsistent and unfair practices are further evidenced by systematic examinations of how the platforms implement their own content guidelines. Social media platforms apply their content guidelines differently to posts with similar content,, and some suspend the accounts of right-leaning individuals at a higher rate than left-leaning individuals,. Officials of the platforms themselves have admitted that employees in charge of content moderation "could be biased and pursuing their own political agendas."

The social media platforms' inconsistent treatment of user content would be bad enough if they were transparent about how they make moderation decisions. But some of the most important platforms are notoriously secretive about such matters, even while publicly claiming—contrary to the public record—that they apply their policies "in a way that is fair and consistent to all," (quoting prior version of Facebook report on enforcement of community standards). Perhaps most notoriously, senior Google executives have publicly claimed that the company does not manually alter search results despite public reporting to the contrary.

to give his opponent an advantage in the campaign against him. In response to the mistreatment of Senator Hughes, Facebook promised to hide behind Section 230 if the Senator sought redress from the government for its deceptive trade practices. What happened to Senator Hughes has happened to hundreds of law makers across the country. (The censorship of Senator Showers of Alaska was also incredibly egregious). In primaries involving Democrat candidates, social media websites have been censoring and shadow banning the candidate they disfavor, putting a thumb on the scale of such elections. This practice has provoked Democrat legislators to sign on as prime sponsor and co-sponsor of the Stop Social Media Censorship Act in a variety of states. For example, Senator Gabbard of Hawaii, a Democrat, who is former Presidential contender Tulsi Gabbard's father, prime sponsored the Stop Social Media Censorship Act because of the onslaught of censorship that his daughter experienced in running to become the Commander In Chief. Social media websites that marked themselves as being neutral on politics in order to create a digital public square censored Congresswoman Gabbard's speech ad nausem throughout her campaign for President simply because their employees favored other candidates, whose policies make them feel less convicted about their personal immorality. To pretend that social media websites are not threatening election integrity is asinine, and not a position that the judicial branch should take. For the judicial branch to continue to interpret Section 230 in a manner that allows for social media websites to meddle in election in bad faith with absolute immunity is unminding the trustworthiness and legitimacy of the courts writ large.

## FACTS REGARDING DIRECT INJURY TO THE PLAINTIFFS PERPETRATED BY FACEBOOK, TWITTER, AND YOUTUBE THAT HAVE GONE WITHOUT GOVERNMENT REDRESS BECAUSE OF THE THREAT OF SECTION 230 AND THE ABSENCE OF NARROWLY TAILORED STATE STATUTE LIKE THE STOP SOCIAL MEDIA CENSORSHIP ACT

56. While residing in West Virginia (4th Circuit), Tennessee (6th Circuit), Florida (11th Circuit), Louisiana (5th Circuit), the District Of Columbia (DC Circuit) and elsewhere, the Plaintiffs were induced and enticed to contract witih Facebook, Twitter, Youtube, and Tictok, creating and investing substantially in user profiles on the promise that the platforms were (1) free, (2) fair, (3) open to the public, (4) a place where the free exchange of ideas by the user was permitted and encouraged, and (6) neutral on issues of religion and politics.

57. At the time the Plaintiffs created their user profiles just about everyone they knew had a user profile to include people who shared the same religious and political beliefs as themselves. The Plaintiffs, like virtually all of the other billions of users of social media websites, did not retain lawyers who are subject matter experts in digital contracts to review the terms of services of what was apparently an adhesion contract. Instead, the Plaintiffs predominately consider how social media websites marketed themselves as being neutral on political and religious speech in deciding to create and invest substantially in their user profiles. The social media websites gave the Plaintiffs and millions of others the reasonable expectation that religious and political views could be expressed at will without the fear of punishment and reprisal by the social media website employees.

58. The Plaintiffs are Christ-Followers who believe that the Bible is the Divine word of God and that Jesus Christ was exactly who He said He was. See John 14:6. The Plaintiffs are advocates for the radically transformative gospel narrative and feel compelled to attempt to gracefully fulfill the great commision in response to the love they believe that God has for them. See John 3:16; see Matthew 28:16-20. The gospel can in-part be summarized as, "humans are far worse than we ever dared to imagine, but we are far more loved by God than we could have ever dreamed." It is a faith-based worldview that humbles them and uplifts believes at the same

time. The Plaintiffs are not legalists,[45] and they were delighted to join social media platforms with other users who are critical of Christian doctrine and practices. The Plaintiffs welcome such critiques by non-believers and skeptics, while maintaining that the Plaintiffs' religious and political speech warrants equal protection, respect, and treatment. In creating several social media user profiles, the Plaintiffs believed based on how the social media websites marketed themselves that they could express and advocate for Christian principles, ideology, and beliefs without fear of censorship, persecution, or reprisal carried out by the social media website's employees themselves, who harbor animus towards Christians and Republicans and Democrats who represent "friends of the founding" of our Nation.

59. The Plaintiffs take no issue with third parties with user profiles censoring the Plaintiffs' speech or blocking the Plaintiffs' profiles. The Plaintiffs were personally injured by the employees of the social media website, who themselves censored, banned, and blocked the Plaintiffs' speech based on vague and arbitrary shifting standards that were abused out of the overflow of the moral superiority complexes harbored by the employees of the social media websites. This imperialistic elitism should be staunchly condemned by the judicial branch.

60. The employees at the social media websites censored, deleted, shadow-banned, and froze countless user profiles created by the Plaintiffs because the Plaintiffs took positions like (1) "men cannot be women;" (2) "Secular Humanism is a religion for the purpose of the First Amendment as the Supreme Court recognized" (3) "woke leftism dogma is inseparably linked to the religion of Secular Humanism religion for purposes of the Establishment Clause of the First Amendment;" (4) "a public library's decision to host Drag Queen Story Time at the taxpayer's expense violated the Establishment Clause of the First Amendment;" (5) "the government's decision to get in bed with the LGBTQ cult has proven to be a disaster for everyone;" (5) "life

---

[45] Ephesians 2:8-9

beings at conception and convience abortions are self-evidently immoral and subversive to human florishing;" (6) "the First Amendment Establishment Clause is the underlying legal basis for the Hyde Amendment and for the government to award public funds to convenience abortion providers is unconstitutional under the Establishment Clause for failing the prongs of the Lemon Test;" (7) "Black Lives Matter thinks that only the lives fthat matter are the one's who agree with their communist ideology - see Candice Owens;" (8) "the reason it is called the 'gay pride movement' is because everyone knows that there is nothing to be 'proud' about;" (9) "when a person says 'love is love' what they really mean is that they are perfectly ok with government assets being used to crush anyone who dares to suggest that homosexuality is entirely immoral, which is a position that is unloving;" (10) critical race theory is racists; (11) "Jesus is Lord;" (12) "what non-theistic leftist don't seem to understand is that love without truth is just shallow sentimentality."

61. In a trial against social media webistes, the Plaintiffs could show that the social media websites decision to delete, shadow-ban, and censor the Plaintiffs' profiles costs the Plaintiffs hundreds of thousands of dollars. This is especially true in the case of Warriors For Christ, which had accumulated over 226,000 followers on Facebook, 575,000 followers on Youtube, and 335,000 followers on Twitter. Warriors For Christ followers tuned in to watch weekly sermons provided by Pastor Rich and made donations to the ministry through its social media profiles. In a coordinated effort, social media websites deleted, banned, or froze Warriors For Christ user profiles just because the messages offered by Pastor Rich offended the delicate sensibilities of the brainwashed employees who work for the social media website in response to their refusal to think logically. After building entire business platforms on social media websites with the promise that the social media websites were neutral on politics and religion, the Plaintiffs have

had their accounts arbitrarily deleted, censored, blocked, marginalized, banned, and shadow-banned literally hundreds of times. The evidence shows that social media websites employees get off on haranguing, marginalizing, and oppressing users who do not share the same worldview, only to then cower behind 230 immunity that was passed by Congress.[46]

62. Just because some of the employees at social media websites do not like feeling convicted and harbor an emotional problem with the truth about the way things are and the way we are as humans does not mean that Congress can pass a law that shields social media websites from being held to account for their injurious malicious conduct. Accordingly, this Court is tasked with carving out the path for victims to be able to seek redress from the government in the wake of harmful business practices used by social media websites. Hundreds of religious institutions and political commentators have been deplatformed in a manner that is injurious to everyone, all because the social media website feel entitled to not live up to how they marketed themselves because of Section 230.

## FIRST AMENDMENT VIOLATION - GENERALLY

63. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs. The First Amendment of the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

64. "Congress... ma[d]e" Section 230, a "law," and this "law" has been interpreted and construed by government actors to create blanket immunity to the extent that the law "abridges

---

[46] Social media websites have proven that people who are intolerant of intolerant people are intolerant; people who are judgmental against judgmental people are judgmental; and people who are dogmatic about not being dogmatic are the most dogmatic of all.

[the Plaintiffs] freedom of speech" and "the [Plaintiffs] right to petition the government for redress of grievances" in the wake of bad faith acts of social media websites that have engaged in self-evidently immoral consumer protection violations to include indecent deceptive trade practices, fraudulent inducement, unjust enrichment, bad faith, unfair dealing, breach of contract, and false advertising.

65. The First Amendment right to petition the government for redress of grievances encompasses both the right to attempt to persuade the legislative and executive branches and the right to access the courts. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

66. While at the United States Capitol in D.C. in the halls of the Senate Russell building, in a heated exchange with Mark Zuckerberg, Plaintiff Sevier did the Christian thing and threatened to sue Mark Zuckerberg's "as@#$$ into powder," if his entity did not "stop its political and religious censoring of theists for being theists. In response, Mr. Zuckerberg, authorized agents, retorted that Facebook would invoke a Section 230 immunity blanket defense in the litigation threatened by De Facto Attorneys General, stating that Facebook could do "whatever the hell it wanted." [47] The posturing of Facebook's CEO combined with judicial interpretation of Section 230 has given the Plaintiffs the reasonable apprehension that the making of Section 230 by Congress constituted a legal blockade that has stopped the Plaintiffs from being able to seek redress from the government for the bad faith injurious actions of social media websites, like Facebook, that has harmed the Plaintiffs personally.

67. Pursuant to Section 230, the government's creation or enforcement or lack of responsiveness to Section 230 has encouraged social media websites to censor the

---

[47] This interaction is included pursuant to the state of mind exception of the hearsay rule, and not to prove the truth of the matter asserted.

constitutionally protected speech of the Plaintiffs, after the social media websites falsely marketed themselves as being neutral towards protected religious and political speech.

68. The interpretation of Section 230 has created total blanket immunity in a manner that has thwarted the Plaintiffs from being able to seek redress for their grievances.

69. Using its authority under Section 230 together and acting in concert, major social media websites regulate the content of speech over a vast swath of the Internet in bad faith, after having falsely marketed themselves as being free, fair, open to the public, and neutral towards religious and political speech that is considered to be protected speech.

## RIGHT TO PETITION - COUNT ONE
## U.S. Const., amend. 1 (Petition Clause)

70. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

71. The Petition Clause of the First Amendment of the U.S. Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people . . .to petition the Government for a redress of grievances." U.S. Const., amend. I.

72. The Challenged Provision prohibits the Plaintiffs from seeking redress from the government against social media websites that have injured them through fraud, breach of contract, false advertising, unjust enrichment, bad faith, unfair dealing, and deceptive trade practices.

73. The Challenged Provision is overly broad and not justified by a legitimate, compelling, or overriding government interest.

74. The Challenged Provision is not narrowly tailored to achieve any such legitimate, compelling, or overriding government interest.

75. The Challenged Provision violates the Petition Clause of the First Amendment.

76. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Petition Clause of the First Amendment to the U.S. Constitution.

77. Based on prior interpretations of Section 230 by the judicial branch, the Plaintiffs are under the apprehension that Section 230 serves as a total immunity blanket for social media websites that falsely market themselves and censor consumers after inducing them to invest.

## FREE SPEECH - COUNT TWO
### [U.S. Const., amend. 1 (Freedom of Speech)]

78. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

79. The Free Speech Clause of the First Amendment to the U.S. Constitution provide: "Congress shall make no law . . . abridging the freedom of speech."

80. The Challenged Provision prevents speech and expressive activity by allowing social media websites to act in bad faith while engaging in fraud, false advertising, theft-by-trick, breach of contract, unfair dealing, and deceptive trade practices with immunity.

81. The Challenged Provision is unconstitutionally overbroad on its face because its unconstitutional applications are substantial in relation to its legitimate applications.

82. As applied to the Plaintiffs, the Challenged Provision unconstitutionally restricts their protected speech.

83. The Challenged Provision is not narrowly tailored to any legitimate, compelling, or overriding government interest.

84. The Challenged Provision violates the Free Speech of the First Amendment in its making by Congress and its enforcement.

85. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Free Speech Clause of the First Amendment to the U.S. Constitution.

## FREE EXERCISE CLAUSE - COUNT THREE
### [U.S. Const., amend. 1 (Free Exercise)]

86. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

87. The Free Exercise Clause of the First Amendment to the U.S. Constitution protects plaintiffs' religious activities.

88. As the result of Congressional action, the Plaintiffs religious expressions are being disfavored, stifled, and censored. The Congressional action that led to the censorship of the Plaintiffs religious speech has relegated the Plaintiffs to second-class citizen status. The Plaintiffs do not feel welcomed in their own country , even though they consider themselve to be "friends of the founding fathers," just as this Court is required to be.

89. The Plaintiffs have no adequate remedy at law other than to have Section 230 voided.

90. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Free Exercise Clause of the First Amendment to the U.S. Constitution because it stifles religious expressions that are otherwise protected.

## ESTABLISHMENT CLAUSE VIOLATION - COUNT FOUR
### [U.S. Const., amend. 1 (Establishment Clause)]

91. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs.

92. The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion."

93. The Establishment Clause of the First Amendment forbids the enactment of any law, program, or practice "respecting an establishment of religion." Congress is required to pursue a course of neutrality with respect to religion.

94. From the reasonable person perspective, Congress's enactment of Section 230 fails all three prongs of the Lemon Test and violates the First Amendment Establishment Clause for constituting a non-secular sham that lacks a primary secular purpose that has cultivated an indefensible legal weapon against non-observers of the religion of Secular Humanism, and for serving to excessively entangle the government with the religion of Secular Humanism.[48]

95. The Supreme Court and nearly all of the Federal Court of appeals have recognized that Secular Humanism is a religion for the purpose of the First Amendment's Free Speech, Free

---

[48] To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). It is important to understand that government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Ag ostini v. Felton*, 521 U.S. 203, 218 (1997). The evidence will show that Congress's make Section 230 fails all three prongs of the *Lemon* Test. At the core of the "Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamberof Commerce, Inc.,*698 F. 2d 1098, 1111 (11th Cir.1983).T his secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844 (2005). Under this second prong of the *Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual purpose," *Wallace v. Jaffree,* 4 72 U.S. 38, 56 n.42 (1985), the "symbolic union of church and state...is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. v. Ball*, 473 U.S. 373, 390 (1985);*see also Larkin v. Grendel's Den*, 459 U.S. 116, 126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited). Congress's enactment of Section 230 has constituted a "legal weapon that no [Christian or non-observer of Secular Humanism] can obtain." *City of Boerne v. Flores,* 521 U.S. 507 (1997). Social media websites have wielded a legal weapon in direct violation of prong II of Lemon.

Exercise, and Establishment Clauses.[49] The high priest and poet, Justice Kennedy, enshrined the

core fundamental truth claim of Secular Humanism into law in *Planned Planned Parenthood v.*

---

[49] The United States Supreme Court already found that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in*Torcaso v. Watkins*, 367 U.S.488, n. 11 (1961), stating "among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism, and others. See *Washington Ethical Society v. District of Columbia,* 2 49 F.2d 127, 101 U.S. App. D.C. 371 (D.C. Cir 1957); *Fellowship of Humanity v. County of Alameda*, 153 Cal.App.2d 673, 315 P.2d 394 (1957); II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Britannica (1957 ed.) 325-327; 21 id., at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120-138, 254-313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47."

See also - *School District of A Bington Township, Pa. v. Schempp,* 374 U.S. 203, 225 (1963)("[T]he State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe.")

See also - the decision in *United States v. Seeger,* 3 80 US 163, 166 (1965) defined religion as all sincere beliefs "based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent." Thus, according to *Seeger,* "religion" includes atheists and agnostics, as well as adherents to traditional theism. The logical conclusion from the Seeger decision is that "[a]bsolute vertical disbelief in the traditional sense - disbelief in God - is irrelevant" to First Amendment considerations. *Id. See generally* Bowser, *Delimiting Religion in the Constitution: A Classification Problem,* 11 VAL. U.L. REV. 163 (1977); Boyan, *Defining Religion in Operational and Institutional Terms,* 1 16 U. PA. L. REv. 479 (1968); Clancy and Weiss, The Conscientious Objector Exemption: *Problems in Conceptual Clarity and Constitutional Considerations,* 17 ME.L. REV. 479 (1968); Clark, *Guidelines for the Free Exercise Clause,* 8 3 HARV. L. REV. 327 (1969); Killilea, *Standards for Expanding Freedom of Conscience,* 34 U. Prrr. L. REv. 531 (1973); Rabin, *When is a Religious Belief Religious: United States v. Seeger and the Scope of Free Exercise,* 51 CORNELL L.Q. 231 (1966); Comment, *Defining Religion: Of God, the Constitution and the* D.A.R., 32 U. CHI. L. REv. 533 (1965).

See also - in *Welsh v. United States*, 398 U.S. 333 (1970), the Supreme Court extended the *Seeger* rationale and held "that purely ethical and moral considerations were religious." The Supreme Court further blurred the distinction between religion and morality by holding that a sincere person may be denied an exemption only if his belief or belief system does "not rest upon and invade ethical or religious principles, but instead rests solely upon considerations of policy, pragmatism or expediency." *Id.* at 342-43. Most of the Federal Court of appeals have also already found that Secular Humanism is a religion for the purpose of the First Amendment Establishment Clause in cases such as *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979); *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977); *Thomas v. ReviewBd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003); *Real Alternatives, Inc. v.Se'y Dep't of Health & Human Ser*, 150 F. Supp. 3d 419, 2017 WL3324690 (3d Cir. Aug. 4, 2017); and *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001); *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943).

*Casey*, 505 U.S. 833, 846-47 (1992), when he stated that "at the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe." Hitler believed this as well and hung the same condescending message over the front gate of Buchenwald concentration camp. The largest religion in the United States is Secular Humanism, also referred to by theologians as anti-theism, postmodern individualistic western moral relativism and expressive individualism. [50]

96. The Plaintiffs have standing as taxpayers under *Flast v. Cohen*, 392 U.S. 83 (1968)[51] and other cases to pursue this cause of action. The Plaintiffs have a logical nexus as taxpayers to pursue this cause of action as the authors of the Stop Social Media Censorship Act. [52]

---

[50] Critical race theory, Black Lives Matter's ideology, Planned Parenthood's dogma, and the LGBTQ orthodoxy are doctrines that are inseparably linked to the religion of Secular Humanism. While Facebook, Twitter, and Youtube marketed themselves as being neutral on matters of religion, they have used Section 230 to excessively entangle the Nation with the irrational and licentious religion of Secular Humanism. What the Democrat party fails to understand is that Secular Humanism promotes licentiousness and is an attempt to justify practices that are inconsistent with the peace and safety of the state. The government has the right to regulate the fire out of Secular Humanism practices because the Free Exercise Clause is not absolute.

[51] The general rules regarding standing to challenge governmental actions are designed to ensure that courts are addressing actual cases that can be resolved by the judicial system. However, in some circumstances, individuals may seek to challenge governmental actions for which neither those individuals nor any other individuals could meet standing requirements. Indeed, the Supreme Court has noted that in some instances "it can be argued that if [someone with a generalized grievance] is not permitted to litigate this issue, no one can do so." *United States v. Richardson*, 418 U.S. 166 (1974). Generally, the Supreme Court has noted, "lack of standing within the narrow confines of Art.III jurisdiction does not impair the right to assert [one's] views in the political forum or at the polls." However, the ability of individuals to affect change through political and democratic means does not eliminate all cases where a large group of individuals would be affected by the challenged governmental action. In particular, the Court has specifically allowed taxpayer standing for claims arising under the Establishment Clause. Under the *Flast* exception to the general prohibition on taxpayer standing, taxpayers may raise challenges of actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause which is applicable to the states under the Fourteenth Amendment. *Flast v. Cohen*, 392 U.S. 83 (1968). As Justice Ginsburg shrewdly pointed out, "the underlying premise of *Flast v. Cohen* [is] that the Establishment Clause will be unenforceable unless we recognize taxpayer standing." *Id.* At 8

[52] The Plaintiffs pay every form of conceivable state and federal tax in Florida. The federal taxes that the Plaintiffs pay in Florida go to the United States' general fund. The salaries

97. Congress may have had an emotional reason for passing Section 230 into law
because it wanted to see the Internet "grow" but that consideration is an emotional appeal, and it
is a long-standing jurisprudence that emotional appeals, even really good ones, cannot be used to
usurp the Establishment Clause of the First Amendment. See *Holloman v. Harland*, 370 F.3 1252
(11th Cir. 2004).

98. The enactment of Section 230 by Congress has represented an endorsement of the
religion of Secular Humanism in how it has been used by social media websites to entangle the
government with the religion of Secular Humanism , constituting excessive endorsement of the
Secular Humanist religion due to Congress making a bad law that was not thoughtout.

99. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the
Plaintiffs as victims of bad faith social media censorship violates the Establishment Clause of the
First Amendment to the U.S. Constitution for failing the prongs of the Lemon Test.

## DECLARATION OF FIRST AMENDMENT VIOLATIONS OF SECTION 230's MAKING - COUNT FIVE

100. Plaintiffs re-allege and re-aver all of the allegations contained in the previous
paragraphs.

101. In censoring (flagging, shadow-banning, etc.) the Plaintiffs, social media websites
relied upon and acted pursuant to Section 230 of the Communications Decency Act. Congress's
action constitutes the superseding cause that is preventing Plaintiffs from acquiring relief from
social media websites.

---

of the members of Congress are paid out of the general fund. Congress made Section 230 in the
normal course of business, and that statute has served as government action that establishes the
secular humanism as favored by social media websites as the official and favored religion of the
United States. As non-observers of the secular humanism religion, the Plaintiffs have been
relegated to second-class citizen status.

102. The social media websites would not have deplatformed the Plaintiffs or similarly situated profile users but for the immunity purportedly offered by Section 230.

103. Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected" under the Free Speech Clause and Free Exercise Clause of the First Amendment.  47 U.S.C. § 230(c)(2).

104. In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

105. Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

106. Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

107. Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

106. Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and

viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

108. Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression, to religious exercise, and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.[53]

109. Accordingly, the Plaintiffs seek an injunction and a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected free speech and constitutionally protected free exercise of religion.

## ALTERNATIVE COUNT
## DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT, THE STOP SOCIAL MEDIA CENSORSHIP ACT, AND § 501.204 - COUNT SIX

[53] The "ministries of truth" favor the religion of Secular Humanism over non-religion and over other religions, causing any reasonable observer to see that the Congress's immunity has had the effect of establishing Secular Humanism as the supreme religion of the Nation in violation of the prongs of the Lemon Test and the First Amendment's Establishment Clause.

_____110. Plaintiffs re-allege and re-aver all of the allegations contained in the previous

paragraphs. This claim for declaratory relief is pleaded in the alternative. 47 U.S.C. § 230(3)(c)

states "Nothing in this section shall be construed to prevent any State from enforcing any State

law that is consistent with this section. No cause of action may be brought and no liability may

be imposed under any State or local law that is inconsistent with this section.

111. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the

Plaintiffs does not violate the First Amendment only if Florida or any other state were to enact a

statute, like the Stop Social Media Censorship Act, that is narrowly tailored to fall in the state

law exemption under subsection (e) subparagraph (3) of Section 230 because a lawsuit brought

under such a statute would allow litigants to seek redress against social media websites that act in

bad faith and commit fraud.

112. Issuing a declaration that clarifies the state-law exemption is not enough. Therefore,

the Plaintiffs ask this Court to direct Governor DeSantis to call a special session pursuant to

Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of

Article VI of the United States Constitution to enact the Stop Social Media Censorship Act to

cure constitutional defects of SB7072 in view of the decision in *Netchoice, LLC et al., v. Moody

et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs can finally have the

actual ability to properly petition the courts of competent jurisdiction for redress against

deceptive social media websites that defrauded and dehumanized them.

113. The Plaintiffs seek declaration and clarification from the Court on whether the

Plaintiffs and other injured Floridians could bring a lawsuit under § 501.2041 against social

media websites that have victimized them in view of the preliminary injunction entered in

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) or whether § 501.2041 would be automatically preempted by Section 230.

## DEMAND FOR A BENCH TRIAL

114. The Plaintiffs request a bench trial on all issues so triable.

## PRAYER FOR RELIEF

115. WHEREFORE, the Plaintiffs respectfully requests that the Court either enter an Order:

A. Declaring that the challenged provision, 47 U.S.C. § 230, et. seq. on its face and as applied to Plaintiffs, violates the Petition Clause of the First Amendment to the U.S. Constitution and the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment to the U.S. Constitution and is enjoined from enforcement;

B. Alternatively, declaring that 47 U.S.C. § 230(c)(1) and (c)(2)

on its face and as applied to Plaintiffs, violates the Petition Clause of the First Amendment to the U.S. Constitution and the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment to the U.S. Constitution and is, thereby, enjoined from enforcement;

C. Alternatively, declaring that the State of Florida should have enacted the amended version of HB 33 by Sen. Gruters and Rep. Sabatin (referred interchangeably as the Stop Social Media Censorship Act), and not SB7072 that suffers from the Constitutional concerns described by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113);

D. Alternatively, declaring that if Florida or any other state were to enact the Stop Social Media Censorship Act that the statute would not be preempted under Section 230 and because it falls squarely within the state-law exemption under subsection (e) subparagraph (3) of Section 230 and that the Plaintiffs and others who were similarly situated could pursue a cause of action

under the state statute without the lawsuit being automatically preempted by the Supremacy
Clause in view of Section 230;

E. Alternatively, requiring Defendant Governor DeSantis to call a special session
pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under
Clause 3 of Article VI of the United States Constitution to deliberate enacting the Stop Social
Media Censorship Act to cure Constitutional defects of SB7072[54] in view of the decision in
*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the
Plaintiffs and other Floridians who have been injured by social media websites can finally and
properly petition the government for redress in a legally proper manner so that they could have
the chance to be made whole again;

F. Alternatively, declaring that the Plaintiffs could bring a lawsuit under § 501.2041
against social media websites that have victimized them and that § 501.204 would not be
automatically preempted by Section 230 because § 501.2041 within the state-law exemption
subsection (e) subparagraph (3).

G. Permitting an award of attorneys' fees and costs to Plaintiffs in an amount to be
determined at trial.

H. Permitting an award of such other and further relief as the Court may deem just and
proper.

I. Granting Plaintiff Sevier ECF filing access;

J. Granting the Plaintiffs leave to file two separate motions for preliminary injunction,
permanent injunction, and/or summary judgment and that they be given leave to file excessive
pages for the same reasons the plaintiffs in *Netchoice, LLC et al., v. Moody et. al.*
4:21cv220-RH-MAF (N.D.F.L 2021) were given.

[54] SB7072 the bill which created §106.072, § 287.137, and § 501.204

K. Liberally granting leave to third parties that seek leave to submit *amicus* briefs, even

if the briefs are critical of the Plaintiffs' watertight positions.

/s/Christopher Sevier Esq./
DE FACTO ATTORNEYS GENERAL
Mailing: 118 16th Ave S #247 - Music Row
Nashville, TN 37203
(615) 500-4411
BCN: 026577
909 Santa RosaBlvd,
Fort Walton Beach, FL 32548
4301 50th St, Suite 300, #2009,
Washington, DC 20816
ghostwarsmusic@gmail.com
www.specialforcesofliberty.com
www.chrissevier.com
1LT 27A JAG
Bravo Two Zero

/s/John Gunter Jr./
SPECIAL FORCES OF LIBERTY
195 NW 103rd Strreet
Miami, FL 33150
(801) 654-5973
johnjr@tel-electronics.com
www.specialforcesofliberty.com
www.stopsocialmediacensorshipact.com
SGM 27D
Gator Six Zulu
(TO BE REPRESENTED PRO HAC)

/s/Deb Maxwell/
SPECIAL FORCES OF LIBERTY
4415 Spring Lake CT
New Port Richey, FL 34652
(727) 400-2182
1debmaxwell@gmail.com
www.specialforcesofliberty.com
(TO BE REPRESENTED PRO HAC)

/s/Pastor Rich Penkoski/
WARRIORS FOR CHRIST
195 NW 103rd Strreet
Miami, FL 33150
4301 50th St, Suite 300, #2009,

Washington, DC 20816
(801) 654-5973
pastor@wfcchurch.org
https://www.wfcchurch.org
(TO BE REPRESENTED PRO HAC)

/s/Greg' Degeyter Esq./
DE FACTO ATTORNEYS GENERAL
BCN: 24062695
degeyterlaw@gmail.com
9898 Bissonnet St Ste 626
Houston , Texas 77036
(713) 505-0524
Attorney On Behalf Of Special Forces Of Liberty &
Warriors For Christ
(*PRO HAC APPLICIATION FORTHCOMING*)

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

| | |
|---|---|
| **Chris Sevier, DE FACTO ATTORNEYS GENERAL, John Gunter, SPECIAL FORCES OF LIBERTY, Richard Penkoski, WARRIORS FOR CHRIST**<br><br>**Plaintiffs,**<br><br>**V.**<br><br>**Merrick Garland, IN HIS OFFICIAL CAPACITY OF THE UNITED STATES, Ron DeSantis, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF FLORIDA**<br><br>**Defendants.** | **COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF** |

## ORIGINAL COMPLAINT

*What the ACLU started in Reno American Civil Liberties Union, 521 U.S. 844 (1997), we intend to finish and perfect. - De Facto Attorneys General*

*Understanding the Stop Social Media Censorship Act*
*https://www.youtube.com/watch?v=CCcOALXNteM*

*http://www.specialforcesofliberty.com/*

1. This is an action for declaratory and injunctive relief that challenges the sole surviving

provisions of the "Communications Decency Act of 1996", 47 U.S.C. § 230 et. seq.,[1] (hereinafter

referred to as "Section 230") for namely violating the Petition and Access Clause of the First

Amendment of the United States Constitution, as well as the Free Speech, Free Exercise and

Establishment Clauses. The Plaintiffs attack this issue from a different angle than the Trump

---

[1] In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 with Section 230(c), intending to promote the growth and development of Internet platforms, as well as to protect against the transmission of obscene materials over the Internet to children. Section 230 is vague and not the least restrictive means to fulfill any interests asserted by the government.

Plaintiffs.[2] Congress, not Twitter, Facebook, or Youtube, made Section 230. If a litigant wants to

have a court strike down one of Congress's laws, the proper party to sue in most cases is the

chief enforcer of Congress's laws, the United States Attorney General. That is what the ACLU

did in getting all of the other sections of the Communications Decency Act struck down in *Reno*

*American Civil Liberties Union,* 521 U.S. 844 (1997). That is what the Plaintiffs have done here.

2. In view of a recent decision in *Netchoice, LLC et al., v. Moody et. al.*

4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) and in other cases, there are only two

intellectually honest outcomes that this Court can render. Option one: this Court could find that

"Congress...ma[d]e [a] law...abridging...the right [of the Plaintiffs] to petition the Government

for a redress of grievances" in violation of the First Amendment of the United States

Constitution, when it made Section 230. Option two, this Court could declare that Florida can,

should, or must enact a narrowly tailored law, like the amended version HB 33 (referred to

hereinafter as the Stop Social Media Censorship Act) by Sen. Gruters and Rep. Sabatini that was

painstakingly crafted to fall squarely within the state-law exemption, so that the Plaintiffs and

other Floridians, for the first time, can legitimately seek redress for their grievances against

social media websites [3] that acted in bad faith in inflicting personal injury on profile users

---

[2] See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021), *Trump v. Facebook*, 1:21-cv-22440
(S.D.F.L. 2021), and *Trump et al v. YouTube*, LLC, 1:21-cv-22445-KMM (S.D.F.L. 2021)
[3] For purposes of this complaint "social media websites" refer to Facebook, Twitter, Youtube."
The amended version of HB 33 defines social media websites as follows:
"Social media website":

1. Means an Internet website or application that enables users to communicate with each
other by posting information, comments, messages, or images and that meets all of the following
requirements:

i. Is open to the public.

ii. Has more than 75 million subscribers with personal user profiles.

iii. From its inception, has not been specifically affiliated with any one religion or
political party.

iv. Provides a means for the website's users to report obscene materials and has in place
procedures for evaluating those reports and removing obscene material; and

v. Allows for subscribers to sign up for a personal user profile page or account where

through fraud, breach, and other deceptive trade practices. Social media websites injured the

Plaintiffs by falsely marketing themselves as a place where the Plaintiffs were free to exchange

their political and religious views. After inducing the Plaintiffs to create and invest heavily in

their user profiles on social media webistes that marketed themselves as glorified digital bulletin

boards that were neutral on religious and political expression, the social media websites

arbitrarily shifted their standards and were no longer neutral towards religious and political

speech, engaging in self-help reprisal actions. The social media websites changed the deal terms

in bad faith after having reached critical mass and having successfully created a monopoly on the

digital public square to the shock and awe of users like the Plaintiffs. The bad faith censorship in

the wake of arbitrary shifting standards that were designed to elevate the religion of Secular

Humanism over non-religion and other religions has economically and emotionally injured the

Plaintiffs.[4] Social media websites have been permitted to get away with these consumer

protection violations because of a Congressional action in making Section 230.

   3. In determining the trajectory of the First Amendment of the United States

Constitution, the public's interest would likely best be served if the Court goes with the second

option presented. Accordingly, the Plaintiffs plead in the alternatively under FRCP 8(e)(2) and

demand that if the Court finds that Section 230 does not violate the First Amendment because

Congress included an escape hatch under subsection (e) subparagraph (3) (referred to as the

state-law exemption), that the Court should:

---

beliefs and preferences can be expressed by the user.
   2. The term does not include a website that merely permits members of the general public
to post comments on content published by the owner of the website.
   [4] In this case, the Plaintiffs seek a legal path so that social media websites that were never
affiliated with a religious institution or political party from their inception will be forced to keep
their promises to consumers to remain neutral on political and religious speech. Social media
websites that have less than 75,000,000 subscribers or that made it clear upfront to consumers
that they were affiliated with a specific religious organization or political party are not of concern
to the Plaintiffs in this action.

(a) declare that the State of Florida should have enacted the amended version of HB 33 and not the comparatively disastrous SB7072 [5] that suffers from the Constitutional concerns described by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113);

(b) declare that if Florida or any other state were to enact the Stop Social Media Censorship Act that the statute would not be preempted under Section 230 and because it narrowly falls squarely within the state-law exemption under subsection (e) subparagraph (3) of Section 230;

(c) affirmatively order and direct Governor DeSantis to call a special session pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of Article VI of the United States Constitution to enact the Stop Social Media Censorship Act to cure constitutional defects of SB7072 in view of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs can finally have the actual ability to properly petition the courts of competent jurisdiction for redress against deceptive social media websites that defrauded and dehumanized them.

(d) declare that the Plaintiffs could bring a lawsuit under § 501.2041 against social media websites that have victimized them and that § 501.2041 would not be automatically preempted by Section 230, even though § 501.2041 is poorly written in comparison to the Stop Social Media Cenosrship Act.

## NATURE OF THE CASE

4. This case creates a binary that asks for a logically consistent outcome by the Judicial branch, who is tasked with the obligation to interpret Section 230, the Stop Social Media

---

[5] SB7072 is the bill enacted on May 24, 2021 by Governor DeSantis, which created §106.072, § 287.137, and § 501.204.

Censorship Act, and SB7072 in view of the doctrine of preemption created by the Supremacy

Clause and the First Amendment of the United States Constitution. The Plaintiffs need

responsiveness from the Court and the Governor because they are concerned about the statute of

limitations for the kinds of censorship they have experienced that have been detailed by some

media outlets in articles such as:

(a) *"Facebook Continues Censorship Of Warriors For Chris Page Pastor Says"* -
*Christian Post*

https://www.christianpost.com/news/facebook-continues-censorship-of-warriors-for-chris
t-page-pastor-says.html

(b) *Facebook Removes Christian Page 'Warriors for Christ' - Christian Headlines*

https://www.christianheadlines.com/blog/facebook-removes-christian-page-warriors-for-c
hrist.html

(c) *"Facebook shuts down Warriors for Christ page" - Geller Report*

https://gellerreport.com/2018/01/facebook-warriors-christ.html/

(d) *"Gay Activists Shut Down Christian Facebook Page" - Church Militant*

https://www.churchmilitant.com/news/article/gay-activists-succeed-in-getting-christian-fa
cebook-page-shut-down

(e) *"Facebook Yanks Warriors For Christ After Ignoring Death Threats To Pastor, Says
Angel In Armor Pic Violates Standards" - Conservative Firing Line*

https://conservativefiringline.com/facebook-yanks-warriors-christ-ignoring-death-threats-
pastor-says-angel-armor-pic-violates-standards/

(f) *"Facebook Censorship of Christians MUST STOP! Lawsuit underway!" - Counter
Culture Mom*

https://counterculturemom.com/facebook-censorship-of-christians-must-stop-lawsuit-und
erway/

(h) *"Youtube Censorship: 'Warriors for Christ' Channel Demonetized" - National File*

https://nationalfile.com/youtube-censorship-warriors-for-christ-channel-demonetized/

(i) *"LGBT Activists Target Pastor with Death Threats and Feces over a Facebook Emoji"*
- *CBN News*

https://www1.cbn.com/cbnnews/us/2017/july/pastor-sent-death-threats-feces-in-mail-for-
opposing-this-emoji-on-facebook

(j) *"Pastor who banned rainbow flag emoji from his Facebook page is forced to flee after
receiving death threats" - Christian Today*

https://www.christiantoday.com/article/pastor.who.banned.rainbow.flag.emoji.from.his.fa
cebook.page.is.forced.to.flee.after.receiving.death.threats/111157.htm

5. The ultimate question raised by this action is what is the best solution to the ongoing bi-partisan problem of social media censorship? Is it (a) "an executive order by the President?" or (b) "to have the judicial branch decree that social media websites are quasi-state actors for purposes of the First Amendment?" or (c) "the striking down Section 230 by judcial action under the petition and access clause or the total repeal of Section 230 by Congressional action?" or (d) "to do nothing, allowing the status quo of bad faith abuse to continue?", or (e) "to allow censored litigants to successfully bring a cause of action pursuant to a narrowly tailored state statute, like the Social Media Censorship Act, that will allow injured consumers to hold social media websites accountable for having engaged in self-evident unprotected harmful forms of speech to include: (1) breach of contract, (2) false advertising, (3) deceptive trade practices, (4) bad faith, (5) unfair dealing, (6) unjust enrichment, and (7) fraudulent inducement?" The Plaintiffs believe that it would be in the best interest of everyone if the Court resolved that the optimal solution to this problem is the fifth option - option (e). This is because already built into section 230 is the "state-law exemption" under subsection (e) subparagraph (3).[6] The following coalition of bi-partisan state legislatures agreed that the fifth option is the best and served as the prime sponsor of the Stop Social Media Censorship Act[7] at the 2021 legislative session and have promised to introduce the bill at the 2022 legislative session. Here is the breakdown state by state of the bill language, bill numbers, and the name of the prime sponsors:

---

[6] When Congress passed section 230 they included exception provisions for when a section 230 immunity defense could not be successfully invoked by an internet intermediary under subsection (3). The state of Florida has the authority to enact the Stop Social Media Censorship Act under the Tenth Amendment of the United States Constitution so that Florida citizens are protected.

[7] All of these bills were assembled by either De Facto Attorneys General or Professor Hamburger of Columbia law school.

https://www.law.columbia.edu/sites/default/files/2020-02/hamburger-_resume_5.30.19.pdf
The measures are championed by the Heartland institute of policy. https://www.heartland.org.

**1. Alabama** - Drafted as follows for the 2022 legislative session:

https://www.dropbox.com/s/mh0kpmi8s9bkisp/2022%20ALABAMA%20STOP%20SOCIAL%20MEDIA%20CENSORSHIP%20AMENDED%20FINAL.pdf?dl=0

**2. Alaska.** Drafted by **Senator Showers (R)** for introduction at the 2022 legislative session:

https://www.dropbox.com/s/ci7c8x9r10jb55z/2022%20Alaska%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**3. Arizona. SB1428 sponsored by Sen. Townsend (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/AZ/text/SB1428/2021

-Amended for 2022 legislative session to be introduced by **Sen. Townsend**:

https://www.dropbox.com/s/7i0iakb3z4to1eg/2022%20Arizona%20Stop%20Social%20Media%20Censorship%20final.pdf?dl=0

**4. Arkansas.** Drafted by **Chairman Sen. Clark (R)** to be introduced at the 2023 legislative session:

https://www.dropbox.com/s/o98fkpfblyzgkmy/2023%20Arkansas%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20%281%29.pdf?dl=0

**5. California.** In review by **Sen. Grove (R)** to be introduced at the 2022 legislative session as follows:

https://www.dropbox.com/s/b7n96qegfhkgsw3/2022%20California%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**6. Colorado.** To be introduced by **Rep. Williams (R)** at the 2022 legislative session as follows:

https://www.dropbox.com/s/tcc7uxddoqwgs6f/2022%20Colorado%20Stop%20Social%20Media%20Censorship%20Act%20Final.pdf?dl=0

**7. Connecticut.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/db4xv70hcu5j4jp/2022%20Connecticut%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**8. Delaware.** To be introduced by **Sen. Richardson (R)** at the 2022 legislative session:

https://www.dropbox.com/s/0x3ayrs6964xy9n/2022%20Delaware%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**9. Florida. HB 33 sponsored by Rep. Sabatini (R)** - provided by De Facto Attorneys General - at the 2021 legislative session :

https://legiscan.com/FL/bill/H0033/2021

To be introduced at the 2022 legislative session as follows:

https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**10. Georgia.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/391sacz7gg3oekj/2022%20New%20Georgia%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20%281%29.pdf?dl=0

**11. Hawaii. SB357 sponsored by Sen. Gabbard (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/HI/text/SB357/2021

To be introduced at the 2022 legislative session by Sen. Gabbard as follows:

https://www.dropbox.com/s/4drp0d1wrkp4gah/2022%20Hawaii%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**12. Idaho. H0323 sponsored by Rep. Nichols (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ID/text/H0323/2021

To be introduced at the 2022 legislative session by Rep. Nichols as follows:

https://www.dropbox.com/s/5m97v1mpdrs36cg/2022%20Idaho%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**13. Illinois.** Drafted as follows for the 2022 legislative session:

https://www.dropbox.com/s/tun4sxpl4r4h2ka/2022%20Illinois%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**14. Indiana:** To be introduced at the 2022 legislative session by **Rep. Jacobs (R)** as follows:

https://www.dropbox.com/s/laea6ssvk03j5lj/2022%20Indiana%20Stop%20Social%20Media%20Censorship%20Act%20.pdf?dl=0

**15. Iowa. HF171 sponsored by Rep. Salmon (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/IA/text/HF171/2021

To be introduced at the 2022 legislative session by Rep. Salmon as follows:

https://www.dropbox.com/s/66e8he2cd0zxsj4/2022%20Iowa%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**16. Kansas. HB2322 sponsored by Rep. Gaber (R) -** provided by De Facto Attorneys General. To be introduced by Rep. Garber at the 2022 legislative session as follows:

https://www.dropbox.com/s/6dxnzcfpzlr67qd/2022%20Kansas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**17. Kentucky. SB111 sponsored by Sen. Mills (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/KY/text/SB111/2021

To be introduced at the 2022 legislative session by Sen. Mills as follows:

https://www.dropbox.com/s/tlr4kcqakr1elyc/2022%20Kentucky%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**18. Louisiana. SB196 sponsored by Sen. Morris (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/LA/text/SB196/2021

To be introduced at the 2022 legislative session by Sen. Morris as follows:

https://www.dropbox.com/s/o0qiu7nout6np6h/Louisiana-2021-SB196-Engrossed%20%283%29.pdf?dl=0

**19. Maine. LD1609 sponsored by Rep. Sampson (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ME/text/LD1609/2021

To be introduced at the 2022 legislative session by Rep. Sampson as follows:

https://www.dropbox.com/s/xji2kpbtktkkrsf/2022%20Maine%20Stop%20Social%20Media%20
Censorship%20Act.pdf?dl=0

**20. Maryland. HB1314 sponsored by Del. Adams (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/MD/text/HB1314/2021

To be introduced at the 2022 legislative session by Del. Adams as follows:

https://www.dropbox.com/s/nshl9js3df3vyn5/2022%20Maryland%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**21. Massachusetts.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yy2ubrqeo5eft6k/2022%20Massachusetts%20Stop%20Social%20M
edia%20Censorship%20Act.pdf?dl=0

**22. Michigan.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/n3lqn0uw23re37z/2022%20Michigan%20Stop%20Social%20Media
%20Censorship%20Act%20Final%20amendment.pdf?dl=0

**23. Minnesota.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7zrv9qy8jzv48gi/2022%20Minnesota%20Stop%20Social%20Media
%20Censorship%20Act%20Amended%20final.pdf?dl=0

**24. Mississippi: SB2617 sponsored by Sen. Hill (R)** - provided by De Facto Attorneys General
- at the 2021 legislative session:

https://legiscan.com/MS/text/SB2617/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/wyjq7ean5b37ogw/Mississippi%20Stop%20Social%20Media%20C
ensorship%20Act.pdf?dl=0

**25. Missouri. HB482 sponsored by Rep. Coleman (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/MO/bill/HB482/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/2hj5e2vlyro8m39/2022%20Missouri%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**26. Montana.** To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/qtwz360f2dik04u/2023%20MONTANA%20STOP%20SOCIAL%2
0MEDIA%20CENSORSHIP%20ACT%20AMENDED%20FINAL.pdf?dl=0

**27. Nebraska. LB621 sponsored by Sen. Curt Friesen (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NE/text/LB621/2021

To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/4s6wsko5dw9suj4/2022%20Nebraska%20%20Stop%20Social%20
Media%20Censorship%20Act%20FINAL.pdf?dl=0

**28. Nevada:** To be introduced as follows at the 2023 legislative session:

**29. New Hampshire. HB133 sponsored by Rep. Plett (R) -** provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NH/text/HB133/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/bi1whnhjf4cfxui/2022%20New%20Hampshire%20Stop%20Social
%20Media%20Censorship%20Act.pdf?dl=0

**30. New Jersey. A578 sponsored by Asm. Auth (R) -** provided by De Facto Attorneys General
- at the 2021 legislative session:

https://legiscan.com/NJ/text/A578/2020

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/pkt2wqtqx8mwpjb/New%20Jersey%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**31. New Mexico.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/3rjkno4547telvr/2022%20New%20Mexico%20Stop%20Social%20
Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**32. New York.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/fretoaagwy7108z/2022%20New%20York%20Stop%20Social%20M
edia%20Censorship%20Act%20FINAL%20AMENDED%20.pdf?dl=0

**33. North Carolina. S497 sponsored by Sen. Alexander (R) -** provided by De Facto
Attorneys General - at the 2021 legislative session:

https://legiscan.com/NC/text/S497/2021

**34. North Dakota. HB1144 sponsored by Rep. Kading (R) -** provided by Professor
Hamburger- at the 2021 legislative session:

https://legiscan.com/ND/text/1144/2021

To be introduced as follows at the 2022 legislative session by Rep. Jones:

https://www.dropbox.com/s/iwf5b1eyvj82wsi/2022%20North%20Dakota%20Stop%20Social%2
0Media%20Censorship%20Act.pdf?dl=0

**35. Ohio.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yziri2z6g80eer4/2022%20New%20Ohio%20Stop%20Social%20Me
dia%20Censorship%20Act%20Final.pdf?dl=0

**36. Oklahoma. SB383 sponsored by Sen. Standridge (R) -** provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/OK/text/SB383/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/l50i8fe4z7qwuxb/2022%20Oklahoma%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**37. Oregon.** To be introduced as follows at the 2022 legislative session by Rep. Leif:

https://www.dropbox.com/s/4k0sm4j5o0iub68/2022%20Oregon%20Stop%20Social%20Media%
20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**38. Pennsylvania. SB604 sponsored by Sen. Mastriano (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/PA/text/SB604/2021

 **39. Rhode Island. H5564 sponsored by Vella-Wilkinson (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/hnk11ybifb0bqk8/2022%20Rhode%20Island%20Stop%20Social%2 0Media%20Censorship.pdf?dl=0

**40. South Carolina. H3450 sponsored by Rep. Burns (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SC/text/H3450/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/73d6fwl1hwr204t/2022%20South%20Carolina%20Stop%20Social %20Media%20Censorship%20Act%20Consolidated%20%282%29.pdf?dl=0

**41. South Dakota. HB1223 sponsored by Rep. Jensen (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SD/bill/HB1223/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7bnc8jvt50hhzbu/2022%20South%20Dakota%20Stop%20Social%2 0Media%20Censorship%20Act.pdf?dl=0

**42. Tennessee.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/y1r1biujf5awlep/2022%20Tennessee%20Stop%20Social%20Media %20Censorship%20bill%200859%20amended%20FINAL%20.pdf?dl=0

**43. Texas. SB12 sponsored by Sen. Hughes** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/upeh2w5u5pn6zfc/2022%20Texas%20Stop%20Social%20Media%2 0Censorship%20Act.pdf?dl=0

**44. Utah. SB228 sponsored by Sen. McKell (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/UT/text/SB0228/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/6zv60b2iqd5xpun/2022%20Utah%20Stop%20Social%20Media%20 Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**45. Vermont.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/kyx6ok5u8o1fhwu/2021%20Vermont%20Stop%20Social%20Media %20Censorship%20Act%20FINAL%20.pdf?dl=0

**46. Virginia.** To be introduced as follows at the 2022 legislative session by Delegate Byron:

https://www.dropbox.com/s/fmbibg9oe9r6st3/2022%20Virginia%20Stop%20Social%20Media% 20Censorship%20Act%20%281%29.pdf?dl=0

**47. Washington.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/x3tig83nsjdhr0p/2022%20Washington%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL.pdf?dl=0

**48. West Virginia.** To be introduced as follows at the 2022 legislative session by Sen Azinger:
https://www.dropbox.com/s/6tfkmxloznw5igj/West%20Virginia%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**49. Wisconsin.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/pt8v99suwbirje1/2022%20Wisconsin%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**50. Wyoming. SF0100 sponsored by Sen. Steinmetz (R)** - provided by Professor Hamburger-
at the 2021 legislative session:
https://legiscan.com/WY/text/SF0100/id/2339364/Wyoming-2021-SF0100-Engrossed.pdf
To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/mdr58wy4wsuvh91/2022%20Wyoming%20Stop%20Social%20Me
dia%20Censorship%20Act.pdf?dl=0

6. The Plaintiff, along with hundreds of legislatures, have spent an enormous amount of

time, money, and resources working on this issue because it is vital to the strength of our

democracy and the welfare of our citizens. The Court could hold that the "cure-all" to the

problems presented by this case is the state legislature must be responsive in enacting the Stop

Social Media Censorship Act, if they want their constituents to be protected from the deceptive

trade practices perpetrated by social media websites.

### DEMAND FOR SUA SPONTE RESPONSIVENESS OF THE GOVERNOR AND SETTLEMENT OFFER TO THE GOVERNOR IN THE SPIRIT OF FRCP 68

7. In keeping with the spirit of FRCP 68, if Governor DeSantis, also a former Judge

Advocate General, like several members of De Facto Attorneys General and Special Forces Of

Liberty, will sua sponte call a special session pursuant to Article III, Section 3 of the Florida

Constitution to attempt to enact the Stop Social Media Censorship Act as set forth in Appendix B

and in the body of this complaint, then the Plaintiffs will voluntarily non-suit their case against

the Governor pursuant to FRCP 41(a) without prejudice.[8] In view of the decision in *Netchoice,*

---

[8] The Plaintiffs do not care who is the prime sponsor in the Florida House and Senate,
but note that Sen. Gruters and Rep. Sabatini carried the bill in the past.

*LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113), Governor DeSantis has a duty pursuant to his oath of office under clause 3 of Article VI of the United States Constitution to call a special session regarding the Stop Social Media Censorship Act in view of the constitutional issues embodied in SB7027 as identified by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). The demand asserted by the Plaintiffs on the Governor mirrors what he is already Constitutionally obligated to do and reflects the goals he was attempting to accomplish in enacting SB7072.

## RELEVANT PROCEDURAL AND LEGISLATIVE HISTORY OF THE CASE

8. In 1996 Congress enacted the Communications Decency Act (CDA) to promote "decent" speech, not the deceptive trade practices that social media websites have been engaging in with a sense of absolute impunity because of Congress's action. Congress enacted the CDA to make it easier for consumers to avoid being exposed to ubiquitous obscene pornographic material on Internet-enabled devices that is injurious to minors and the public's health. (Most of the states have resolved that pornography online is creating a public health crisis that is harming children and families). Section 230 was included in part of the CDA to encourage the free flow exchange of ideas and to help the Internet grow, by either somewhat limiting or by totally limiting the liability of certain Internet providers - like social media websites. The Constitutionality of the CDA was challenged by the ALCU for good cause, and the Supreme Court struck down all relevant parts of the CDA in *Reno American Civil Liberties Union,* 521 U.S. 844 (1997), except for Section 230, which was not challenged.[9] So what started out as an

---

[9] The Plaintiffs, who are ardent anti-pornography activists, agree with the ACLU's positions and the *Reno* court's decision. The Plaintiffs do believe that Congress should take up JJustice Rehnquist's suggestion of Internet zoning and zoning pornographic websites in the same way and for the same reason that adult establishments are zoned by ordinances. After Congress enacted the Human Trafficking And Child Exploitation Prevention Act or SOCA, the Plaintiffs intend to aggressively take up the matter with Congress for good cause.

attempt to marginalize indecent content morphed into an immunization sword of indecent deceptive trade practices and perversion.

9. In 1998, Congress attempted to cure the failures of the CDA and deal with the problem of unavoidable pornography online by enacting the Child Online Privacy Protection Act (COPPA).[10] The ACLU successfully had COPPA struck down in *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004). COPPA suffered from fewer Constitutional problems than the CDA, and in striking down COPPA, the Supreme Court provided a road map for the legislative branch so that it could successfully deal with the problem of online pornography websites distributed by Internet-enabled devices without running afoul of the First Amendment, stating "Congress may undoubtedly act to encourage the use of filters.....It could also take steps to promote their development by industry, and their use by parents," which was the Supreme Court's way of signaling to the legislative branch that it could pass filter legislation, such as the Human Trafficking And Child Exploitation Prevention Act or Save Our Children Act (SOCA) authored by the Plaintiffs, and that such a legislative instrument would survive judicial review under heightened scrutiny, since as the ACLU put it, "filters are the least restrictive means" for purposes of the First Amendment of the United States Constitution.

10. After engaging in operations in Iraq and Afghanistan, some of the members of De Facto Attorneys General and Special Forces Of Liberty joined groups of former Special Forces and FBI to do extractions in the area of sex trafficking overseas. While doing the training for such field operations, the evidence became overwhelmingly clear that human trafficking and rampant prostitution was not just a problem overseas, but was a serious growing problem in our own backyard here in America thanks to the concerted efforts of manufacturers and retailers of

---

[10] The Plaintiffs' friend, Senator Markey, a Democrat, from Massachusetts was the prime sponsor of COPPA. He still serves in the United States Senate and could prime sponsor the Federal version of the Human Trafficking And Child Exploitation Prevention Act.

Internet-enabled devices to distribute prostitution websites and pornographic websites in flagrant disregard of obscenity codes and products liability statutes.[11] While the manufacturers and retailers of Internet-enabled devices are not creating pornography content or offering sex trafficking themselves directly, their distribution of pornographic websites and prostitution hubs make them the head of the causal chain of harm. To kill a snake, you have to cut off its head.

11. In response to this realization, the founder of De Facto Attorneys General, acting on behalf of 35 different entities, filed lawsuits against the Tech Enterprise for racketeering in violation of products liability law and obscenity codes, asserting that the current condition that Internet-enabled devices were sold in were dangerous and defective because they exposed consumers to prostitution websites and pornography websites, after the products were falsely marketed as "family-friendly." *Sevier v. Google*, 15-5345 (6th Cir. 2014). The plaintiff asked the court in *Sevier v. Google*, 15-5345 (6th Cir. 2014)[12] and *Sevier v. Apple Inc.,* 3:2013-cv-00607 (M.D.T.N. 2013) to issue an injunction that required the manufacturers and retailers of Internet-enabled devices to sell their products in a manner that opted-out consumers by default from having immediate access to websites that displayed obscenity, child pornography, and revenge pornography and websites that were known to facilitate human trafficking and

---

[11] The evidence shows that the pornography pandemic hurting the public's health and the explosion in sex trafficking across the globe is the direct result of concerted effort by the Tech Enterprise to disregard obscenity laws and products liability codes, knowingly selling their products in a dangerous and defective manner that has unleashed a litany of secondary harmful effects.

[12] Appellant brief.
https://www.dropbox.com/s/43hvt217s2p2a63/Appellant%20Brief%20in%20Sevier%20v.%20G oogle.pdf?dl=0
Appellee Google response
https://www.dropbox.com/s/y7y0quqs1r6c85l/Appellee%20Response%20Brief%20in%2 0Sevier%20v.%20Google.pdf?dl=0
Appellant reply
https://www.dropbox.com/s/3jnzmi62adsovpq/Reply%20Brief%20official.pdf?dl=0

prostitution. [13] In the litigation, one of the defendants, Verizon, raised a Section 230 immunity defense, but the defense did not work because the plaintiffs' cause of action concerned the safeness of physical Internet-enabled products, not the Internet itself. This was the first time that some of De Facto Attorneys General and Special Forces Of Liberty team members encountered an attempt by the Tech Enterprise to use Section 230 to justify immoral business practices.[14]

12. The ultimate goal of the De Facto Attorneys General litigation against the Tech Enterprise in *Sevier v. Google*, 15-5345 (6th Cir. 2014) and *Sevier v. Apple Inc.*,

3:2013-cv-00607 (M.D.T.N. 2013) was to cure the problems with COPPA. In the wake of the litigation, the Plaintiffs custom authored a bill called Human Trafficking And Child Exploitation Prevention Act or, alternatively, the Save Our Children Act (SOCA) for all 50 states. See www.humantraffickingpreventionact.com.[15] This legislative instrument was fashioned directly off the findings of the Supreme Court in *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) and *Ginsberg v. New York*, 390 U.S. 629 (1968), two cases that none of the Tech enterprise's lawyers could get around in their destructive crusade to keep big tech from being regulated at all cost. [16]

---

[13] The case was covered extensively by the press extensively, and the International Business Times reported that the litigation carved a path in a manner that prompted Britsh Prime Minister Cameron to bring about some of policy demands in the United Kingdom.https://www.ibtimes.com/war-porn-uk-does-david-camerons-plan-battle-child-pornogr aphy-go-too-far-video-1355279

[14] Instead of pursuing the litigation to its final conclusion, the Plaintiffs took to the legislative branch to solve the problem so as to not ask too much from the judicial branch. [15] Here is a link to the proposed bill language for the SOCA bill for all 50 states: https://www.dropbox.com/sh/o59we5kqkbu1qpr/AABrDTwd19yrWkUu1GhNqo8Ma?dl=0

[16] The United States Supreme Court found in *Ginsberg v. New York*, 390 U.S. 629 (1968) that a physical display state statute that required physical brick and mortar stores to put physical obscene material behind a physical blinder rack was Constitutional under first amendment heightened scrutiny, which means that a digital blinder rack statute, such as the Save Our Children Act, that requires digital retailers to put digital obscene material behind a digital blinder rack is also constitutional on the same legal basis.

13. In working with 37 state legislative bodies on the Human Trafficking And Child Exploitation Prevention Act/SOCA, many of the legislatures in both parties asked the Plaintiffs to draft an additional piece of legislation so that their party would not be construed as "the party of censorship" and so that the code under a new area of law called "indecent deceptive trade practices" would be balanced out. In response, the Plaintiffs custom-designed the language for the Stop Social Media Censorship for all 50 states for the benefit of their legislative drafting commissions - also referred to commonly as Legislative Research Commission (LRC) or the Office of Legal Services (OLS). The Stop Social Media Censorship At is based on well-settled existing contract and tort principles. By introducing the Stop Social Media Censorship Act and the Human Trafficking And Child Exploitation Prevention Act contemporaneously, several state created a seamless narrative that their statehouse is not for censorship (see the Stop Social Media Censorship Act) unless the content is injurious to children or facilitates human trafficking (See the Human Trafficking And Child Exploitation Prevention Act-SOCA), and even then, their statehouse was not for total censorship.

14. The goals of the Human Trafficking And Child Exploitation Prevention Act/SOCA and the Stop Social Media Censorship Act was not to reinvent the wheel but to merely get existing law to catch up to modern-day technology to protect the general public from objective harm. Internet-enabled devices makers and social media websites have been operating in direct violation of the law under a double standard without consequence in a manner that is devastating our democracy and undermining National unity.

15. In 2017, before being elected to Congress, Florida state Rep. Spano introduced the Human Trafficking And Child Exploitation Prevention Act at the Plaintiffs' request.[17]

---

[17] See the current modified version for the 2022 legislative session
https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

16. In 2019, Sen. Gruters introduced the Stop Social Media Censorship Act at the Plaintiffs' request, constituting the first state legislator to introduce the measure in the Country.

17. In 2020, Sen. Gruters and Rep. Sabatini[18] reintroduced the Stop Social Media Censorship Act at the Plaintiffs' request. [19]

18. In 2021, Rep. Sabatini introduced the Stop Social Media Censorship Act (HB33), and subsequently, for unknown reasons, Rep. Sabatini got into some kind of squabble with Speaker Sprowls, as passions do tend to run high in the legislative branch and there are a lot of opportunities for conflict in the legislative branch. This dust-up caused the members of the Florida House to oppose Rep. Sabatini's bills simply because of "who he was" and not because of "the meritorious substance of his bills." In the wake of the Sabatini/Sprowls spat, Governor DeSantis got his staff to use the Stop Social Media Censorship Act as a preliminary foundation to draft the monstrosity that became SB7072.

19. At the risk of sounding snarky, SB7072 - although well-intended - was distorted by ambitions and legal ignorance. Upon information and belief, personal glory might have been prioritized over substance and the rule of law. [20] The judicial branch can help the legislative branch get things right.

20. On May 24, 2021, SB7072 was enacted and set to go into effect in early July.

21. In early June, Netchoice (a hyper dishonest lobbying firm that does Big Tech's dirty work)[21] filed a lawsuit to stop the state from enforcing SB7072. See *Netchoice, LLC et al., v.*

---

[18] Rep. Sabatini is running for Congress, and the Plaintiffs support his efforts to do so.
[19] See the press conference with Laura Loomer:
https://www.facebook.com/watch/live/?v=907548599640066&ref=watch_permalink)
[20] The Plaintiffs do not give two shakes of a lamb's tail about credit, but they do want to see themselves and other consumers protected. The Plaintiffs would remind the Governor of the Reagan priniciple in asking him to sua sponte call a special session"there is no limit to the amount of good you can do if you don't care who gets the credit."
[21] The Plaintiffs deal with Netchoice's agents all the time at different state houses around the country. Their lobbiests are some of the greasiest and the most intellectually dishonest people

*Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021). Countless lawmakers around the

country implored the Plaintiffs to intervene in that case, and the Plaintiffs refused to be

responsive knowing from personal experience - with all due respect - that if you give Judge

Hinkle of the Northern District of Florida enough rope, he will metaphorically hang himself.[22]

22. On June 30, 2021, Judge Hinkle in *Netchoice* granted the plaintiffs' motion for

preliminary injunction to enjoin Florida state officials from enforcing parts of SB7072. Id. at

(DE 113). This decision, taken with others, gave the Plaintiffs the apprehension that there is no

way for the Plaintiffs to seek redress from the harmful acts of social media websites because of

the unconstitutional actions of Congress in making Section 230.

23. On July 7, 2021, President Trump and others filed a lawsuit against Twitter,

Facebook, and Youtube but did not include a cause of action under state statute written to fall

within the state-law exemption of Section 230. See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L.

2021); *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021); *Trump et al v. YouTube, LLC*,

1:21-cv-22445-KMM (S.D.F.L. 2021). On July 16, 2021, the Plaintiffs, in this case, filed an

---

imaginable. They routinely distort the law unethically and ultimately are driven by greed. Their
entire position can be boiled down to "big tech should be permitted to do whatever it wants
because it is big tech." Widgets and the Internet are special. Fundamental rights are, like the
freedom to practice one's religion.

[22]https://www.lifesitenews.com/news/former-jag-officer-highlights-absurdity-of-gay-marr
iage-by-suing-to-marry-h

The courts should have dismissed the same-sex marriage cases for lack of subject matter
jurisdiction. The Establishment Clause of the First Amendment of the United States Constitution
prohibits the states and federal government from legally recognizing or promoting any form of
non-secular parody marriage. Also, the states can limit marriage to one man and one woman
because all other forms of marriage policies promote licentiousness and undermine the state's
compelling interest to uphold community standards of decency. In the wake of the judiciaries
unconstitutional endorsement of the LGBTQ secular humanist religion, the Plaintiffs have
authored the Establishment Act for all 50 states. See Florida's version:
https://www.dropbox.com/s/iwam8l7t7madp4r/2021%20Florida%20Establishment%20Act.pdf?
dl=0

*amicus* brief in partial support of the Trump plaintiffs' cause of action and in *Trump v. Twitter*,

1:21-cv-22441 (S.D.F.L. 2021) in partial opposition before filing this lawsuit.[23]

## **SECTION 230**

24. The Plaintiffs challenge every section and every subsection of Section 230,

collectively and individually, for having been misconstrued or written to prevent citizens from

acquiring relief from the government for the bad faith act of social media websites in violation of

the petition and access clause of the First Amendment of the United States Constitution.

25. For the Court and Defendants' convenience, here is Section 230 in its entirely:

### **(a) Findings**

The Congress finds the following:

(1)The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3)The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

### **(b) Policy**

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

---

[23] The *amicus* brief filed by the Plaintiffs in the *Trump v. Twitter* case raises similar questions of law asserted in this complaint. There are several Federal courts that have concurrent jurisdiction over the claims here - including this one - and the Plaintiffs are giving the Florida District Court the first crack at resolving this controversy in a manner that honors common sense, the rule of law, the United States Constitution, while protecting the interest of social media websites and the general public. Other groups that the Plaintiffs work with may be immediately filing a similar lawsuit to encourage judicial accountability.

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c)  Protection for "Good Samaritan" blocking and screening of offensive material**

(1)  Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)  Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A)  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B)  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). [1]

(d)  Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e)  Effect on other laws**

(1)  No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

(2)  No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3)  State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4)  No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5)  No effect on sex trafficking law

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

    (A) any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

    (B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

    (C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

    As used in this section:

    (1) Internet

    The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

    (2) Interactive computer service

    The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

    (3) Information content provider

    The term " information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

    (4) Access software provider

    The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    (A) filter, screen, allow, or disallow content;

    (B) pick, choose, analyze, or digest content; or

    (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

26. The purpose of Section 230 was to allow for the free exchange of competing ideas

and to allow the Internet to "grow," by putting some limit on liability for certain providers in

certain circumstances. But social media websites, that haveinduced billions of subscribers to

sign up for user profiles, have "grown," and that extreme "growth" occurred because social

media websites falsely marketed themselves as being neutral on religious and political speech to

induce everyone to sign up despite their religious and political affiliations. Just because

Congress wanted to see the Internet businesses grow does not mean that it gets to ignore the

Petition and Access Clause of the First Amendment and subject the Plaintiffs to harmful fraud without remedy. Former Attorney General Bill Barr described this scenario as "the greatest bait and switch in history" stating that social media websites created the modern-day public square "by saying that they were open to all views" until they reached critical mass only to prove otherwise after the fact. (See interview with Michael Knowles of the Daily Wire on Verdict with Ted Cruz: https://youtu.be/_HVqRE-6bkc)

27. Section 230(b)(1) asserts that "it is the policy of the United States to promote the continued development of the Internet and other interactive computer services and other interactive media" but that policy must fail if completely blocks aggrieved parties, like the Plaintiffs and the Trump plaintiffs, from having the opportunity to petition the government for redress against social media websites that have engaged in harmful consumer protection violations in view of the First Amendment.[24]

28. Section 230(c)(2)(A) does not apply for blanket immunity for social media websites that censor in bad faith.[25] Yet, so far, this has been misconstrued by the courts to allow for a

---

[24] As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw, *The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,* pg. 564, 565 (2018): Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.' Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services. Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.' Rather, Congress sought to provide limited protections for limited actions.

[25] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the caselaw, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7

range of injurious action to go without redress in a manner that causes Section 230 to violate the

Petition and Access Clause of the First Amendment, as well as the Free Speech, Free Exercise,

and Establishment Clauses of the First Amendment. The Plaintiffs are under the apprehension

that they have no lawful recourse, unless this Court clarifies the importance of the state-law in

exemption and the need for state legislatures to pass good laws, like the Stop Social Media

Censorship Act that will cut through an immunity defense.

## FACTS ABOUT THE CURRENT LANDSCAPE OF CENSORSHIP GENERALLY

29. The evidence shows that the decision in *Stratton Oakmont, Inc. v. Prodigy Services*

*Co.*, 1995 WL 323710, at \*3–4 (N.Y. Sup. Ct. May 24, 1995) in part led to the creation of

Section 230.[26]

---

(D.N.J. May 4, 2020). In *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021), the court stated in its order granting a preliminary injunction that "the legislation compels providers to host speech that violates their standards—speech they otherwise would not host—and forbids providers from speaking as they otherwise would." But that court failed to realize that the social media website providers shift those standards in bad faith in an arbitrary and dishonest manner in total breach of how they marked themselves to the public to induce reliance. That court also failed to realize that the providers invited, enticed, and induced members of the public to speak out openly and freely on different religious and political doctrines without any threat of emotional or economic reprisal, ony to then turn around and deploy a "gotcha game" with the expectation of total immunity.

[26] In *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at \*3–4 (N.Y. Sup. Ct. May 24, 1995), an anonymous user posted allegedly defamatory content on an electronic bulletin board—an earlier version of what today might be called social media. The court said that if the provider of such a bulletin board did not undertake to review posted content—much as a librarian does not undertake to review all the books in a library—the provider would not be deemed the publisher of a defamatory post, absent sufficient actual knowledge of the defamatory nature of the content at issue. On the facts of that case, though, the provider undertook to screen the posted content—to maintain a "family-oriented" site. The court held this subjected the provider to liability as a publisher of the content. At least partly in response to that decision, which was deemed a threat to the development of the internet, Congress enacted 47 U.S.C. § 230. The Stop Social Media Censorship Act does not subject computer services to tort liability for passively hosting content posted by others but seeks to empower users by limiting how content may be censored. See 47 U.S.C. § 230(b)(2) (describing congressional purpose to ensure that users retain "a great degree of control over the information that they receive")

30. The Plaintiffs in this case, unlike the Trump Plaintiffs in their cases, contend that

there are valid uses of Section 230 that should remain in place, if and only if this Court clarifies

that the state-law exemption can be used by states to provide consumers with the means for

recourse, as was perhaps intended by Congress.[27] However, what has been happening to the

Plaintiffs, the Trump plaintiffs, and millions of profile users, who are both registered Democrat

and Republican, is that social media websites have been arbitrarily censoring users speech in bad

faith when it just so happens to offend the delicate sensibilities of the employees who happen to

work at the social media website at the time of the censorship. When censored individuals file a

lawsuit against the social media website for such injurious wrongdoing, the social media

defendants invariably float the same questionable argument that they were "merely engaging in

'editorializing' and should, therefore, not be held liable in view of the Section 230 absolute

immunity shield." So far in these kinds of cases, the courts have reluctantly allowed the social

media defendants to barely escape liability, like a man jumping through flames. See 1

---

[27] Preliminarily, Section 230 should be explained so that a fifth-grader can understand it.
Basically, Section 230 was a federal statute created by Congress that was part of the
Communications Decency Act (CDA). The Communications "Decency" Act was designed to
promote "decent" speech, not the "deceptive trade practices" that social media websites have
engage in to the direct injury of the Plaintiffs. Section 230 allows for certain internet
intermediaries to invoke an immunity defense for the harmful acts of third parties, if and only if,
the internet intermediary was not acting as a publisher/speaker/common carrier to a certain
arbitrary and hard to determine degree. So, since that explanation is still confusing and since
trying to determine whether a platform provider was a speaker, publisher, or common carrier
tends to be a linguistic nightmare, the best way for anyone to understand a valid Section 230
immunity defense is through the following example: if a Floridian maliciously posts a
defamatory comment on Twitter against a person from New York, the New Yorker who was
defamed could legitimately sue the Floridian for defamation. However, if the New Yorker named
Twitter as a co-defendant in the lawsuit, then Youtube could successfully file a motion to dismiss
under FRCP 12 et. seq. invoking Section 230 immunity defense as the legal basis, and
legitimately have the lawsuit dismissed with prejudice against it.

 That example involves a good use of Section 230 - showing that Section 230 is good law
- because Youtube was merely acting as an innocent platform in that scenario. Therefore, this
Court could find that Section 230 does not violate the First Amendment Petition but only if it
finds that the Stop Social Media Censorship Act, if enacted, would fall in the state-law
exemption and not be preempted by the doctrine of preemption like SB7072 was.

Corinthians 3:15. [28] Despite having hundreds of thousands of users who have been defrauded and

brutalized, social media websites to date have not been held liable a single time that the Plaintiffs

are aware of as the result of unconstitutional Congressional action.

## FACTS ABOUT THE STATE LAW EXEMPTION AND FACTUAL DIFFERENCES BETWEEN THE STOP SOCIAL MEDIA CENSORSHIP ACT AND SB7077

31. The evidence shows that lawyers know just enough to be dangerous on any topic

unless they have litigated the issue. (See the staff lawyers who work for Defendant Governor

Desantis, who wrote SB7072). The Plaintiffs have litigated Section 230 issues and social media

censorship before a host of Federal Courts, and more importantly, they have litigated the matter

before countless legislative committees in the face of robust opposition:

(1) See the video of the hearing on the Social Media Censorship Act before the public
laws committee in Missouri, which included arguments from De Facto Attorneys General,
Google, and the Heartland Institute:
https://www.youtube.com/watch?v=e4QUKoTHKZs
(2) See the video of the hearing before the Commerce Committee in the Louisana
Senate with testimony by Senator Morris, De Facto Attorneys General, Netchoice, and
(https://www.youtube.com/watch?v=c-NqZhBqkBs&t=8s)
(3) See the video of the hearing before the Judiciary Committee in the State of Maine
with testimony by Rep. Sampson and De Facto Attorneys General.
(https://www.youtube.com/watch?v=jjZ_Ljnx-dE)

32. While the Plaintiffs appreciate Florida's initiative to solve this problem, the Plaintiffs

are concerned that the Florida state government and Federal Court could get this complex issue

wrong at the expense of the entire country. The Plaintiffs seek a perfect result from a

constitutional perspective and have filed this action before this Article III Court for good cause

in view of their personal injuries.

---

[28] In rendering such decisions, the courts have been hinting that if the state legislature was
to enact a statute that was (1) narrowly tailored, (2) consistent with the spirit of Section 230, and
(3) intentionally designed to fall in the state-law exemption, then such a cause of action would
successfully pierce through a Section 230 immunity defense. The Court could declare that the
Stop Social Media Censorship Act - a state statute - is the answer that everyone is looking for
whether they realize it or not.

33. The "state-law exemption" is the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3).

34. In the wake of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) regarding SB7072, it is unclear whether the courts are suggesting that no state statute could fall in the state-law exemption that would allow the Plaintiffs to acquire relief against the deceptive bad faith trade practice routinely perpetrated by social media websites.[29] On the one hand, the Plaintiffs in this case have sensibly concluded that Section 230 does create total and perpetual immunity as a result of Congressional action for social media websites who engage in fraudulent and bad faith consumer protection violations, and therefore, the statute violates the First Amendment's Petition and Access Clause. On the other hand, the Plaintiffs believe that perhaps Governor DeSantis and the Florida general assembly errored in enacting SB7072 over the amended version of the Stop Social Media Censorship Act and that if the Stop Social Media Censorship Act was enacted, then and only then could the Plaintiffs and other similarly situated victims legitimately seek redress from the government regarding the deceptive trade practices perpetrated social media websites.

35. The language of the Stop Social Media Censorship Act was carefully and intentionally written by the Plaintiffs for all 50 states so that it would fall squarely in the

---

[29] Because it is possible that the Stop Social Media Censorship could be construed to be unconstitutional or preempted by Section 230, as was seeming the case with SB7072, then the Plaintiffs First Amendment claim to strike down Section 230 must prevail under *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (discussing when conditions on federal funding "result in an unconstitutional burden on First Amendment rights"). Accordingly, the courts should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it. The states have an ongoing compelling interest to protect their citizens in step with their police powers under the Tenth Amendment of the United States Constitution from fraud, deceptive trade practices, breach, bad faith, etc - none of which is protected speech for purposes of the First Amendment. It is up to this Court to decide the fate of the state-law exemption and Section 230.

state-law exemption under Section 230(e)(3). For the Court's and Defendants' convenience, here

is the Stop Social Media Censorship Act in its entirety.

WHEREAS, the Communications Decency Act was created to protect decent speech, notdeceptive trade practices, and

WHEREAS, repealing section 230 of the Communications Decency Act at the federal level is unnecessary because it already includes a state-law exemption and the Stop Social Media Censorship Act was crafted to fall squarely in the state-law exemption of section 230 to cure abuses of section 230 to protect the consumers of this state, and

WHEREAS, contract law is a state-law issue, and when a citizen of this state signs up to use certain social media websites, they are entering into a contract, and

WHEREAS, this state has a compelling interest in holding certain social media websites to higher standards for having substantially created a digital public square through fraud, false advertising, and deceptive trade practices, and

WHEREAS, major social media websites have engaged in the greatest bait and switch of all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to then prove otherwise at great expense to consumers and election integrity, and

WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent inducement, and deceptive trade practices are not protected forms of speech for purpose of the first amendment of the United States Constitution or the Constitution of this state, and

WHEREAS, the major social media websites have already reached critical mass, and they did it through fraud, false advertising, and deceptive trade practices at great expense to the health, safety, and welfare of consumers of this state, while making it difficult for others to compete with them, and

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner, NOW THEREFORE,

Be It Enacted by the Legislature of the State of Florida:

**Section 1.** This act may be cited as the "Stop Social Media Censorship Act."

**Section 2.** This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following:

(1) Deceptive trade practices;

(2) False advertising;

(3) Breach of contract;

(4) Bad faith;

(5) Unfair dealing;

(6) Fraudulent inducement; and

(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

**Section 3.** Social media website speech; cause of action; penalties.—

(1) As used in this section, the term:

(a) "Algorithm" means a set of instructions designed to perform a specific task.

(b) "Hate speech" means a phrase concerning content that an individual finds offensive based on his or her personal moral code.

(c) "Obscene" means that an average person, applying contemporary community standards, would find that, taken as a whole, the dominant theme of the material appeals to prurient interests.

(d) "Political speech" means speech relating to the state, government, body politic, or public administration as it relates to governmental policymaking. The term includes speech by the government or a candidate for office and any discussion of social issues. The term does not include speech concerning the administration, law, or civil aspects of government.

(e) "Religious speech" means a set of unproven answers, truth claims, faith-based assumptions, and naked assertions that attempt to explain such greater questions created, what constitutes right and wrong what happens after death.

(f) "Social media website":

1. Means an Internet website or application that enables users to communicate with each other by posting information, comments, messages, or images and that meets all of the following requirements:

i. Is open to the public.

ii. Has more than 75 million subscribers with personal user profiles.

iii. From its inception, has not been specifically affiliated with any one religion or political party.

iv. Provides a means for the website's users to report obscene materials and has in place procedures for evaluating those reports and removing obscene material; and

v. Allows for subscribers to sign up for a personal user profile page or account where beliefs and preferences can be expressed by the user.

2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

(g) "User profile" means a collection of settings and information associated with a user or subscriber who signs up for an account made available by a social media website. Such accounts often include the explicit digital representation of the identity of the user or subscriber with respect to the operating environment of a social media website. Such accounts often associate characteristics with a user or subscriber, which may help in ascertaining the interactive behavior of the user along with their personal preferences and beliefs.

(2)(a) The owner or operator of a social media website who contracts with a social media website user in this state is subject to a private right of action by such user if the social media website purposely:

1. Deletes or censors the user's religious speech or political speech; or

2. Uses an algorithm to disfavor or censure the user's religious speech or political speech.

(b) A social media website user may be awarded all of the following damages under this section:

1. Up to $75,000 in statutory damages.

2. Actual damages.

3. If aggravating factors are present, punitive damages.

4. Other forms of equitable relief.

(c) The prevailing party in a cause of action under this section may be awarded costs and reasonable attorney fees.

(d) A social media website that restores from deletion or removes the censoring of a social media website user's speech in a reasonable amount of time may use that fact to mitigate any damages.

(3) A social media website may not use the social media website user's alleged hate speech as a basis for justification or defense of the social media website's actions at trial.

(4) The Attorney General may also bring a civil cause of action under this section on behalf of a social media website user who resides in this state and whose religious speech or political speech has been censored by a social media website.

(5) This section does not apply to any of the following:

(a) A social media website that deletes or censors a social media website user's speech or that uses an algorithm to disfavor or censure speech that:

1. Calls for immediate acts of violence;

2. Is obscene, lewd, lascivious, filthy or pornographic in nature;

3. Is the result of operational error;

4. Is the result of a court order;

5. Comes from an inauthentic source or involves false personation;

6. Entices criminal conduct;

7. Involves minors bullying minors;

8. Constitutes trademark or copyright infringement;

9. Is excessively violent; and

10. Constitutes harassing spam of the commercial, not religious or political, nature.

(b) A social media website user's censoring of another social media website user's speech.

(6) Only users who are 18 years of age or older have standing to seek enforcement of this section.

Section 4. The Secretary of State may:

(1) Issue a fine in one of the following amounts if the Secretary of State finds that the social media website has engaged in deplatforming or shadowbanning a political candidate seeking office in Florida in violation of this act:

(a) If the candidate is seeking Statewide office, up to $100,000 per day of the violation;

(b) For all other candidates, up to $10,000 per day of the violation; and

(2) Disclose a social media company's algorithmic bias for or against a political candidate seeking Statewide office under subsection (1) of this section as a campaign contribution.

Section 5. If any section in this act or any part of any section is declared invalid or unconstitutional, the declaration shall not affect the validity or constitutionality of the remaining portions.

Section 6. This act shall take effect July 1, 2021.

36. There are several factual differences between SB7072 and the Stop Social Media Censorship Act that are appropriate to identify for this Honorable Court. [30]

37. First, SB7072 is vague and the Stop Social Media Censorship Act is not.[31]

38. The Stop Social Media Censorship Act is not vague whatsoever in view of its ten legislative findings and purpose section and the straightforward structure of the language. The legislative findings of the Stop Social Media Censorship Act spell out the legislative intent in a common sense manner.

39. Furthermore, the purpose and legal framework of the Stop Social Media Censorship Act is crystal clear, whereas the purpose of SB7072 is not. The purpose section of the Stop Social Media Censorship Act states:

---

[30] Never since the inception of American jurisprudence has a plaintiff brought a lawsuit under a state statute and argued that the Section 230 immunity defense could not be successfully invoked because the lawsuit was filed under a statute that fell within the state-law exemption, piercing through the Section 230 immunity defense. Yet, when comparing the Stop Social Media Censorship Act to SB7072, the *Amici* somewhat agree with Judge Hinkle's sentiment that the "statutes [created by SB7072] are not narrowly tailored" and might constitute an "instance of burning the house to roast a pig." See *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) (page 27 of DE 113). See also, e.g., *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882 (1997*); Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 131 (1989). It would be more accurate to say that striking down Section 230 of the CDA completely would be an "instance of burning the house to roast a pig" when the Stop Social Media Censorship Act is obviously the cure-all from the perspective of any reasonable observer to this ongoing dilemma because it falls squarely in the state-law exemption.

[31] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253 (2012). "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). To pass muster, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent "arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." Id.; accord *Wollschlaeger v. Governor,* 848 F.3d 1293, 1320 (11th Cir. 2017). Although greater clarity is necessary when a statute regulates expression, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989); see also *Grayned,* 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams,* 553 U.S. 285, 305 (2008).

This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following: (1) Deceptive trade practices; (2) False advertising; (3) Breach of contract; (4) Bad faith; (5) Unfair dealing; (6) Fraudulent inducement; and(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

The purpose of the Stop Social Media Censorship Act is to parallel the goals and spirit of Section 230 so that the proposed statute "threads the needle," unquestionably falling within the state-law exemption of Section 230(e)(3) to piece through a Section 230 immunity defense. The Stop Social Media Censorship Act mirrors the objectives of Section 230 and Congress but also allows the state of Florida to protect consumers, like the Plaintiffs and the Trump plaintiffs, [32] in step with the state's police powers, afforded under the Tenth Amendment of the United States Constitution to the state of Florida, without offending the doctrine of preemption or the First Amendment.

40. Second, unlike with SB7072, the language of the Stop Social Media Censorship Act and Section 230 are parallel and verbatim in some respects on purpose. For example, 47 U.S.C. § 230(c)(2)(A) states that an interactive computer service, like the Defendants, cannot be "held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Similarly, the Stop Social Media Censorship Act states that social media websites that are subject to the act cannot be held liable if they censor content that:

1. Calls for immediate acts of *violence*; 2. Is *obscene, lewd, lascivious, filthy* or pornographic in nature; 3. Is the result of operational error; 4. Is the result of a court order; 5. Comes from an inauthentic source or involves false personation; 6. Entices criminal conduct; 7. Involves minors bullying minors; 8. Constitutes trademark or

---

[32] See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021); *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021); and *Trump et al v. YouTube*, LLC, 1:21-cv-22445-KMM (S.D.F.L. 2021).

copyright infringement; 9. Is *excessively violent*; and 10. Constitutes *harassing* spam of the commercial, not religious or political, nature.[33]

These parallel exemptions and exceptions are all based on common sense. The government has a narrowly tailored compelling interest to uphold community standards of decency.

41. Third, by framing the issues as breach of contract, bad faith, false advertising, unfair

dealing, unjust enrichment, deceptive trade practices, and consumer protection violations, the

Stop Social Media Censorship Act fulfills a litany of compelling government interests in ways

that SB7072 fails to do so.[34]

42. Fourth, by framing the issue as arising under breach of contract, bad faith, fraudulent

inducement, false advertising, unjust enrichment principles, a social media website sued under

the Stop Social Media Censorship Act could not assert "good faith" protections under Section

$230(c)(2)(A)$.[35] Judge Hinkle failed to pick up on this critical factor in *Netchoice, LLC et al., v.*

---

[33] Because the Stop Social Media Censorship Act neatly parallels the spirit and intent of Section 230, it "threads the needle" in a way that SB7072 does not. From every angle, it is clear that the Stop Social Media Censorship Act has been crafted for all 50 states in a manner that respects federal law, while allowing consumers to be protected from deceptive trade practices. The Stop Social Media Censorship Act respects the doctrine of preemption and the First Amendment rights of social media websites, while protecting consumers from deceptive trade practices.

[34] The Stop Social Media Censorship Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner Broad. Sys., Inc. v. FCC ("Turner")*, 512 U.S. 622, 662–63 (1994). Ensuring that the public "has access to a multiplicity of information sources," the Supreme Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Furthermore, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994). Additionally, Florida also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States*, 290 U.S. 534 (1934); *Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986).

[35] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the case law, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See*

*Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) in granting a preliminary injunction that sent

SB7072 down the path of nullification.

43. Fifth, where SB7072 construes social media websites as common carriers,[36] the Stop

Social Media Censorship Act focuses more on consumer protection violations, existing torts, and

existing breach of contract principles.[37]

44. Sixth, because the Stop Social Media Censorship Act is framed on breach of

contract, tort, and consumer protection principles, jurisdiction for enactment and enforcement is

not Constitutionally problematic in view of the Ten Amendment of the United States

Constitution, unlike with SB7072.[38]

---

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7 (D.N.J. May 4, 2020).

[36] In Section 1 of SB7072, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers." SB7072 § 1(5), 1(6). In fact, as Justice Thomas recently explained, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring)

[37] The Stop Social Media Censorship treats social media websites like any entity doing business in the state, and prevents the business from harming consumers for engaging in fraud, breach, deceptive practices, false advertising, etc. While the Florida Legislature permissibly determined that the "old rules" applicable to common carriers should be applied to the "new circumstances" of social media in SB7072, the Stop Social Media Censorship Act merely gets existing consumer protection laws and contract law principles to apply to the "new circumstances" of social media, while invoking the state-law exemption. See *Parks v. Alta Cal. Tel. Co.,* 13 Cal. 422, 422 (1859). Put simply, the Stop Social Media Censorship Act does not ask the judicial branch to reinvent the wheel; it merely asks that existing law be permitted to catch up to modern-day technology to safeguard consumers and election integrity.

[38] The state of Florida has the legal authority to enact the Stop Social Media Censorship and injured parties, like the Plaintiffs, have the right to enforce it under the long-arm statute. See Fla. Stat. § 48.193. When the Plaintiffs signed up to use Facebook and Twitter, they entered into a contract in Florida. One of the oldest jurisprudence is that "contract law" is a "state-law issue." States have paramount jurisdiction to enact statutes that place certain restrictions on contracts to protect consumers from harm. Otherwise, all consumer protection laws and all products liability laws could be declared to violate the First Amendment. Twitter and Facebook reached into the state of Florida and induced the Plaintiffs to sign up to use their services by a contract, which gives the state of Florida jurisdiction to regulate those contracts and put parameters around them. While a contract does exist between social media websites and the Plaintiffs, the contract is only

45. Seventh, perhaps the biggest distinction between the Stop Social Media Censorship

Act and SB7072 is that the Stop Social Media Censorship only applies to social media websites

that have more than 75 million profile users that were never affiliated with any particular

religious or political party from their inception.[39] A social media website that was affiliated with

a religious or political party can, therefore, continue to censor users at will, since they do not

suffer from the same false marketing problem.[40] If from their inception Facebook, Twitter,

Youtube, or Tictok had openly marked themselves as being aligned with the Democrat Party or

with the licentious religion of secular humanism, then they would have a defense for the removal

of political and religious speech that does not happen to conform to their favored religious and

political worldviews. But those social media websites that have brutalized the Plaintiffs and

---

relevant for the purpose of the state having jurisdiction to regulate those contracts because the
contract at issue is undoubtedly a contract of adhesion. Twitter and Facebook have billions of
subscribers, they never had a realistic expectation that the Plaintiffs would employ lawyers to
review their contract. Therefore, the contract is a contract of adhesion. Accordingly, the
specific terms of the adhesion contract do not matter. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110,
119, 126–27 (2d Cir. 2012). However, what does matter is the fact that Twitter, Facebook, and
Youtube have conspired to falsely market themselves as being "free, fair, open to the public, and
open to all religious and political ideas" to induce reliance only to then break their promise and
censor certain users in bad faith. This is a problem of broken promises flowing out of egoism.

[39] The reason why the Stop Social Media Censorship Act only applies to social media
websites that have more than 75 million users is not to treat different potential speakers
differently. The reason for this threshold is because the purpose of Section 230 was to allow
websites on the internet to grow without the fear of certain liability. The evidence shows from
the reasonable observer perspective that a social media website that has over 75 million profile
users has "sufficiently grown." Therefore, a statute, such as the Stop Social Media Censorship
Act, that allows victims of the deceptive, fraudulent, and dishonest honest trade practices of
social media websites to acquire relief against a social media provider with more than 75 million
subscribers is consistent with the spirit and "growth goals" of Section 230, which further causes
it to fall squarely in the state-law exemption. The 75 million threshold is not imposed to treat
smaller and larger social media websites differently. The threshold is included out of respect for
the doctrine of preemption so that the Stop Social Media Censorship Act will squarely fall in the
state-law exemption.

[40] A Black Lives Matter social media website, a Christian social media website, a Muslim
social media website, an LGBTQ social media website could censor any profile user who
opposed their fundamental doctrine and not be subjected to liability under the Stop Social Media
Censorship Act, if they made their affiliation and preference of a certain worldview known
upfront.

others, like the Trump plaintiffs, due to a hidden religious and political agenda that they sprang

on the whole of society to its extreme detriment.[41] This "gotcha game" tactic makes social media

websites the poster child of bad faith, and the idea that they can continue to have total immunity

because Congress made a bad law action combined with a bad judicial interpretation of that bad

law is self-evidently unconscionable and repugnant to the vast majority of Americans. The

arbitrary shifting of undefined standards conducted in the normal course of business by social

media websites constitutes classic bad faith and breach of contract that has led to the injury of

millions of profile users - to include the Plaintiffs. This controversy presents an opportunity for

this Honorable Court and Governor DeSantis to alleviate real suffering that is crushing

Floridians and the citizens of the other 49 states, by framing these issues correctly for once.

46.   In terms of breach of warranty, the Plaintiffs have been harmed by social media

websites censoring others in bad faith. For example, Pastor Franklin Graham of the Billy

---

[41] The Stop Social Media Censorship Act is calculated to stop businesses from harming consumers through broken promises, false advertisement, and fraud. The so-called "standards" floated by Facebook, Twitter, and Youtube have always been unclear, vague, and shifting. The changing of those standards constitutes bad faith. While it is true that social media websites might be able "to establish standards of decency without risking liability for doing so," what they cannot do is to change those standards arbitrarily after they induced billions of people to subscribe and invest in user profiles, having relied on the fact that the social media websites marketed themselves as free, fair, open to the public, and open to neutral political and religious speech. See *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021). The court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) failed to pick up on the critical factor that Facebook, Twitter, and Youtube arbitrarily changed their standards in bad faith all the time, after fraudulently inducing billions of people to subscribe and invest in their service at great personal expense to themselves, their families, and their communities. That court ignored the shifting standards completely, shrugging it off in callous disregard for reality, because it is out of touch with just how serious of a problem this has become for consumers and the Nation.

In sum, this controversy is just about making the mega social media websites keep their promises to consumers. The goal of the Stop Social Media Censorship Act is not to punish disfavored, out-of-state businesses and to stop or deter them from exercising their First Amendment rights in ways the Plaintiffs dislikes. The goal is to force certain social media websites to honor their promises and to live up to the way that they marketed themselves from their inception in order to induce reliance. Social media websites like Twitter marked themselves as being neutral on religion and politics, and they should be legally forced to remain so despite the unwarranted inflated view that the employees who work there.

Graham Foundation had over a million followers on his facebook profile page. The Plaintiffs were followers of his page and benefitted greatly from his life-giving posts that were rife with Bible verses. One day, Facebook's employees decided to delete Pastor Graham's Facebook page without warning, simply because the employees felt entitled to metaphorically crusify Pastor Graham and punish his followers for seeking the truth of the Gospel. Deleting Pastor Graham's profile had transferable injury on the Plaintiffs who were not only inconvenienced but stifled by the threat of deletion themselves.

## JURISDICTION AND VENUE

47. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. §§ 1331 and 1361.

48. The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

49. The Court has the authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

50. Venue is proper in this district under 28 U.S.C. § 1391(e)

## THE PARTIES

51. John Gunter Jr. is the executive director of Special Forces Of Liberty. Christopher Sevier Esq. is the executive director of De Facto Attorneys General. Pastor Rich Penkoski is the executive director of Warriors For Christ. Deb Maxwell is a Florida chapter leader of Special Forces Of Liberty and Warriors For Christ. De Facto Attorneys General, Special Forces Of Liberty, and Warriors For Christ are partners, who have served as administrators on social media websites through Facebook, Twitter, Youtube, and Tictok. Plaintiff Gunter lives in Miami, and

Deb Maxwell lives in Tampa. Plaintiff Sevier lives in Florida for part of the year. The Plaintiffs

have a headquarters in Miami Florida. The Plaintiffs entered into agreements with Facebook,

Twitter, and Youtube at different times in Florida, Tennessee, Louisiana, West Virginia, and in

the District Of Columbia, and were subsequently censored by the social media websites after the

social media websites had acted in concert to falsely marketed themselves as being free, fair,

open to the public, and neutral on matters of politics and religion. The Plaintiffs felt the injury in

Florida. [42]

---

[42] The social media websites shifted their standards in bad faith and censored the Plaintiffs because their Constitutionally protected religious and political speech offended the delicate sensibilities of the employees who happened to work for the social media websites at the time. At the time of each censorship, the Plaintiffs had previously invested a ton of time and money in their user profile accounts. Every time the Plaintiffs have threatened Facebook, Twitter, and Youtube with legal action, the social media websites promise to immunize their deceptive and destructive trade practices by invoking Section 230 of the Communications Decency Act. This assumption based on the public record that social media websites might have total immunity under Section 230 has given rise to the Plaintiffs cause of action here in which the Constitutional or the parameters of Section 230 are in question.

The Plaintiffs collectively consists primarily of Christ-followers, who served in the United States Military in foreign theaters of war, namely on the rule of law mission, which is purposed to better ensure a government's compliance with their highest Constitutional authority. The Plaintiffs have continued that mission state-side in America even though they no longer officially operating under Title 10 jurisdiction on behalf of the Armed Forces. The Plaintiffs routinely file comprehensive lawsuits across the United States on different controversial and complex issues that typically concern the "culture wars" and First Amendment issues that are too "politically hot" for the government-funded Attorneys General to pursue. In bringing such lawsuits, the Plaintiffs - without apology - often end up converting Article III Courts into their own private legislative research commission. Out of the overflow of the litigation pursued by the Plaintiffs, the Plaintiffs subsequently draft legislation for all 50 states and for the federal government, which is then routinely introduced by a bi-partisan network of sponsors that stretches across the Country before the Article I branch. The legislation authored by the Plaintiffs that gets presented to the members of legislative branch is legally vetted ad nausem and is calculated to survive judicial review, if subsequently challenged once enacted.

One of the fights that the *Amici* have undertaken in multitudes of Federal District Courts concerns Big Tech censorship, since this fight has created a freedom crisis that is eroding the quality of life for millions of Americans. Subsequently, the Plaintiffs authored a proposed bill called the "Stop Social Media Censorship Act" that is customized for all 50 states and is narrowly tailored to parallel the spirit of Section 230 of the CDA so that it falls squarely in the state-law exemption under subsection (e) subparagraph (3) of the Section 230 - thereby getting around the problem of preemption. Here is a website for the bill:

52.   The Plaintiffs authored the Stop Social Media Censorship Act for all 50 states, not for personal glory or donations but because it is the right thing to do and because as Christian missionaries, the Plaintiffs have set out to advance human flourishing as far as they are able.

53.   Defendant Attorney General Garland is the chief legal officer of the United States and heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of federal civil laws, including the statute at issue in this case.[43]

54.   Governor DeSantis is the Governor of Florida. He resides in Florida and is sued in his official capacity. His staff members were the architects of SB7072 which has been set on the path of nullification in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). Defendant Governor DeSantis has the authority under Article III, Section 3 of the Florida Constitution to convene a special session so that the Stop Social Media Censorship Act can be enacted in a manner that will allow the Plaintiffs here and the Trump Plaintiffs in *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021) to get relief from the government for their injuries inflicted by social media websites that engage in breach of contract, bad faith, unfair

https://www.specialforcesofliberty.com/. Here is a short video that the Plaintiffs provide to state legislatures who prime sponsor, co-sponsor, or support the bill so that they can easily understand the bill and the issues involved: (https://youtu.be/CCcOALXNteM).

Over 25 states moved on two primary bills written to stop the on-going problem of social media censorship that were drafted by either De Facto Attorneys General or Professor Hamburger of Columbia Lawschool. Countless Republicans and Democrats prime sponsored, co-sponsored, or supported these legislative measures. For a breakdown by state and by prime sponsor for the 2021 legislative session and the 2022 legislative session of the proposed language of the bills see Appendix A.

[43] Attorney General Garland is unfit for the job because his paramount agenda is to excessively entangle the government with the religion of Secular Humanism in direct violation of the Establishment Clause. Attorney General Garland lacks the character and fitness to serve on the courts or as Attorney General because he does not understand the differences between "right and wrong," "real and fake," and "secular and non-secular." This individual has checked his brain at the door of secular humanism to the point that he does not even operate in objective reality or see that most of the Democrat party platform is cultish and unconstitutional under the Establishment Clause.

dealing, fraudulent inducement, deceptive trade practices, false advertising, and other forms of

consumer protection violations. The Plaintiffs are asking Governor DeSantis to sua sponte

convene a special session or, alternatively, that this Court order and direct the Governor to do so,

which will actually give the Plaintiffs a valid pathway to acquiring redress through the courts

against social media websites that have injured them and millions of others due to fraud.

## NOT ALLOWING CONSUMERS TO REDRESS INJURIES AGAINST SOCIAL MEDIA WEBSITES THAT MARKETED THEMSELVES FROM THEIR INCEPTION AS BEING NEUTRAL ON POLITICAL AND RELIGIOUS SPEECH IS HARMING THE PUBLIC

55. Issuing an injunction that strikes down Section 230 or finding that Florida could pass

Stop Social Media Censorship Act and cure the constitutional defects of the Section 230 in view

of the state-law exemption, serves the public's best interest. The public record is replete with

examples evincing social media companies' sustained campaign of inconsistently and unfairly

censoring, shadow banning, deplatforming, and deprioritizing Floridians, including journalistic

enterprises and candidates for public office.[44] Senator Hughes of Texas, the prime sponsor of

---

[44] For example, state of Florida has admitted the following in the public record regarding how bad social media censorship is for the general public: *The Babylon Bee*, a conservative Christian news satire website headquartered in Jupiter, Florida that publishes satirical articles on religion, politics, and current events has repeatedly been the target of social media platforms' inconsistent and unfair behavior. In 2018, *The Babylon Bee's* Facebook page was threatened with removal and demonetization after one of its satirical articles titled "'CNN Purchases Industrial-Sized Washing Machine to Spin News Before Publication' was 'fact-checked.'" Facebook later apologized and explained that it had made a "mistake." In 2020, *the Babylon Bee* posted a story titled "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch," referencing the comedy *Monty Python and the Holy Grail*. Facebook demonetized *The Babylon Bee*'s Facebook page and stuck to its determination that the article "incited violence" due to its reference to burning witches, reversing its decision only after numerous media outlets lambasted Facebook for its censorship. Also in 2020, Twitter briefly suspended *The Babylon Bee*'s page for being "spam," reversing the suspension shortly thereafter and explaining that *The Babylon Bee* had "mistakenly" been caught in a spam filter.

The *New York Post* has received a similar treatment for some of its stories. Twitter locked the *New York Post*'s account and demanded that it delete six tweets that linked to the *Post*'s exposé on Hunter Biden in the fall of 2020. Facebook reduced the distribution of the story on its site. Twitter CEO Jack Dorsey later called the move a "total mistake," describing it as the result of a "process error." In April 2021, Facebook disallowed its users from sharing the *New York*

SB12, paid Facebook large amounts to promote his campaign posts on his user profile. Facebook

pocketed the money and did not allow the campaign advertisements to be viewed by the public.

Then Facebook began shadow banning Senator Hughe's posts and shutting down his profile page

---

*Post*'s story about a Black Lives Matter co-founder's expensive real estate purchases, citing the story as against its "community standards."

    Individuals and journalistic enterprises alike have had to grapple with social media platforms' inconsistent and unfair practices regarding COVID-19. In February 2021, Facebook announced that it would expand its content moderation on COVID-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." It blocked the *New York Post*'s article written that month suggesting that the virus could have leaked from a Chinese virology lab.. But now, given "ongoing investigations into the origin of COVID-19 and in consultation with public health experts," Facebook has decided that it will no longer "remove the claim that COVID-19 is man-made or manufactured."

    The social media platforms' behavior has also affected politicians. YouTube removed a video of Governor Ron DeSantis holding a panel with pandemic health experts for allegedly violating community standards regarding COVID-19 medical information. YouTube stated that the video included information on mask-wearing that "contradicts the consensus of local and global health authorities." In April 2020, Twitter terminated the account of Howie Hawkins, a Green Party candidate for President, for allegedly violating its rule on "impersonation." And in early 2021, Facebook, Twitter, Instagram, and YouTube banned President Trump in the wake of the January 6 Capitol riot out of concerns that he would encourage violence on their platforms, while taking no action against Representative Maxine Waters for her statements to protestors during Derek Chauvin's trial for the murder of George Floyd.

    Social media platform users are not always notified that they have been deplatformed or given an explanation for how they violated the platforms' content guidelines. When a social media platform shadow bans a user, that user is still able to access the platform, post content, and comment on others' posts, but their actions are invisible to all other normal users. The user is not notified of the shadow ban. In one instance, a user was shadow banned from Reddit but continued to spend four to five hours a day posting content for weeks before realizing that the content was invisible to all other normal users.

    These examples of social media platforms' inconsistent and unfair practices are further evidenced by systematic examinations of how the platforms implement their own content guidelines. Social media platforms apply their content guidelines differently to posts with similar content,, and some suspend the accounts of right-leaning individuals at a higher rate than left-leaning individuals,. Officials of the platforms themselves have admitted that employees in charge of content moderation "could be biased and pursuing their own political agendas."

    The social media platforms' inconsistent treatment of user content would be bad enough if they were transparent about how they make moderation decisions. But some of the most important platforms are notoriously secretive about such matters, even while publicly claiming—contrary to the public record—that they apply their policies "in a way that is fair and consistent to all," (quoting prior version of Facebook report on enforcement of community standards). Perhaps most notoriously, senior Google executives have publicly claimed that the company does not manually alter search results despite public reporting to the contrary.

to give his opponent an advantage in the campaign against him. In response to the mistreatment of Senator Hughes, Facebook promised to hide behind Section 230 if the Senator sought redress from the government for its deceptive trade practices. What happened to Senator Hughes has happened to hundreds of law makers across the country. (The censorship of Senator Showers of Alaska was also incredibly egregious). In primaries involving Democrat candidates, social media websites have been censoring and shadow banning the candidate they disfavor, putting a thumb on the scale of such elections. This practice has provoked Democrat legislators to sign on as prime sponsor and co-sponsor of the Stop Social Media Censorship Act in a variety of states. For example, Senator Gabbard of Hawaii, a Democrat, who is former Presidential contender Tulsi Gabbard's father, prime sponsored the Stop Social Media Censorship Act because of the onslaught of censorship that his daughter experienced in running to become the Commander In Chief. Social media websites that marked themselves as being neutral on politics in order to create a digital public square censored Congresswoman Gabbard's speech ad nausem throughout her campaign for President simply because their employees favored other candidates, whose policies make them feel less convicted about their personal immorality. To pretend that social media websites are not threatening election integrity is asinine, and not a position that the judicial branch should take. For the judicial branch to continue to interpret Section 230 in a manner that allows for social media websites to meddle in election in bad faith with absolute immunity is unminding the trustworthiness and legitimacy of the courts writ large.

## FACTS REGARDING DIRECT INJURY TO THE PLAINTIFFS PERPETRATED BY FACEBOOK, TWITTER, AND YOUTUBE THAT HAVE GONE WITHOUT GOVERNMENT REDRESS BECAUSE OF THE THREAT OF SECTION 230 AND THE ABSENCE OF NARROWLY TAILORED STATE STATUTE LIKE THE STOP SOCIAL MEDIA CENSORSHIP ACT

56. While residing in West Virginia (4th Circuit), Tennessee (6th Circuit), Florida (11th Circuit), Louisiana (5th Circuit), the District Of Columbia (DC Circuit) and elsewhere, the Plaintiffs were induced and enticed to contract witih Facebook, Twitter, Youtube, and Tictok, creating and investing substantially in user profiles on the promise that the platforms were (1) free, (2) fair, (3) open to the public, (4) a place where the free exchange of ideas by the user was permitted and encouraged, and (6) neutral on issues of religion and politics.

57. At the time the Plaintiffs created their user profiles just about everyone they knew had a user profile to include people who shared the same religious and political beliefs as themselves. The Plaintiffs, like virtually all of the other billions of users of social media websites, did not retain lawyers who are subject matter experts in digital contracts to review the terms of services of what was apparently an adhesion contract. Instead, the Plaintiffs predominately consider how social media websites marketed themselves as being neutral on political and religious speech in deciding to create and invest substantially in their user profiles. The social media websites gave the Plaintiffs and millions of others the reasonable expectation that religious and political views could be expressed at will without the fear of punishment and reprisal by the social media website employees.

58. The Plaintiffs are Christ-Followers who believe that the Bible is the Divine word of God and that Jesus Christ was exactly who He said He was. See John 14:6. The Plaintiffs are advocates for the radically transformative gospel narrative and feel compelled to attempt to gracefully fulfill the great commision in response to the love they believe that God has for them. See John 3:16; see Matthew 28:16-20. The gospel can in-part be summarized as, "humans are far worse than we ever dared to imagine, but we are far more loved by God than we could have ever dreamed." It is a faith-based worldview that humbles them and uplifts believes at the same

time. The Plaintiffs are not legalists,[45] and they were delighted to join social media platforms with other users who are critical of Christian doctrine and practices. The Plaintiffs welcome such critiques by non-believers and skeptics, while maintaining that the Plaintiffs' religious and political speech warrants equal protection, respect, and treatment. In creating several social media user profiles, the Plaintiffs believed based on how the social media websites marketed themselves that they could express and advocate for Christian principles, ideology, and beliefs without fear of censorship, persecution, or reprisal carried out by the social media website's employees themselves, who harbor animus towards Christians and Republicans and Democrats who represent "friends of the founding" of our Nation.

59. The Plaintiffs take no issue with third parties with user profiles censoring the Plaintiffs' speech or blocking the Plaintiffs' profiles. The Plaintiffs were personally injured by the employees of the social media website, who themselves censored, banned, and blocked the Plaintiffs' speech based on vague and arbitrary shifting standards that were abused out of the overflow of the moral superiority complexes harbored by the employees of the social media websites. This imperialistic elitism should be staunchly condemned by the judicial branch.

60. The employees at the social media websites censored, deleted, shadow-banned, and froze countless user profiles created by the Plaintiffs because the Plaintiffs took positions like (1) "men cannot be women;" (2) "Secular Humanism is a religion for the purpose of the First Amendment as the Supreme Court recognized" (3) "woke leftism dogma is inseparably linked to the religion of Secular Humanism religion for purposes of the Establishment Clause of the First Amendment;" (4) "a public library's decision to host Drag Queen Story Time at the taxpayer's expense violated the Establishment Clause of the First Amendment;" (5) "the government's decision to get in bed with the LGBTQ cult has proven to be a disaster for everyone;" (5) "life

---

[45] Ephesians 2:8-9

beings at conception and convience abortions are self-evidently immoral and subversive to human florishing;" (6) "the First Amendment Establishment Clause is the underlying legal basis for the Hyde Amendment and for the government to award public funds to convenience abortion providers is unconstitutional under the Establishment Clause for failing the prongs of the Lemon Test;" (7) "Black Lives Matter thinks that only the lives fthat matter are the one's who agree with their communist ideology - see Candice Owens;" (8) "the reason it is called the 'gay pride movement' is because everyone knows that there is nothing to be 'proud' about;" (9) "when a person says 'love is love' what they really mean is that they are perfectly ok with government assets being used to crush anyone who dares to suggest that homosexuality is entirely immoral, which is a position that is unloving;" (10) critical race theory is racists; (11) "Jesus is Lord;" (12) "what non-theistic leftist don't seem to understand is that love without truth is just shallow sentimentality."

61. In a trial against social media webistes, the Plaintiffs could show that the social media websites decision to delete, shadow-ban, and censor the Plaintiffs' profiles costs the Plaintiffs hundreds of thousands of dollars. This is especially true in the case of Warriors For Christ, which had accumulated over 226,000 followers on Facebook, 575,000 followers on Youtube, and 335,000 followers on Twitter. Warriors For Christ followers tuned in to watch weekly sermons provided by Pastor Rich and made donations to the ministry through its social media profiles. In a coordinated effort, social media websites deleted, banned, or froze Warriors For Christ user profiles just because the messages offered by Pastor Rich offended the delicate sensibilities of the brainwashed employees who work for the social media website in response to their refusal to think logically. After building entire business platforms on social media websites with the promise that the social media websites were neutral on politics and religion, the Plaintiffs have

had their accounts arbitrarily deleted, censored, blocked, marginalized, banned, and shadow-banned literally hundreds of times. The evidence shows that social media websites employees get off on haranguing, marginalizing, and oppressing users who do not share the same worldview, only to then cower behind 230 immunity that was passed by Congress.[46]

62. Just because some of the employees at social media websites do not like feeling convicted and harbor an emotional problem with the truth about the way things are and the way we are as humans does not mean that Congress can pass a law that shields social media websites from being held to account for their injurious malicious conduct. Accordingly, this Court is tasked with carving out the path for victims to be able to seek redress from the government in the wake of harmful business practices used by social media websites. Hundreds of religious institutions and political commentators have been deplatformed in a manner that is injurious to everyone, all because the social media website feel entitled to not live up to how they marketed themselves because of Section 230.

## FIRST AMENDMENT VIOLATION - GENERALLY

63. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs. The First Amendment of the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

64. "Congress... ma[d]e" Section 230, a "law," and this "law" has been interpreted and construed by government actors to create blanket immunity to the extent that the law "abridges

---

[46] Social media websites have proven that people who are intolerant of intolerant people are intolerant; people who are judgmental against judgmental people are judgmental; and people who are dogmatic about not being dogmatic are the most dogmatic of all.

[the Plaintiffs] freedom of speech" and "the [Plaintiffs] right to petition the government for redress of grievances" in the wake of bad faith acts of social media websites that have engaged in self-evidently immoral consumer protection violations to include indecent deceptive trade practices, fraudulent inducement, unjust enrichment, bad faith, unfair dealing, breach of contract, and false advertising.

65. The First Amendment right to petition the government for redress of grievances encompasses both the right to attempt to persuade the legislative and executive branches and the right to access the courts. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

66. While at the United States Capitol in D.C. in the halls of the Senate Russell building, in a heated exchange with Mark Zuckerberg, Plaintiff Sevier did the Christian thing and threatened to sue Mark Zuckerberg's "as@#$$ into powder," if his entity did not "stop its political and religious censoring of theists for being theists. In response, Mr. Zuckerberg, authorized agents, retorted that Facebook would invoke a Section 230 immunity blanket defense in the litigation threatened by De Facto Attorneys General, stating that Facebook could do "whatever the hell it wanted." [47] The posturing of Facebook's CEO combined with judicial interpretation of Section 230 has given the Plaintiffs the reasonable apprehension that the making of Section 230 by Congress constituted a legal blockade that has stopped the Plaintiffs from being able to seek redress from the government for the bad faith injurious actions of social media websites, like Facebook, that has harmed the Plaintiffs personally.

67. Pursuant to Section 230, the government's creation or enforcement or lack of responsiveness to Section 230 has encouraged social media websites to censor the

---

[47] This interaction is included pursuant to the state of mind exception of the hearsay rule, and not to prove the truth of the matter asserted.

constitutionally protected speech of the Plaintiffs, after the social media websites falsely marketed themselves as being neutral towards protected religious and political speech.

68. The interpretation of Section 230 has created total blanket immunity in a manner that has thwarted the Plaintiffs from being able to seek redress for their grievances.

69. Using its authority under Section 230 together and acting in concert, major social media websites regulate the content of speech over a vast swath of the Internet in bad faith, after having falsely marketed themselves as being free, fair, open to the public, and neutral towards religious and political speech that is considered to be protected speech.

## RIGHT TO PETITION - COUNT ONE
### U.S. Const., amend. 1 (Petition Clause)

70. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

71. The Petition Clause of the First Amendment of the U.S. Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people . . .to petition the Government for a redress of grievances." U.S. Const., amend. I.

72. The Challenged Provision prohibits the Plaintiffs from seeking redress from the government against social media websites that have injured them through fraud, breach of contract, false advertising, unjust enrichment, bad faith, unfair dealing, and deceptive trade practices.

73. The Challenged Provision is overly broad and not justified by a legitimate, compelling, or overriding government interest.

74. The Challenged Provision is not narrowly tailored to achieve any such legitimate, compelling, or overriding government interest.

75. The Challenged Provision violates the Petition Clause of the First Amendment.

76. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Petition Clause of the First Amendment to the U.S. Constitution.

77. Based on prior interpretations of Section 230 by the judicial branch, the Plaintiffs are under the apprehension that Section 230 serves as a total immunity blanket for social media websites that falsely market themselves and censor consumers after inducing them to invest.

## FREE SPEECH - COUNT TWO
### [U.S. Const., amend. 1 (Freedom of Speech)]

78. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

79. The Free Speech Clause of the First Amendment to the U.S. Constitution provide: "Congress shall make no law . . . abridging the freedom of speech."

80. The Challenged Provision prevents speech and expressive activity by allowing social media websites to act in bad faith while engaging in fraud, false advertising, theft-by-trick, breach of contract, unfair dealing, and deceptive trade practices with immunity.

81. The Challenged Provision is unconstitutionally overbroad on its face because its unconstitutional applications are substantial in relation to its legitimate applications.

82. As applied to the Plaintiffs, the Challenged Provision unconstitutionally restricts their protected speech.

83. The Challenged Provision is not narrowly tailored to any legitimate, compelling, or overriding government interest.

84. The Challenged Provision violates the Free Speech of the First Amendment in its making by Congress and its enforcement.

85. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Free Speech Clause of the First Amendment to the U.S. Constitution.

## FREE EXERCISE CLAUSE - COUNT THREE
### [U.S. Const., amend. 1 (Free Exercise)]

86. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

87. The Free Exercise Clause of the First Amendment to the U.S. Constitution protects plaintiffs' religious activities.

88. As the result of Congressional action, the Plaintiffs religious expressions are being disfavored, stifled, and censored. The Congressional action that led to the censorship of the Plaintiffs religious speech has relegated the Plaintiffs to second-class citizen status. The Plaintiffs do not feel welcomed in their own country , even though they consider themselve to be "friends of the founding fathers," just as this Court is required to be.

89. The Plaintiffs have no adequate remedy at law other than to have Section 230 voided.

90. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Free Exercise Clause of the First Amendment to the U.S. Constitution because it stifles religious expressions that are otherwise protected.

## ESTABLISHMENT CLAUSE VIOLATION - COUNT FOUR
### [U.S. Const., amend. 1 (Establishment Clause)]

91. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs.

92. The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion."

93. The Establishment Clause of the First Amendment forbids the enactment of any law, program, or practice "respecting an establishment of religion." Congress is required to pursue a course of neutrality with respect to religion.

94. From the reasonable person perspective, Congress's enactment of Section 230 fails all three prongs of the Lemon Test and violates the First Amendment Establishment Clause for constituting a non-secular sham that lacks a primary secular purpose that has cultivated an indefensible legal weapon against non-observers of the religion of Secular Humanism, and for serving to excessively entangle the government with the religion of Secular Humanism.[48]

95. The Supreme Court and nearly all of the Federal Court of appeals have recognized that Secular Humanism is a religion for the purpose of the First Amendment's Free Speech, Free

_____

[48] To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). It is important to understand that government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Ag ostini v. Felton*, 521 U.S. 203, 218 (1997). The evidence will show that Congress's make Section 230 fails all three prongs of the *Lemon* Test. At the core of the "Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamberof Commerce, Inc.,* 698 F. 2d 1098, 1111 (11th Cir.1983).T his secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844 (2005). Under this second prong of the *Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual purpose," *Wallace v. Jaffree,* 4 72 U.S. 38, 56 n.42 (1985), the "symbolic union of church and state...is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. v. Ball,* 473 U.S. 373, 390 (1985);*see also Larkin v. Grendel's Den,* 459 U.S. 116, 126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited). Congress's enactment of Section 230 has constituted a "legal weapon that no [Christian or non-observer of Secular Humanism] can obtain." *City of Boerne v. Flores,* 521 U.S. 507 (1997). Social media websites have wielded a legal weapon in direct violation of prong II of Lemon.

Exercise, and Establishment Clauses.[49] The high priest and poet, Justice Kennedy, enshrined the

core fundamental truth claim of Secular Humanism into law in *Planned Planned Parenthood v.*

---

[49] The United States Supreme Court already found that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins*, 367 U.S.488, n. 11 (1961), stating "among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism, and others. See *Washington Ethical Society v. District of Columbia*, 2 49 F.2d 127, 101 U.S. App. D.C. 371 (D.C. Cir 1957); *Fellowship of Humanity v. County of Alameda*, 153 Cal.App.2d 673, 315 P.2d 394 (1957); II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Britannica (1957 ed.) 325-327; 21 id., at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120-138, 254-313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47."

See also - *School District of A Bington Township, Pa. v. Schempp,* 374 U.S. 203, 225 (1963)("[T]he State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe.")

See also - the decision in *United States v. Seeger,* 3 80 US 163, 166 (1965) defined religion as all sincere beliefs "based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent." Thus, according to *Seeger,* "religion" includes atheists and agnostics, as well as adherents to traditional theism. The logical conclusion from the Seeger decision is that "[a]bsolute vertical disbelief in the traditional sense - disbelief in God - is irrelevant" to First Amendment considerations. *Id. See generally* Bowser, *Delimiting Religion in the Constitution: A Classification Problem,* 11 VAL. U.L. REV. 163 (1977); Boyan, *Defining Religion in Operational and Institutional Terms,* 1 16 U. PA. L. REv. 479 (1968); Clancy and Weiss, The Conscientious Objector Exemption: *Problems in Conceptual Clarity and Constitutional Considerations,* 17 ME.L. REV. 479 (1968); Clark, *Guidelines for the Free Exercise Clause,* 8 3 HARV. L. REV. 327 (1969); Killilea, *Standards for Expanding Freedom of Conscience,* 34 U. Prrr. L. REv. 531 (1973); Rabin, *When is a Religious Belief Religious: United States v. Seeger and the Scope of Free Exercise,* 51 CORNELL L.Q. 231 (1966); Comment, *Defining Religion: Of God, the Constitution and the* D.A.R., 32 U. CHI. L. REv. 533 (1965).

See also - in *Welsh v. United States*, 398 U.S. 333 (1970), the Supreme Court extended the *Seeger* rationale and held "that purely ethical and moral considerations were religious." The Supreme Court further blurred the distinction between religion and morality by holding that a sincere person may be denied an exemption only if his belief or belief system does "not rest upon and invade ethical or religious principles, but instead rests solely upon considerations of policy, pragmatism or expediency." *Id.* at 342-43. Most of the Federal Court of appeals have also already found that Secular Humanism is a religion for the purpose of the First Amendment Establishment Clause in cases such as *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979); *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977); *Thomas v. ReviewBd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003); *Real Alternatives, Inc. v.Se'y Dep't of Health & Human Ser*, 150 F. Supp. 3d 419, 2017 WL3324690 (3d Cir. Aug. 4, 2017); and *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001); *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943).

*Casey*, 505 U.S. 833, 846-47 (1992), when he stated that "at the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe." Hitler believed this as well and hung the same condescending message over the front gate of Buchenwald concentration camp. The largest religion in the United States is Secular Humanism, also referred to by theologians as anti-theism, postmodern individualistic western moral relativism and expressive individualism. [50]

96. The Plaintiffs have standing as taxpayers under *Flast v. Cohen*, 392 U.S. 83 (1968)[51] and other cases to pursue this cause of action. The Plaintiffs have a logical nexus as taxpayers to pursue this cause of action as the authors of the Stop Social Media Censorship Act. [52]

---

[50] Critical race theory, Black Lives Matter's ideology, Planned Parenthood's dogma, and the LGBTQ orthodoxy are doctrines that are inseparably linked to the religion of Secular Humanism. While Facebook, Twitter, and Youtube marketed themselves as being neutral on matters of religion, they have used Section 230 to excessively entangle the Nation with the irrational and licentious religion of Secular Humanism. What the Democrat party fails to understand is that Secular Humanism promotes licentiousness and is an attempt to justify practices that are inconsistent with the peace and safety of the state. The government has the right to regulate the fire out of Secular Humanism practices because the Free Exercise Clause is not absolute.

[51] The general rules regarding standing to challenge governmental actions are designed to ensure that courts are addressing actual cases that can be resolved by the judicial system. However, in some circumstances, individuals may seek to challenge governmental actions for which neither those individuals nor any other individuals could meet standing requirements. Indeed, the Supreme Court has noted that in some instances "it can be argued that if [someone with a generalized grievance] is not permitted to litigate this issue, no one can do so." *United States v. Richardson*, 418 U.S. 166 (1974). Generally, the Supreme Court has noted, "lack of standing within the narrow confines of Art.III jurisdiction does not impair the right to assert [one's] views in the political forum or at the polls." However, the ability of individuals to affect change through political and democratic means does not eliminate all cases where a large group of individuals would be affected by the challenged governmental action. In particular, the Court has specifically allowed taxpayer standing for claims arising under the Establishment Clause. Under the *Flast* exception to the general prohibition on taxpayer standing, taxpayers may raise challenges of actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause which is applicable to the states under the Fourteenth Amendment. *Flast v. Cohen*, 392 U.S. 83 (1968). As Justice Ginsburg shrewdly pointed out, "the underlying premise of *Flast v. Cohen* [is] that the Establishment Clause will be unenforceable unless we recognize taxpayer standing." *Id.* At 8

[52] The Plaintiffs pay every form of conceivable state and federal tax in Florida. The federal taxes that the Plaintiffs pay in Florida go to the United States' general fund. The salaries

97. Congress may have had an emotional reason for passing Section 230 into law because it wanted to see the Internet "grow" but that consideration is an emotional appeal, and it is a long-standing jurisprudence that emotional appeals, even really good ones, cannot be used to usurp the Establishment Clause of the First Amendment. See *Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004).

98. The enactment of Section 230 by Congress has represented an endorsement of the religion of Secular Humanism in how it has been used by social media websites to entangle the government with the religion of Secular Humanism , constituting excessive endorsement of the Secular Humanist religion due to Congress making a bad law that was not thoughtout.

99. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs as victims of bad faith social media censorship violates the Establishment Clause of the First Amendment to the U.S. Constitution for failing the prongs of the Lemon Test.

## DECLARATION OF FIRST AMENDMENT VIOLATIONS OF SECTION 230's MAKING - COUNT FIVE

100. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs.

101. In censoring (flagging, shadow-banning, etc.) the Plaintiffs, social media websites relied upon and acted pursuant to Section 230 of the Communications Decency Act. Congress's action constitutes the superseding cause that is preventing Plaintiffs from acquiring relief from social media websites.

---

of the members of Congress are paid out of the general fund. Congress made Section 230 in the normal course of business, and that statute has served as government action that establishes the secular humanism as favored by social media websites as the official and favored religion of the United States. As non-observers of the secular humanism religion, the Plaintiffs have been relegated to second-class citizen status.

102. The social media websites would not have deplatformed the Plaintiffs or similarly situated profile users but for the immunity purportedly offered by Section 230.

103. Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected" under the Free Speech Clause and Free Exercise Clause of the First Amendment. 47 U.S.C. § 230(c)(2).

104. In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

105. Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

106. Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

107. Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

106. Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and

viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

108. Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression, to religious exercise, and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.[53]

109. Accordingly, the Plaintiffs seek an injunction and a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected free speech and constitutionally protected free exercise of religion.

### ALTERNATIVE COUNT
### DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT, THE STOP SOCIAL MEDIA CENSORSHIP ACT, AND § 501.204 - COUNT SIX

---

[53] The "ministries of truth" favor the religion of Secular Humanism over non-religion and over other religions, causing any reasonable observer to see that the Congress's immunity has had the effect of establishing Secular Humanism as the supreme religion of the Nation in violation of the prongs of the Lemon Test and the First Amendment's Establishment Clause.

_____110. Plaintiffs re-allege and re-aver all of the allegations contained in the previous paragraphs. This claim for declaratory relief is pleaded in the alternative. 47 U.S.C. § 230(3)(c) states "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

111. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the Plaintiffs does not violate the First Amendment only if Florida or any other state were to enact a statute, like the Stop Social Media Censorship Act, that is narrowly tailored to fall in the state law exemption under subsection (e) subparagraph (3) of Section 230 because a lawsuit brought under such a statute would allow litigants to seek redress against social media websites that act in bad faith and commit fraud.

112. Issuing a declaration that clarifies the state-law exemption is not enough. Therefore, the Plaintiffs ask this Court to direct Governor DeSantis to call a special session pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of Article VI of the United States Constitution to enact the Stop Social Media Censorship Act to cure constitutional defects of SB7072 in view of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs can finally have the actual ability to properly petition the courts of competent jurisdiction for redress against deceptive social media websites that defrauded and dehumanized them.

113. The Plaintiffs seek declaration and clarification from the Court on whether the Plaintiffs and other injured Floridians could bring a lawsuit under § 501.2041 against social media websites that have victimized them in view of the preliminary injunction entered in

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) or whether § 501.2041 would be automatically preempted by Section 230.

## DEMAND FOR A BENCH TRIAL

114. The Plaintiffs request a bench trial on all issues so triable.

## PRAYER FOR RELIEF

115. WHEREFORE, the Plaintiffs respectfully requests that the Court either enter an Order:

A. Declaring that the challenged provision, 47 U.S.C. § 230, et. seq. on its face and as applied to Plaintiffs, violates the Petition Clause of the First Amendment to the U.S. Constitution and the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment to the U.S. Constitution and is enjoined from enforcement;

B. Alternatively, declaring that 47 U.S.C. § 230(c)(1) and (c)(2)

on its face and as applied to Plaintiffs, violates the Petition Clause of the First Amendment to the U.S. Constitution and the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment to the U.S. Constitution and is, thereby, enjoined from enforcement;

C. Alternatively, declaring that the State of Florida should have enacted the amended version of HB 33 by Sen. Gruters and Rep. Sabatin (referred interchangeably as the Stop Social Media Censorship Act), and not SB7072 that suffers from the Constitutional concerns described by the court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113);

D. Alternatively, declaring that if Florida or any other state were to enact the Stop Social Media Censorship Act that the statute would not be preempted under Section 230 and because it falls squarely within the state-law exemption under subsection (e) subparagraph (3) of Section 230 and that the Plaintiffs and others who were similarly situated could pursue a cause of action

under the state statute without the lawsuit being automatically preempted by the Supremacy Clause in view of Section 230;

E. Alternatively, requiring Defendant Governor DeSantis to call a special session pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of Article VI of the United States Constitution to deliberate enacting the Stop Social Media Censorship Act to cure Constitutional defects of SB7072[54] in view of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs and other Floridians who have been injured by social media websites can finally and properly petition the government for redress in a legally proper manner so that they could have the chance to be made whole again;

F. Alternatively, declaring that the Plaintiffs could bring a lawsuit under § 501.2041 against social media websites that have victimized them and that § 501.204 would not be automatically preempted by Section 230 because § 501.2041 within the state-law exemption subsection (e) subparagraph (3).

G. Permitting an award of attorneys' fees and costs to Plaintiffs in an amount to be determined at trial.

H. Permitting an award of such other and further relief as the Court may deem just and proper.

I. Granting Plaintiff Sevier ECF filing access;

J. Granting the Plaintiffs leave to file two separate motions for preliminary injunction, permanent injunction, and/or summary judgment and that they be given leave to file excessive pages for the same reasons the plaintiffs in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) were given.

[54] SB7072 the bill which created §106.072, § 287.137, and § 501.204

K. Liberally granting leave to third parties that seek leave to submit *amicus* briefs, even

if the briefs are critical of the Plaintiffs' watertight positions.

/s/Christopher Sevier Esq./
DE FACTO ATTORNEYS GENERAL
Mailing: 118 16th Ave S #247 - Music Row
Nashville, TN 37203
(615) 500-4411
BCN: 026577
909 Santa RosaBlvd,
Fort Walton Beach, FL 32548
4301 50th St, Suite 300, #2009,
Washington, DC 20816
ghostwarsmusic@gmail.com
www.specialforcesofliberty.com
www.chrissevier.com
1LT 27A JAG
Bravo Two Zero

/s/John Gunter Jr./
SPECIAL FORCES OF LIBERTY
195 NW 103rd Strreet
Miami, FL 33150
(801) 654-5973
johnjr@tel-electronics.com
www.specialforcesofliberty.com
www.stopsocialmediacensorshipact.com
SGM 27D
Gator Six Zulu
(TO BE REPRESENTED PRO HAC)

/s/Deb Maxwell/
SPECIAL FORCES OF LIBERTY
4415 Spring Lake CT
New Port Richey, FL 34652
(727) 400-2182
1debmaxwell@gmail.com
www.specialforcesofliberty.com
(TO BE REPRESENTED PRO HAC)

/s/Pastor Rich Penkoski/
WARRIORS FOR CHRIST
195 NW 103rd Strreet
Miami, FL 33150
4301 50th St, Suite 300, #2009,

Washington, DC 20816
(801) 654-5973
pastor@wfcchurch.org
https://www.wfcchurch.org
(TO BE REPRESENTED PRO HAC)

/s/Greg' Degeyter Esq./
DE FACTO ATTORNEYS GENERAL
BCN: 24062695
degeyterlaw@gmail.com
9898 Bissonnet St Ste 626
Houston , Texas 77036
(713) 505-0524
Attorney On Behalf Of Special Forces Of Liberty &
Warriors For Christ
(*PRO HAC APPLICATION FORTHCOMING*)

APPENDIX A

**1. Alabama** - Drafted as follows for the 2022 legislative session:
https://www.dropbox.com/s/mh0kpmi8s9bkisp/2022%20ALABAMA%20STOP%20SOCIAL%20MEDIA%20CENSORSHIP%20AMENDED%20FINAL.pdf?dl=0

**2. Alaska.** Drafted by Senator Showers (R) for introduction at the 2022 legislative session:
https://www.dropbox.com/s/ci7c8x9r10jb55z/2022%20Alaska%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**3. Arizona. SB1428 sponsored by Sen. Townsend (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/AZ/text/SB1428/2021

-Amended for 2022 legislative session to be introduced by Sen. Townsend:
https://www.dropbox.com/s/7i0iakb3z4to1eg/2022%20Arizona%20Stop%20Social%20Media%20Censorship%20final.pdf?dl=0

**4. Arkansas.** Drafted by Chairman Sen. Clark (R) to be introduced at the 2023 legislative session:
https://www.dropbox.com/s/o98fkpfblyzgkmy/2023%20Arkansas%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20%281%29.pdf?dl=0

**5. California.** In review by Sen. Grove to be introduced at the 2022 legislative session as follows:
https://www.dropbox.com/s/b7n96qegfhkgsw3/2022%20California%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**6. Colorado.** To be introduced by Rep. Williams at the 2022 legislative session as follows:
https://www.dropbox.com/s/tcc7uxddoqwgs6f/2022%20Colorado%20Stop%20Social%20Media%20Censorship%20Act%20Final.pdf?dl=0

**7. Connecticut.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/db4xv70hcu5j4jp/2022%20Connecticut%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**8. Delaware.** To be introduced by Sen. Richardson (R) at the 2022 legislative session:
https://www.dropbox.com/s/0x3ayrs6964xy9n/2022%20Delaware%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**9. Florida. HB 33 sponsored by Rep. Sabatini (R)** - provided by De Facto Attorneys General - at the 2021 legislative session :
https://legiscan.com/FL/bill/H0033/2021

To be introduced at the 2022 legislative session as follows:
https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**10. Georgia.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/391sacz7gg3oekj/2022%20New%20Georgia%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20%281%29.pdf?dl=0

**11. Hawaii. SB357 sponsored by Sen. Gabbard (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/HI/text/SB357/2021

To be introduced at the 2022 legislative session by Sen. Gabbard as follows:

https://www.dropbox.com/s/4drp0d1wrkp4gah/2022%20Hawaii%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**12. Idaho. H0323 sponsored by Rep. Nichols (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ID/text/H0323/2021

To be introduced at the 2022 legislative session by Rep. Nichols as follows:

https://www.dropbox.com/s/5m97v1mpdrs36cg/2022%20Idaho%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**13. Illinois.** Drafted as follows for the 2022 legislative session:

https://www.dropbox.com/s/tun4sxpl4r4h2ka/2022%20Illinois%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**14. Indiana:** To be introduced at the 2022 legislative session by Rep. Jacobs as follows:

https://www.dropbox.com/s/laea6ssvk03j5lj/2022%20Indiana%20Stop%20Social%20Media%20Censorship%20Act%20.pdf?dl=0

**15. Iowa. HF171 sponsored by Rep. Salmon** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/IA/text/HF171/2021

To be introduced at the 2022 legislative session by Rep. Salmon as follows:

https://www.dropbox.com/s/66e8he2cd0zxsj4/2022%20Iowa%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**16. Kansas. HB2322 sponsored by Rep. Gaber (R)** - provided by De Facto Attorneys General. To be introduced by Rep. Garber at the 2022 legislative session as follows:

https://www.dropbox.com/s/6dxnzcfpzlr67qd/2022%20Kansas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**17. Kentucky. SB 111 sponsored by Sen. Mills (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/KY/text/SB111/2021

To be introduced at the 2022 legislative session by Sen. Mills as follows:

https://www.dropbox.com/s/tlr4kcqakr1elyc/2022%20Kentucky%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**18. Louisiana. SB196 sponsored by Sen. Morris (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

**https://legiscan.com/LA/text/SB196/2021**

To be introduced at the 2022 legislative session by Sen. Morris as follows:

https://www.dropbox.com/s/o0qiu7nout6np6h/Louisiana-2021-SB196-Engrossed%20%283%29.pdf?dl=0

**19. Maine. LD1609 sponsored by Rep. Sampson (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ME/text/LD1609/2021

To be introduced at the 2022 legislative session by Rep. Sampson as follows:

https://www.dropbox.com/s/xji2kpbtktkkrsf/2022%20Maine%20Stop%20Social%20Media%20
Censorship%20Act.pdf?dl=0

**20. Maryland. HB1314 sponsored by Del. Adams (R) -** provided by De Facto Attorneys

General - at the 2021 legislative session:

https://legiscan.com/MD/text/HB1314/2021

To be introduced at the 2022 legislative session by Del. Adams as follows:

https://www.dropbox.com/s/nshl9js3df3vyn5/2022%20Maryland%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**21. Massachusetts.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yy2ubrqeo5eft6k/2022%20Massachusetts%20Stop%20Social%20M
edia%20Censorship%20Act.pdf?dl=0

**22. Michigan.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/n3lqn0uw23re37z/2022%20Michigan%20Stop%20Social%20Media
%20Censorship%20Act%20Final%20amendment.pdf?dl=0

**23. Minnesota.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7zrv9qy8jzv48gi/2022%20Minnesota%20Stop%20Social%20Media
%20Censorship%20Act%20Amended%20final.pdf?dl=0

**24. Mississippi: SB 2617 sponsored by Sen. Hill (R) -** provided by De Facto Attorneys

General - at the 2021 legislative session:

https://legiscan.com/MS/text/SB2617/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/wyjq7ean5b37ogw/Mississippi%20Stop%20Social%20Media%20C
ensorship%20Act.pdf?dl=0

**25. Missouri. HB 482 sponsored by Rep. Coldman (R) -** provided by De Facto Attorneys

General - at the 2021 legislative session:

https://legiscan.com/MO/bill/HB482/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/2hj5e2vlyro8m39/2022%20Missouri%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**26. Montana.** To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/qtwz360f2dik04u/2023%20MONTANA%20STOP%20SOCIAL%2
0MEDIA%20CENSORSHIP%20ACT%20AMENDED%20FINAL.pdf?dl=0

**27. Nebraska. LB621 sponsored by Sen. Curt Friesen (R) -** provided by De Facto Attorneys

General - at the 2021 legislative session:

https://legiscan.com/NE/text/LB621/2021

To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/4s6wsko5dw9suj4/2022%20Nebraska%20%20Stop%20Social%20
Media%20Censorship%20Act%20FINAL.pdf?dl=0

**28. Nevada:** To be introduced as follows at the 2023 legislative session:

**29. New Hampshire. HB133 sponsored by Rep. Plett (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NH/text/HB133/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/bi1whnhjf4cfxui/2022%20New%20Hampshire%20Stop%20Social
%20Media%20Censorship%20Act.pdf?dl=0

**30. New Jersey. A578 sponsored by Asm. Auth** - provided by De Facto Attorneys General - at
the 2021 legislative session:

https://legiscan.com/NJ/text/A578/2020

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/pkt2wqtqx8mwpjb/New%20Jersey%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**31. New Mexico.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/3rjkno4547telvr/2022%20New%20Mexico%20Stop%20Social%20
Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**32. New York.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/fretoaagwy7108z/2022%20New%20York%20Stop%20Social%20M
edia%20Censorship%20Act%20FINAL%20AMENDED%20.pdf?dl=0

**33. North Carolina. S497 sponsored by Sen. Alexander** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NC/text/S497/2021

**34. North Dakota. HB1144 sponsored by Rep. Kading.** - provided by Professor Hamburger-
at the 2021 legislative session:

https://legiscan.com/ND/text/1144/2021

To be introduced as follows at the 2022 legislative session by Rep. Jones:

https://www.dropbox.com/s/iwf5b1eyvj82wsi/2022%20North%20Dakota%20Stop%20Social%2
0Media%20Censorship%20Act.pdf?dl=0

**35. Ohio.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yziri2z6g80eer4/2022%20New%20Ohio%20Stop%20Social%20Me
dia%20Censorship%20Act%20Final.pdf?dl=0

**36. Oklahoma. SB383 sponsored by Sen. Standridge** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/OK/text/SB383/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/l50i8fe4z7qwuxb/2022%20Oklahoma%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**37. Oregon.** To be introduced as follows at the 2022 legislative session by Rep. Leif:
https://www.dropbox.com/s/4k0sm4j5o0iub68/2022%20Oregon%20Stop%20Social%20Media%
20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**38. Pennsylvania. SB604 sponsored by Sen. Mastriano** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/PA/text/SB604/2021

**39. Rhode Island. H5564 sponsored by Vella-Wilkinson (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/hnk11ybifb0bqk8/2022%20Rhode%20Island%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**40. South Carolina. H3450 sponsored by Rep. Burns (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SC/text/H3450/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/73d6fwl1hwr204t/2022%20South%20Carolina%20Stop%20Social%20Media%20Censorship%20Act%20Consolidated%20%282%29.pdf?dl=0

**41. South Dakota. HB1223 sponsored by Rep. Jensen** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SD/bill/HB1223/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7bnc8jvt50hhzbu/2022%20South%20Dakota%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**42. Tennessee.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/y1r1biujf5awlep/2022%20Tennessee%20Stop%20Social%20Media%20Censorship%20bill%200859%20amended%20FINAL%20.pdf?dl=0

**43. Texas. SB12 sponsored by Sen. Hughes** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/upeh2w5u5pn6zfc/2022%20Texas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**44. Utah. SB228 sponsored by Sen. McKell** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/UT/text/SB0228/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/6zv60b2iqd5xpun/2022%20Utah%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**45. Vermont.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/kyx6ok5u8o1fhwu/2021%20Vermont%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20.pdf?dl=0

**46. Virginia.** To be introduced as follows at the 2022 legislative session by Delegate Byron:

https://www.dropbox.com/s/fmbjbg9oe9r6st3/2022%20Virginia%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**47. Washington.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/x3tig83nsjdhr0p/2022%20Washington%20Stop%20Social%20Medi a%20Censorship%20Act%20FINAL.pdf?dl=0

**48. West Virginia.** To be introduced as follows at the 2022 legislative session by Sen Azinger: https://www.dropbox.com/s/6tfkmxloznw5igi/West%20Virginia%20Stop%20Social%20Media% 20Censorship%20Act.pdf?dl=0

**49. Wisconsin.** To be introduced as follows at the 2022 legislative session: https://www.dropbox.com/s/pt8v99suwbirje1/2022%20Wisconsin%20Stop%20Social%20Media %20Censorship%20Act.pdf?dl=0

**50. Wyoming. SF0100 sponsored by Sen. Steinmetz** - provided by Professor Hamburger- at the 2021 legislative session:

https://legiscan.com/WY/text/SF0100/id/2339364/Wyoming-2021-SF0100-Engrossed.pdf To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/mdr58wy4wsuvh91/2022%20Wyoming%20Stop%20Social%20Me dia%20Censorship%20Act.pdf?dl=0

To survive strict scrutiny, an infringement on speech must further a compelling state interest and must be narrowly tailored to achieve that interest. See, e.g., Reed, 576 U.S. at 171.

The Amici's l

WHAT IS THEIR INTEREST

LEGISLATION

ARGUMENT

It is self-evident that the censorship carried out by the major social media platforms is immoral, harmful, and wrong. But this Court does not have to address whether section 230 is unconstitutional or whether social media websites should be classified as quasi-state actors, who are thereby subject to compliance with the First Amendment.

It is no doubt true that the social media accounts of the President were an instrument of his presidency and that the Democrats have acted in conjunction with the Defendants to censor political opponents.

Is it necessary to classify social media websites as state actors as the Plaintiffs contend in paragraph 3 of their original complaint? No.[1]

Is it necessary for the Court to declare Section 230 unconstitutional?

These companies have the wealth and power of most sovereign nations. They are incredibly powerful entities.

Our rights come from God. Our rights

---

[1] Twitter has increasingly engaged in impermissible censorship resulting from threatened legislative action, a misguided reliance upon Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant Twitter's status thus rises beyond that of a private company to that of a state actor, and as such, Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes.

Employing shifting standards is not good faith. applicable standards.

The First Amendment does not restrict the rights of private entities not performing traditional, exclusive public functions. See, e.g., *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). While it is true that a social media

First, the State has asserted it is on the side of the First Amendment; the plaintiffs are not. It is perhaps a nice sound bite. But the assertion is wholly at odds with accepted constitutional principles. The First Amendment says "Congress" shall make no law abridging the freedom of speech or of the press

Biden v. Knight 141 S. Ct. 1220 (2021) "public forum."

The Plaintiffs are correct, the Communications Decency Act was designed to protect decent speech over indecent speech, not to promote deceptive trade practices.[2]

77. The CDC has publicly stated that it works with "social media partners," including Twitter, to "curb the spread of vaccine misinformation."

Page 27 of 4:21-cv-00220-RH-MAF D
"Whatever might be said of any other allegedly compelling state interest, these statutes are not narrowly tailored. Like prior First Amendment restrictions, this is an instance of burning the house to roast a pig. See, e.g., Reno v. ACLU, 521 U.S. at 882; Sable Commc'n of Cal., Inc. v. FCC, 492 U.S. 115, 131 (1989)."

Even if Florida Statutes § 501.2041 is riddled with imprecision and ambiguity. But this, without more, does not render the statute unconstitutional.

Page 29: The plaintiffs easily meet the other prerequisites to a preliminary injunction. If a preliminary injunction is not issued, the plaintiffs' members will sometimes be compelled to speak and will sometimes be forbidden from speaking, all in violation of their editorial judgment and the First Amendment. This is irreparable injury.

---

[2] 63. In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 with Section 230(c), intending to promote the growth and development of social media platforms, as well as to protect against the transmission of obscene materials over the Internet to children

(Red language means amended)

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB___                                                                          2022

A bill to be entitled

An act relating to social media websites; providing a short title;
providing definitions; providing that the owner or operator of a
social media website is subject to a private right of action by
certain social media website users in this state under certain
conditions; providing for damages; authorizing the award of
reasonable attorney fees and costs; prohibiting a social media
website from using hate speech as a defense; authorizing the Attorney
General to bring an action on behalf of social media website users;
providing exceptions for the deletion or censorship of certain types
of speech; provides for fines by the secretary of state; provides for
severability; providing an effective date.


WHEREAS, the Communications Decency Act was created to
protect decent speech, not deceptive trade practices, and

WHEREAS, repealing section 230 of the Communications
Decency Act at the federal level is unnecessary because it
already includes a state-law exemption and the Stop Social Media
Censorship Act was crafted to fall squarely in the state-law
exemption of section 230 to cure abuses of section 230 to
protect the consumers of this state, and

WHEREAS, contract law is a state-law issue, and when a
citizen of this state signs up to use certain social media
websites, they are entering into a contract, and

WHEREAS, this state has a compelling interest in holding
certain social media websites to higher standards for having
substantially created a digital public square through fraud,
false advertising, and deceptive trade practices, and

WHEREAS, major social media websites have engaged in the greatest bait and switch of all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to then prove otherwise at great expense to consumers and election integrity, and

WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent inducement, and deceptive trade practices are not protected forms of speech for purpose of the first amendment of the United States Constitution or the Constitution of this state, and

WHEREAS, the major social media websites have already reached critical mass, and they did it through fraud, false advertising, and deceptive trade practices at great expense to the health, safety, and welfare of consumers of this state, while making it difficult for others to compete with them, and

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner, NOW THEREFORE,

Be It Enacted by the Legislature of the State of Florida:

Section 1. <u>This act may be cited as the "Stop Social Media Censorship Act."</u>

Section 2.   <u>This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following:</u>

<u>(1)   Deceptive trade practices;</u>

<u>(2)   False advertising;</u>

<u>(3)   Breach of contract;</u>

<u>(4)   Bad faith;</u>

<u>(5)   Unfair dealing;</u>

<u>(6)   Fraudulent inducement; and</u>

<u>(7)   The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.</u>

Section 3.   <u>Social media website speech; cause of action; penalties.—</u>

<u>(1)   As used in this section, the term:</u>

<u>(a)   "Algorithm" means a set of instructions designed to perform a specific task.</u>

<u>(b)   "Hate speech" means a phrase concerning content that an individual finds offensive based on his or her personal moral code.</u>

<u>(c)   "Obscene" means that an average person, applying contemporary community standards, would find that, taken as a whole, the dominant theme of the material appeals to prurient interests.</u>

<u>(d)   "Political speech" means speech relating to the state, government, body politic, or public administration as it relates to governmental policymaking. The term includes speech by the</u>

government or a candidate for office and any discussion of
social issues. The term does not include speech concerning the
administration, law, or civil aspects of government.

(e)   "Religious speech" means a set of unproven answers,
truth claims, faith-based assumptions, and naked assertions that
attempt to explain such greater questions created, what
constitutes right and wrong what happens after death.

(f)   "Social media website":

1. Means an Internet website or application that enables
users to communicate with each other by posting information,
comments, messages, or images and that meets all of the
following requirements:

i.   Is open to the public.

ii.   Has more than 75 million subscribers with personal
user profiles.

iii.   From its inception, has not been specifically
affiliated with any one religion or political party.

iv.   Provides a means for the website's users to report
obscene materials and has in place procedures for evaluating
those reports and removing obscene material; and

v.   Allows for subscribers to sign up for a personal user
profile page or account where beliefs and preferences can be
expressed by the user.

2. The term does not include a website that merely permits
members of the general public to post comments on content
published by the owner of the website.

(g)   "User profile" means a collection of settings and
information associated with a user or subscriber who signs up
for an account made available by a social media website. Such
accounts often include the explicit digital representation of
the identity of the user or subscriber with respect to the
operating environment of a social media website. Such accounts

often associate characteristics with a user or subscriber, which
may help in ascertaining the interactive behavior of the user
along with their personal preferences and beliefs.

(2)(a)   The owner or operator of a social media website who
contracts with a social media website user in this state is
subject to a private right of action by such user if the social
media website purposely:

1.   Deletes or censors the user's religious speech or
political speech; or

2.   Uses an algorithm to disfavor or censure the user's
religious speech or political speech.

(b)   A social media website user may be awarded all of the
following damages under this section:

1.   Up to $75,000 in statutory damages.

2.   Actual damages.

3.  If aggravating factors are present, punitive damages.

4.   Other forms of equitable relief.

(c)   The prevailing party in a cause of action under this
section may be awarded costs and reasonable attorney fees.

(d)   A social media website that restores from deletion or
removes the censoring of a social media website user's speech in
a reasonable amount of time may use that fact to mitigate any
damages.

(3)   A social media website may not use the social media
website user's alleged hate speech as a basis for justification
or defense of the social media website's actions at trial.

(4)   The Attorney General may also bring a civil cause of
action under this section on behalf of a social media website
user who resides in this state and whose religious speech or
political speech has been censored by a social media website.

(5)   This section does not apply to any of the following:

(a)  A social media website that deletes or censors a social media website user's speech or that uses an algorithm to disfavor or censure speech that:

1.  Calls for immediate acts of violence;

2.  Is obscene, lewd, lascivious, filthy or pornographic in nature;

3.  Is the result of operational error;

4.  Is the result of a court order;

5.  Comes from an inauthentic source or involves false personation;

6.  Entices criminal conduct;

7.  Involves minors bullying minors;

8.  Constitutes trademark or copyright infringement;

9.  Is excessively violent; and

10.  Constitutes harassing spam of the commercial, not religious or political, nature.

(b)  A social media website user's censoring of another social media website user's speech.

(6)  Only users who are 18 years of age or older have standing to seek enforcement of this section.

Section 4. The Secretary of State may:

(1)  Issue a fine in one of the following amounts if the Secretary of State finds that the social media website has engaged in deplatforming or shadowbanning a political candidate seeking office in Connecticut in violation of this act:

(a)  If the candidate is seeking Statewide office, up to $100,000 per day of the violation;

(b)  For all other candidates, up to $10,000 per day of the violation; and

(2) Disclose a social media company's algorithmic bias for or against a political candidate seeking Statewide office under subsection (1) of this section as a campaign contribution.

Section 5.  <u>If any section in this act or any part of any</u>
<u>section is declared invalid or unconstitutional, the declaration</u>
<u>shall not affect the validity or constitutionality of the</u>
<u>remaining portions.</u>

Section 6.  This act shall take effect July 1, 2022.

_____

_____

_____

_____

Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 140 of 145

7/19/2021          47 U.S. Code § 230 - Protection for private blocking and screening of offensive material I U.S. Code I US Law I LII / Legal Information Institute

# 47 U.S. Code § 230 - Protection for private blocking and screening of offensive material

U.S. Code     Notes

### (a) FINDINGS

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

### (b) POLICY

⌄

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

### (C) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL

#### (1) TREATMENT OF PUBLISHER OR SPEAKER

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

#### (2) CIVIL LIABILITY

No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 142 of 145

7/19/2021          47 U.S. Code § 230 - Protection for private blocking and screening of offensive material | U.S. Code | US Law | LII / Legal Information Institute

A provider of interactive computer service shall, at the time of entering
an agreement with a customer for the provision of interactive computer
service and in a manner deemed appropriate by the provider, notify such
customer that parental control protections (such as computer hardware,
software, or filtering services) are commercially available that may assist
the customer in limiting access to material that is harmful to minors.
Such notice shall identify, or provide the customer with access to
information identifying, current providers of such protections.

## (e) EFFECT ON OTHER LAWS

### (1) NO EFFECT ON CRIMINAL LAW

Nothing in this section shall be construed to impair the enforcement
of section 223 or 231 of this title, chapter 71 (relating to obscenity)
or 110 (relating to sexual exploitation of children) of title 18, or any
other Federal criminal statute.

### (2) NO EFFECT ON INTELLECTUAL PROPERTY LAW

Nothing in this section shall be construed to limit or expand any law
pertaining to intellectual property.

### (3) STATE LAW

Nothing in this section shall be construed to prevent any State from
enforcing any State law that is consistent with this section. No cause
of action may be brought and no liability may be imposed under any
State or local law that is inconsistent with this section.

### (4) NO EFFECT ON COMMUNICATIONS PRIVACY LAW

Nothing in this section shall be construed to limit the application of
the Electronic Communications Privacy Act of 1986 or any of the
amendments made by such Act, or any similar State law.

### (5) NO EFFECT ON SEX TRAFFICKING LAW

Nothing in this section (other than subsection (c)(2)(A)) shall be
construed to impair or limit—

(A) any claim in a civil action brought under section 1595 of title
18, if the conduct underlying the claim constitutes a violation of

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

## (f) DEFINITIONS

As used in this section:

### (1) INTERNET

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

### (2) INTERACTIVE COMPUTER SERVICE

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

### (3) INFORMATION CONTENT PROVIDER

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

### (4) ACCESS SOFTWARE PROVIDER

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 144 of 145

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

(June 19, 1934, ch. 652, title II, § 230, as added Pub. L. 104–104, title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub. L. 105–277, div. C, title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681–739; Pub. L. 115–164, § 4(a), Apr. 11, 2018, 132 Stat. 1254.)

□ U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

**ACCESSIBILITY**

**ABOUT LII**

$\vee$
~~~~~~ ~~

**TERMS OF USE**

**PRIVACY**